# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | |
|---|---|
| CASA, INC.<br>8151 15th Avenue<br>Hyattsville, MD 20528<br>Prince George's County<br><br>MAKE THE ROAD NEW YORK<br>301 Grove Street<br>Brooklyn, NY 11237<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, Secretary of Homeland<br>Security, in her official capacity<br>2707 Martin Luther King Jr. Ave, SE<br>Washington, D.C. 20528<br><br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY<br>2707 Martin Luther King Jr. Ave, SE<br>Washington, D.C. 20528<br><br>*Defendants*. | **Case No.**: 8:25-cv-00525<br><br><br>Assigned To: Unassigned<br>Assign. Date: |

## I.    NATURE OF ACTION

1.      Plaintiffs challenge U.S. Department of Homeland Security ("DHS") Secretary Noem's unlawful actions to strip approximately 607,000 Venezuelans in the United States of their work permits and immigration status under Temporary Protected Status ("TPS"). TPS is a status established by statute and subject to various statutory protections, including restrictions on the termination of a TPS designation. TPS designations are subject to periodic review by DHS. But once a country is designated under TPS, termination of the designation does not take effect until

the later of the end of that designation period, or a 60-day notice period. The purpose of those restrictions is to provide for the predictability of a fixed period of time and an orderly transition for those who are lawfully present in the United States with TPS. DHS is also statutorily required to consult with other U.S. government agencies before making or amending a TPS determination.

2.      DHS's recent actions ignore the statutory scheme that Congress enacted and instead threaten to force lawfully-admitted and TPS-eligible Venezuelans and their families to return to a country experiencing one of the worst humanitarian disasters in the Western Hemisphere.

3.      In 2021, DHS recognized that extraordinary conditions in Venezuela prevented Venezuelans residing in the United States from safely returning to their home country and allowed eligible Venezuelans to remain in the United States with protected status (the "2021 Designation"). Venezuela's economy had collapsed. The country's healthcare system had failed. Basic services, such as running water and electricity, crumbled. Under Nicolas Maduro's regime, human rights protections deteriorated, leaving citizens vulnerable to the threat of violence from both Maduro's security forces and criminal gangs.

4.      In the past four years, after consultations with the Department of State and other U.S. government agencies, DHS has repeatedly determined that these conditions persisted, that it is not safe for Venezuelan TPS beneficiaries to return to Venezuela, and that their presence in the United States is not contrary to the national interest. DHS issued multiple extensions and even redesignated Venezuela in 2023 following heavy rains, flooding, and deadly landslides (the "2023 Designation"). As recently as January 17, 2025, DHS determined that the situation in Venezuela warranted another extension for TPS holders (the "January 2025 Extension").

5.      Only days after the January 2025 Extension, DHS, under newly confirmed Secretary Kristi Noem, announced the vacatur of the January 2025 Extension on January 28, 2025.

The next day, Secretary Noem went on Fox News to justify the vacatur, stating "the people of this country want these dirtbags out,"[1] echoing the racist, anti-immigrant rhetoric espoused by President Trump during his recent campaign. On February 3, 2025, DHS formally published notice of the vacatur, which contained no analysis of country conditions in Venezuela.

6.      On February 5, 2025, Secretary Noem purported to terminate the 2023 Designation, less than a month after DHS determined that an extension was warranted and that the presence of Venezuelan TPS beneficiaries in the United States was *not* contrary to the national interest.

7.      Secretary Noem's purported vacatur and termination are invalid. DHS lacks authority to "vacate" a prior TPS extension. The TPS statute tightly restricts the procedures and timeframe by which a TPS designation can be terminated, and DHS cannot flagrantly ignore these restrictions.

8.      Moreover, Secretary Noem's decisions were motivated at least in part by racial animus. Secretary Noem made her motivations clear when she called Venezuelan TPS holders "dirtbags" while announcing the vacatur on Fox News. Secretary Noem and President Trump have repeatedly made racist statements to attack nonwhite immigrants, and Venezuelan TPS beneficiaries in particular. The U.S. Constitution forbids the federal government from discriminating against persons because of their race, ethnicity, or national origin. When Executive power is abused in this way, the Constitution authorizes the Judiciary to intervene. Defendants' actions are a thinly-veiled attempt to implement their unconstitutional agenda. Such abuse of authority necessitates judicial intervention.

---

[1] Kristi Noem, *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, FOX News (Feb. 18, 2025), https://www.foxnews.com/video/6367942790112.

9.      For these reasons, Plaintiffs respectfully ask the Court to declare unlawful and set aside DHS's vacatur and termination orders and reinstate the January 2025 Extension until DHS makes a new determination in accordance with the procedures and timeline set forth by statute.

## II.      JURISDICTION AND VENUE

10.      The Court has federal question jurisdiction over claims arising under these statutes pursuant to 28 U.S.C. §§ 1331 and 1343(a).

11.      This action arises under the Fifth Amendment of the United States Constitution, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

12.      Venue is proper in this District under 28 U.S.C. § 1391(e) and in this division because Defendants are officers and employees of the United States or an agency thereof acting in their official capacities; Plaintiff CASA has its principal place of business in this division and District; and a substantial part of the events or omissions giving rise to this action are occurring in this division and District.

## III.      PARTIES

13.      Plaintiff CASA, Inc. ("CASA") is a national nonprofit membership organization headquartered in Prince George's County, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia.  Founded in 1985, CASA has more than 173,000 lifetime members, including thousands of TPS beneficiaries as members and more than 2,000 members overall who have ties to Venezuela.

14.      CASA's mission is to create a more just society by building power and improving the quality of life in working Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities.  In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, Washington,

D.C., Virginia, Pennsylvania, and Georgia, as well as a more limited suite of remote services to members across the United States.

15.    Among the services that CASA provides are free immigration legal consultations for members and full legal representation on TPS applications, as well as other types of affirmative applications to the United States Citizenship and Immigration Services ("USCIS").  CASA has developed specific resources to help Venezuelan members apply for TPS and to educate the community about the designation.  Since its founding, CASA has provided direct assistance on approximately 1,000 TPS applications for its members, including legal services to over 100 Venezuelan members seeking TPS.  Beyond those members, many more CASA members from Venezuela have obtained TPS without being directly represented by CASA, either by submitting applications on their own or with assistance from private counsel or other non-profit organizations.

16.    In addition to the legal services CASA offers members seeking TPS, the organization is also a leader in advocating for TPS nationally.  CASA serves as a founding member of the TPS Funding Collaborative, which has raised more than $3 million to support organizations advocating for TPS.

17.    To become a CASA member, an individual must apply for membership, pay dues (or have the dues requirement waived), and subscribe to the principles of CASA.  A CASA member shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in working-class and immigrant communities.  CASA members play an important role in deciding what campaigns CASA works on and how CASA serves the community.

18.    One of many CASA members affected by the challenged actions is T.G., an individual living in Washington, D.C., who currently has TPS under the 2023 Designation.  T.G.

has five family members who depend on him for support, including a minor daughter with medical issues, as well as two other children, a young grandchild, and his wife. T.G.'s daughter is also a CASA member with a pending TPS application under the 2023 Designation, which has not yet been approved. Losing TPS would place an extreme economic burden on his family and expose him to the risk of being removed to a country where he fears for his safety.

19.     Another affected CASA member is E.B., an individual living in Georgia who was initially granted TPS under the 2021 Designation and currently has TPS under the September 10, 2022 extension of that designation. E.B. works as an insurance agent and is a single mother of a son with a disability, who depends on her for support. Her elderly parents are also living with her, one of whom has a physical disability and both of whom depend on her for support. Losing TPS would expose E.B. to serious emotional pain and increase the risk of her son losing access to the medication and other medical resources he needs.

20.     Another affected CASA member is A.E., an individual living in Maryland who was initially granted TPS under the 2021 Designation and currently has TPS under the September 10, 2022 extension of that designation. A.E. works as a food delivery driver and supports three children, his wife, and another family member. Losing TPS would expose A.E.'s family to severe economic hardship and increase his risk of being removed to a country where he does not feel safe.

21.     Another affected CASA member is R.R., an individual living in Maryland who currently has TPS under the 2023 Designation. R.R. works for a construction company doing electrical work and has a wife and young daughter who depend on him for their income. Losing TPS would expose R.R.'s family to severe economic hardship and increase his risk of being removed to a country where he does not feel safe.

22.     Another affected CASA member is E.R., an individual living in Maryland who currently has TPS under the 2023 Designation.  E.R. works as a dishwasher and cook at a restaurant.  She is the primary breadwinner for her family, including her partner and three adult children.  Her partner is currently very ill and is unable to work.  Losing TPS would expose E.R.'s family to severe economic hardship and place her partner at risk of not being able to access the life-saving medical care he needs.

23.     Another affected CASA member is K.R., an individual who lives in Maryland.  She currently has TPS under the 2023 Designation.  K.R. is a mother and primary income earner to three children, including a minor, and a partner without work authorization.  Losing TPS would expose K.R.'s family to severe economic hardship and place her at risk of being removed to a country where she does not feel safe.

24.     Another affected CASA member is M.B., an individual living in Maryland who was initially granted TPS under the 2021 Designation and currently has TPS under the September 10, 2022 extension of that designation.  He works at a construction company and is married.  M.B. is the sole breadwinner in his family.  Losing TPS would expose M.B.'s family to severe economic hardship and place him at risk of being removed to a country where he does not feel safe.

25.     Plaintiff Make the Road New York ("MRNY") is a nonprofit membership organization incorporated in New York with offices in Bushwick, Brooklyn; Jackson Heights, Queens; Brentwood, Long Island; Port Richmond, Staten Island; and White Plains, Westchester. MRNY was founded in 2007 and is currently the largest participatory immigrant organization in New York, with more than 28,000 members.  Among its membership, more than 20 are Venezuelan TPS beneficiaries or prima-facie eligible applicants for TPS and more than 200 have ties to Venezuela.

26.     MRNY's mission is to build the power of immigrant and working-class communities to achieve dignity and justice.  It provides working class and immigrant New Yorkers with an array of services, including education, health, housing, employment, leadership development, civic engagement, and legal services.  MRNY provides representation in immigration cases as a core component of its work and has represented hundreds of individuals seeking relief through TPS, including over 60 Venezuelans.

27.     MRNY depends on the expertise of its members to shape its vision and mission and remain accountable to the communities it serves.  To become an MRNY member, individuals must apply for membership and generally pay dues.  MRNY members lead organizing committees across MRNY's issue and program areas, take on leadership roles in its campaigns, determine its priorities, and elect the representatives who comprise the majority of the Board of Directors.  MRNY has held legal clinics and presentations specific to Venezuelan TPS holders and developed educational materials on Venezuelan TPS.

28.     One of many affected MRNY members is K.F., a 59-year-old who has TPS under the 2021 Designation and who has lived in New York since 2019.  K.F. was an anesthesiologist in Venezuela with decades of experience in medicine, but after her participation in anti-government protests in 2018 and with growing repression in the country, she felt she had no choice but to leave.  With TPS, she was able to obtain an elder care license and began working as a health aide in New York.  She is hoping to become licensed as a medical assistant.  With her income, she supports her elderly parents in Venezuela.  She is terrified of returning to Venezuela given the persecution directed at activists and professionals perceived as activists, from forced disappearances to prolonged incarceration without food or light.  K.F. has never been in removal proceedings and has no other applications or relief pending.  On January 22, 2025, she applied to renew her TPS.

29.    Another affected MRNY member is J.Z., a 33-year-old who has TPS under the 2023 Designation and who lives in New York.  She and her two minor daughters arrived in the US in July 2023 and received grants of TPS in February 2024, along with J.Z.'s husband and stepdaughter.   After their TPS approval, an immigration judge dismissed their removal proceedings.  The family is scared at the prospect of losing protection from removal and employment authorization if TPS ends.  One of J.Z.'s daughters was sexually abused before fleeing Venezuela and lives in fear of returning.  Since the TPS rescission, J.Z.'s daughters are scared, anxious, and dispirited.  Her husband, who also has TPS, suffered a serious back injury in 2024 and is still receiving treatment and is in need of possible surgery.  Deportation would disrupt that and prevent him from making a full recovery.

30.    Another affected MRNY member is K.P., who has TPS under the 2023 Designation and who has lived in the United States since July 2022.  K.P. and her family fled Venezuela due to the danger they faced as anti-government political activists, but they do not have counsel in their removal proceedings and are fearful of losing their case, being removed to Venezuela, and suffering more persecution.  With TPS, the family feels a greater sense of security.  Many of K.P.'s friends and neighbors are scared to leave their homes due to ICE raids, but with TPS, K.P. feels secure leaving her home to bring her 6-year-old daughter to school.

31.    Another affected MRNY member is C.M., a 63-year-old who has TPS under the 2023 Designation and who has lived in the U.S. since April 2021.  C.M. has had a pending asylum application since October 2021, but even after years of waiting she does not have her next court appearance until the summer of 2026.  She relies on her TPS-based employment authorization and works at an airport.  C.M. was attacked in Venezuela on several occasions for protesting the Chavez and Maduro regimes: she was brutally beaten, threatened with death, and her home raided

and destroyed.  Because of her political opposition to the government there, C.M. is afraid that she will be jailed or even killed if she returns to Venezuela.

32.     Defendant U.S. Department of Homeland Security is a cabinet agency of the United States responsible for administering federal immigration laws and programs, including TPS.

33.     Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity.

## IV.    STATUTORY FRAMEWORK

34.     TPS provides temporary immigration relief to foreign nationals in the United States who cannot safely return to their home nation because of an armed conflict, an environmental disaster, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(a)(1), (b).  Congress created TPS to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil." H.R. Rep. No. 100-627, at 4, rather than rely on ad hoc Presidential action for those purposes.

35.     Under the Immigration and Nationality Act of 1990, 8 U.S.C. §§ 1101 to 1537 ("INA"), the Secretary of Homeland Security[2] may designate a country for protected status if the Secretary, after consultation with appropriate agencies of the Government,

> (A) . . . finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) . . . finds that—
> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a

---

[2] The statute originally provided the Attorney General with this authority.  While the text continues to refer to the Attorney General, in 2003, Congress transferred authority for TPS designation, extension, and termination to the Secretary of the Department of Homeland Security.  6 U.S.C. § 557; 8 U.S.C. § 1103(a); *see* Pub. L. No. 107-296, 116 Stat. 2135 (2002).  Thus, references to the Attorney General in the original provisions of the INA are now deemed to refer to the Secretary of Homeland Security.  *See* 8 U.S.C. § 1103(a).

substantial, but temporary, disruption of living conditions in the area affected,
(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
(iii) the foreign state officially has requested designation under this subparagraph; or

(C) . . . finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).

36.    TPS allows nationals of a designated country (and individuals with no nationality who last habitually resided in the country) who are present in the United States at the time of the designation and meet other stringent eligibility criteria to remain lawfully in the United States for the duration of the designation.  8 U.S.C. § 1254a(a), (c).

37.    To be eligible for protected status, individuals from a designated country must have been present in and resided in the United States continuously since the most recent designation date; meet criteria for admissibility as an immigrant; not have a disqualifying criminal history, where more than one misdemeanor or a single felony is disqualifying; and submit an application, documentation and fees, among other requirements.  8 U.S.C. § 1254a(c)(1); 8 C.F.R. §§ 244.2, 244.4, 244.9.

38.    Congress made clear its intention that TPS beneficiaries could live and work in the United States without fear of deportation.  The TPS statute authorizes TPS beneficiaries to be employed in the United States, prevents DHS from detaining them because of their immigration status, and forbids DHS from removing TPS beneficiaries from the United States.  8 U.S.C. § 1254a(a)(1), (d)(4).

39.     After a country is designated for TPS status, the INA provides a process for periodic review of that status.  At least 60 days before the end of the initial designation period or any extended designation period, the Secretary shall, "after consultation with appropriate agencies of the Government," "review the conditions in the foreign state (or part of such foreign state) for which designation is in effect" and "determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

40.     The INA provides authority for the Secretary to redesignate a country for TPS, "after consultation with appropriate agencies of the Government."  8 U.S.C. § 1254a(b)(1).

41.     The INA also provides a specific process for termination of TPS.  The Secretary may terminate TPS only if, following her periodic review (which is to occur at least 60 days before the end of the TPS designation), she determines the designated country "no longer continues to meet the conditions of designation."   8 U.S.C. § 1254a(b)(3).  The statute provides no other permissible grounds for termination.  *See id.*  The effective date of any TPS termination must be at least 60 days after the termination notice is published and no earlier than "the expiration of the most recent previous extension."  *Id.*  In other words, the Secretary cannot cut a TPS period short. The Secretary, however, can extend the period "to provide for an orderly transition."  8 U.S.C. § 1254a(b)(3), (d)(3).  These provisions reflect an express legislative determination that TPS status, while temporary, should be predictable and not arbitrarily revoked.

42.     If, after the review process, the Secretary does *not* determine that a country's TPS status should terminate, the country's TPS status automatically extends for at least six months or, by the Secretary's discretion, a period of twelve or eighteen months.  8 U.S.C. § 1254a(b)(3)(C).

43.     The INA does not authorize the Secretary to "vacate" a prior TPS determination, and any such procedure would be incompatible with termination procedures specified by statute.

## V.    FACTUAL BACKGROUND

### A.  Initial TPS Designation of Venezuela

44.    Since his election in 2013, Venezuelan President Nicolas Maduro has ruled by decree, extending his time in office by granting himself extraordinary powers and relying on military power to remain in office.[3]  While in power, President Maduro has worked with his inner circle to dismantle Venezuelan democracy.  His regime is renowned for corruption and repression.[4]

45.    In January 2019, Nicolas Maduro again illegally claimed the presidency of Venezuela. Despite global condemnation, including from President Trump in his first administration,[5] Maduro rigged the electoral process, intimidated and disenfranchised voters, and banned the participation of Venezuela's most popular political parties.[6]

46.    In 2020, Venezuela's economy, health system, and basic services collapsed, the country plunged deeper into political crisis, human rights deteriorated, and malnutrition spiked.[7]

47.    On March 9, 2021, then-Secretary of Homeland Security Mayorkas designated Venezuela for TPS on the basis of extraordinary and temporary conditions in Venezuela that prevented nationals of Venezuela from returning safely.[8]  In doing so, DHS cited Venezuela's economic, health, and political crises, lack of access to basic services, human rights abuses, food insecurity, and rising levels of violence and "other factors," to support the 2021 Designation.

---

[3] *Venezuela: Political Crisis and U.S. Policy*, Cong. Rsch. Serv. (Jan. 13, 2025), https://crsreports.congress.gov/product/pdf/IF/IF10230.
[4] *A Democratic Crisis in Venezuela*, U.S. Dep't of State (Jan. 20, 2021), https://2017-2021.state.gov/a-democratic-crisis-in-venezuela.
[5] *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela*, White House (Jan. 23, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela.
[6] *A Democratic Crisis in Venezuela*, U.S. Dep't of State (Jan. 20, 2021), https://2017-2021.state.gov/a-democratic-crisis-in-venezuela.
[7] *See* Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure, 86 Fed. Reg. 13,574 (Mar. 9, 2021).
[8] *See id.*

**B. Unimproved Country Conditions Warrant Extensions and Redesignation of Venezuela's Protected Status**

48.     Since 2021, Secretary Mayorkas twice extended Venezuela's protected status.  For each, Secretary Mayorkas relied on contemporaneous reviews of country conditions prepared by DHS, the Department of State, and other U.S. government agencies.

49.     On September 8, 2022, Secretary Mayorkas extended Venezuela's designation until March 10, 2024.[9]  This notice cited Congressional Research Service reports from April 2021 that Venezuela was "in the throes of a multiyear economic crisis, one of the worst economic crises in the world since World War II."

50.     On October 3, 2023, Secretary Mayorkas extended Venezuela's TPS designation until September 10, 2025.[10]  DHS estimated that 243,000 TPS beneficiaries registered under the 2021 Designation were eligible to re-register for TPS under the extension.

51.     In the same notice, Secretary Mayorkas redesignated Venezuela for TPS for 18 months, through April 2, 2025.  The 2023 Designation allowed more Venezuelan residents to apply for TPS for the first time, provided they had (i) continuously resided in the United States since July 31, 2023, (ii) were continuously physically present in the United States since October 3, 2023, and (iii) met other eligibility criteria.  According to DHS estimates, approximately 472,000 additional individuals were eligible for TPS under the 2023 Designation.  The 2023 Designation was set to expire on April 2, 2025.

52.     Secretary Mayorkas's decision to both extend the 2021 Designation and authorize the 2023 Designation relied on input from the Department of State, other U.S. Government

---

[9] *See* Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55,024 (Sept. 8, 2022).
[10] *See* Extension and Redesignation of Venezuela for Temporary Protected Status, 88 Fed. Reg. 68,184 (Oct. 3, 2023).

agencies, and a DHS review of country conditions in Venezuela, noting that "extraordinary and temporary conditions continue to prevent Venezuelan nationals from returning in safety."[11]  The October 2023 notice determined that the Maduro regime continued to engage in political repression and human rights abuses; crime and insecurity remained high; the health system continued to experience severe problems; and food insecurity impacted 10.9 million Venezuelans.[12]  Despite some economic growth in 2022, 90% of the population continued to live in poverty.[13]  Heavy rains, flooding, and landslides in the spring and summer of 2023 further exacerbated these ongoing country conditions.[14]  These collective conditions led DHS to conclude that Venezuela was "suffering one of the worst humanitarian crises in the history of the Western Hemisphere."

53.     With each extension, Secretary Mayorkas determined that it was not contrary to U.S. national interests to allow Venezuelan TPS beneficiaries to temporarily remain in the United States.

## C. Extension of 2023 Designation Based on Unimproved Country Conditions

54.     On January 10, 2025, Secretary Mayorkas announced the extension of the 2023 Designation for 18 months, through October 2, 2026.[15]  The announcement cited to the "severe humanitarian emergency the country continues to face due to political and economic crises under the inhumane Maduro regime," which "contributed to high levels of crime and violence, impacting access to food, medicine, healthcare, water, electricity, and fuel."[16]

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *DHS to Extend Temporary Protected Status for Venezuela*, U.S. Dep't of Homeland Sec. (Jan. 10, 2025), https://www.dhs.gov/archive/news/2025/01/10/dhs-extend-temporary-protected-status-venezuela.
[16] *Id.*

55.    On January 17, 2025, DHS issued a Federal Register Notice formally publishing the January 2025 Extension.[17]   The re-registration period began that day and would run until September 10, 2025.

56.    Secretary Mayorkas's decision to extend the 2023 Designation occurred approximately 80 days before that designation was set to expire on April 2, 2025; that is, "[a]t least 60 days" before the expiration as directed by the TPS statute.  8 U.S.C. § 1254a(b)(3)(A).

57.    Before issuing the January 2025 Extension, Secretary Mayorkas consulted with the Department of State and other U.S. agencies in determining that the extension was "warranted because extraordinary and temporary conditions supporting Venezuela's TPS designation remain, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily."[18]

58.    The January 2025 Extension also consolidated the applicant filing processes, so that all eligible Venezuelan TPS beneficiaries (from both the 2021 and 2023 Designations) could obtain TPS by the same designation date of October 2, 2026.  This decision was based on USCIS's evaluation that it "can most efficiently process [cases for both designations] by consolidating the filing processes for the two Venezuela TPS populations."  USCIS sought "[t]o decrease confusion among stakeholders" and "ensure optimal operational processes."[19]

59.    The January 2025 Extension concluded that Venezuela continued to experience "a complex, serious and multidimensional humanitarian crisis" with residents "suffer[ing] the second-highest level of hunger in South America."[20]   In addition, the Extension cited the lack of

---

[17] *See* Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5,961 (Jan. 17, 2025).
[18] *Id.*
[19] *Id.*
[20] *Id.*

basic services, the healthcare system's collapse, the prolonged economic meltdown, and that President Maduro's systemic human rights violations continued.[21]

60.     Following the January 2025 Extension, the earliest date that any future termination could take effect is October 2, 2026.[22]

61.     DHS estimated that, as of January 17, 2025, approximately 607,000 Venezuelan TPS beneficiaries were eligible to re-register for TPS under the extension.[23]

### D.  January 2025 Unlawful Revocation of Extension

62.      On January 20, 2025, the same day he was sworn in as President of the United States, President Trump issued an Executive Order titled "Protecting the American People Against Invasion,"[24] a title reflecting language Trump used during his campaign to describe migrants from Venezuela.[25]   In the order, President Trump directed the Secretary of Homeland Security to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including "ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. § 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."[26]

---

[21] *Id.*

[22] *Id.*; 8 U.S.C. § 1254a(b)(3)(b) (termination may be effective no earlier than 60 days after publication in the Federal Register or, "if later, the expiration of the most recent previous extension").

[23] *See* Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5,961 (Jan. 17, 2025).

[24] *Protecting the American People Against Invasion Executive Order*, White House (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/; *see also* Exec. Order No. 14159, 90 Fed. Reg. 8,443 (Jan. 29, 2025).

[25] *See* Ariana Baio, *Trump Says His Mass Deportation Will Begin in Ohio Town Where He Falsely Claimed Haitians Were Eating Pets*, Independent (Sept. 13, 2024), https://www.the-independent.com/news/world/americas/us-politics/trump-mass-deportations-springfield-ohio-b2612623.html.

[26] Exec. Order No. 14159, 90 Fed. Reg. at 8,446 (Jan. 29, 2025).

63.     On January 25, 2025, Secretary Noem was sworn in as DHS Secretary.

64.     On January 28, 2025, Secretary Noem purported to vacate the January 2025 Extension for Venezuela.

65.     On February 3, 2025, Secretary Noem formally published the "Vacatur of 2025 Temporary Protected Status Decision for Venezuela" (the "Vacatur").[27]  The Vacatur announced that DHS "has decided to vacate the January 10, 2025, decision of former Secretary of Homeland Security Alejandro Mayorkas regarding TPS for Venezuela," effective immediately.[28]  No precedent exists for the vacatur of a TPS extension in TPS's 35-year history.  The Vacatur neither referred to any statutory authority permitting the Secretary to vacate a previously-issued TPS decision, nor did Secretary Noem find dispute Secretary Mayorkas's determination that conditions in Venezuela continued to meet the conditions for TPS designation.

66.     Indeed, the Vacatur reflected no consideration of country conditions whatsoever. Instead, the Vacatur objected to the registration requirements established by Secretary Mayorkas, stating that the January 2025 Extension took a "novel approach" in combining the 2021 and 2023 Venezuela designations.   The Vacatur concluded that "vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance."

67.     Rather than terminate the Venezuela TPS designation, the Vacatur would apparently have returned to the status quo ante the January 2025 Extension, in which the 2021 and 2023 Designations would remain in effect, and Secretary Noem would decide whether to extend the designations by February 1, 2025 and July 12, 2025, respectively.  But in an interview with

---

[27] Dep't of Homeland Security, CIS No. 2803-25, *Vacatur of 2025 Temporary Protected Status Decision for Venezuela*, https://www.uscis.gov/sites/default/files/document/notices/Venezuela-Vacatur-FR-SIGNED.pdf.

Fox News the day after announcing the Vacatur, Secretary Noem made clear that her purpose in vacating the prior decision was not to clear up confusion or engage in a deliberate process. Those published rationales were pretexts. Rather, by echoing President Trump's false claim that Venezuelan immigrants to the United States are criminals, Secretary Noem made clear that her purpose was to remove hundreds of thousands of legal TPS beneficiaries from the country immediately and arbitrarily. As she explained, "[t]hey were going to be able to stay here and violate our laws for another 18 months, and we stopped that."[29] She later reiterated, "the people of this country want these dirtbags out. They want their communities to be safe. . . So, this is part of our plan to make sure that we're protecting America, keeping it safe again, just like President Trump promised."[30]

### E. February 2025 Unlawful Termination of the 2023 Venezuela Redesignation

68.     On February 5, 2025, Secretary Noem issued a "Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status" (the "Termination").[31] The Termination announced that Secretary Noem "is terminating the 2023 TPS designation of Venezuela," effective April 7, 2025.[32]

69.     According to the Termination, DHS purports to have consulted with the Department of State and determined that, although "certain conditions for the 2023 TPS designation of Venezuela may continue," "there are notable improvements in several areas such as the economy, public health, and crime . . ."[33]

---

[29] Kristi Noem, DHS *Sec. Noem announces end to temporary protected status for Venezuelan migrants*, FOX News (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112.

[30] *Id*.

[31] CIS No. 2804-25, *Termination of the Oct. 3, 2023 Designation of Venezuela for Temporary Protected Status,* Dep't of Homeland Sec. (Feb. 5, 2025), https://public-inspection.federalregister.gov/2025-02294.pdf; *see also* 90 Fed. Reg. 9,040 (Feb. 5, 2025).

[32] The termination does not apply to the 2021 Venezuela designation, set to expire on September 10, 2025. *See* 90 Fed. Reg. at 9,041.

[33] *Id.* at 9,042.

70.     This determination comes less than a month after DHS, with input from the Department of State and other U.S. government agencies, stated in its January 2025 Extension that any economic improvements in 2024 were "insufficient"; that public health has "worsened" following the collapse of Venezuela's healthcare system; and that Venezuelans continue to "face physical insecurity and violence."[34]

71.     The Termination further states that, "even assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States,"[35] in stark contrast to DHS's conclusion less than a month prior that the January 2025 Extension was *not* contrary to the national interest.[36]

72.     The Termination states that it will take effect April 7, 2025, or 60 days after the publication of the Termination Notice.[37]  But under the January 2025 Extension, and pursuant to the procedures outlined in the TPS statute, the earliest the termination could take effect would be October 2, 2026.[38]  Thus, through the Vacatur and Termination, Secretary Noem sought to evade the requirements for termination of TPS set forth in the INA.

73.     DHS issued the Termination just two days after publishing the Vacatur and less than two weeks after Secretary Noem took office.  Still, the Termination purports to have followed "consultation with the appropriate U.S. Government agencies," a review of "country conditions," and a "consider[ation of] whether permitting Venezuelan nationals covered by the 2023

---

[34] Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5,961, 5,965-66 (Jan. 17, 2025).
[35] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. at 9,042.
[36] Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. at 5,966.
[37] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. at 9,044.
[38] Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. at 5,966; 8 U.S.C. § 1254a(b)(3)(A).

designation is contrary to the national interest."[39]  Those things obviously could not have actually happened in the relevant time, or at least, not in any substantively meaningful sense that would comply with the statutory scheme that Congress devised.

74.    Moreover, the reasons Secretary Noem gave as to why extending the 2023 Designation would be contrary to the national interest do not support her conclusion.  The Termination avers that extending the 2023 Designation conflicts with the national interest because (1) Venezuelan migrants include members of the gang known as Tren de Aragua, (2) various immigration programs have allowed "millions" of individuals to enter the United States, (3) TPS could create a "magnet effect" and draw further immigration from Venezuela, and (4) U.S. interests are best served by "curtailing policies that facilitate or encourage illegal and destabilizing migration."[40]  None of these purported reasons support Secretary Noem's conclusion.

75.    *First*, the 2023 Designation has not and will not allow members of the gang Tren de Aragua to enter or reside in the United States.  Individuals seeking TPS must pass a background check.  And a person is not eligible for TPS if, among other things, they have been convicted of more than a single misdemeanor, have been involved in drug trafficking, could be reasonably regarded as "a danger to the security of the United States," or are involved in a "terrorist organization." 8 U.S.C. § 1254a(c)(2); 8 USCS §§ 1182(a)(2)(A)-(C), (3)(B).  The Secretary may also withdraw TPS from any individual if they later determine that the person was not eligible.  8 U.S.C. § 1254a(c)(3).  Individuals who pose a threat to the United States—such as known members of gangs or drug trafficking groups—are, therefore, categorically ineligible for TPS.

76.    *Second*, the 2023 Designation has not and will not allow "millions" of

---

[39] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. at 9,041.
[40] *Id*. at 9,043.

undocumented immigrants to enter and remain in the United States.  According to DHS's own estimations, approximately 348,202 Venezuelans have received TPS under the 2023 designation and an additional roughly 123,800 may be eligible to apply.[41]  This number will not grow; to be eligible for TPS under the 2023 Designation, Venezuelan nationals must have continuously resided in the United States since July 31, 2023.[42]  Moreover, a significant portion of Venezuelan TPS applicants have other bases for legal presence in the United States.  Among Venezuelans who applied for TPS in 2023, roughly 45% had already applied for or received asylum.[43]

77.     *Third*, extending the 2023 Designation will not create a "pull factor" or drive further immigration.  Secretary Noem cites a single blog post to support for this contention.  In contrast, multiple studies have concluded that TPS designation and redesignation have not created "any significant magnet effect."[44]  This makes sense: Venezuelan immigrants who arrive after July 31, 2023, are not eligible for TPS, removing any incentive for future migration.

78.     *Fourth*, allowing beneficiaries of the 2023 Designation to lawfully remain in the United States will not undermine American interests.  TPS holders work, pay taxes, and contribute to the American economy.  Venezuelans who are eligible for TPS contribute an estimated $11.5

---

[41] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. at 9,043 (estimating that 472,000 Venezuelans may be eligible for TPS under the 2023 Venezuela Designation and, as of the publication of the Notice, approximately 348,202 had registered).

[42] Extension and Redesignation of Venezuela for Temporary Protected Stats, 88 Fed. Reg. 68,130, 68,132 (Oct. 3, 2023); *see also* 8 U.S.C. § 1254a(c)(1)(ii); https://www.federalregister.gov/documents/2023/10/03/2023-21865/extension-and-redesignation-of-venezuela-for-temporary-protected-status; *see also* 8 U.S.C. § 1254a(c)(1)(ii).

[43] *See Temporary Protected Status: Calendar Year 2023 Annual Report* at Table 2 & Appendix A, Dep't of Homeland Sec. (Mar. 15, 2025),
https://www.uscis.gov/sites/default/files/document/reports/TPS_CY23_Congressional_Report.pdf.

[44] Andrew I. Schoenholtz, *The Promise and Challenge of Humanitarian Protection in the United States: Making Temporary Protected Status Work as a Safe Haven*, 15 Nw. J. of L. & Soc. Pol'y 1, 15, 19, 22 (2019); David A. Leblang, et al., *Temporary Protected Status and Immigration to the United States* 3, 23 (June 30, 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3206009; Tom K. Wong, et al., *There is No Evidence That TPS Designations Increase Irregular Migration to the United States*, Ctr. for Am. Progress (Feb. 17, 2021), https://www.americanprogress.org/article/no-evidence-tps-designations-increase-irregular-migration-united-states/.

billion to the U.S. economy each year.[45]  In 2021, TPS holders from all TPS countries paid an estimated $1.3 billion in federal taxes and $966.5 million in state and local taxes.[46]  TPS holders are ineligible for most forms of public benefits and, thus, do not strain American social safety nets. 8 U.S.C. § 1254a(f)(2); 8 U.S.C. §§ 1611, 1641(b).  Extending TPS for Venezuela also keeps American families intact; an estimated 54,000 U.S. citizen children live with TPS-eligible individuals from Venezuela.[47]  Extending the 2023 Designation will not facilitate "illegal and destabilizing migration."  TPS holders are not unlawfully present in the United States, and Secretary Noem has not explained why TPS holders would destabilize American society.

79.    *Finally*, the Termination conflates Venezuelans who came to the United States lawfully through humanitarian parole with undocumented immigrants.  The Termination cites President Trump's statement, referring to Processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV") and other policies, that the prior administration "oversaw an unprecedented flood of illegal immigration."[48]  Venezuelans who availed themselves of CHNV's legal pathway are not part of a "flood of illegal immigration."  Nor are they "illegal aliens."

80.    The text of the Vacatur and Termination and Secretary Noem's statements make clear that the decision to end TPS correlates to President Trump and Secretary Noem's animus towards Venezuelans and other non-European immigrants.  The Termination explicitly cites President Trump's false claims that Venezuelans who have lawfully come to the United States are

---

[45] *Temporary Protected Status protects families while also boosting the U.S. Economy*, FWD.us 2 (Feb. 2024), https://www.fwd.us/wp-content/uploads/2024/02/FWD_TPSIIIReport.pdf.
[46] *The Contributions of Temporary Protected Status Holders to the U.S. Economy*, Am. Immigr. Council 3 (Sept. 2023), https://www.americanimmigrationcouncil.org/sites/default/files/research/contributionstemporaryprotectedstatus_0923.pdf.
[47] *Temporary Protected Status protects families while also boosting the U.S. Economy*, FWD.us 2 (Feb. 2024), https://www.fwd.us/wp-content/uploads/2024/02/FWD_TPSIIIReport.pdf.
[48] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. at 9,043.

"illegal aliens" as justification for the termination.  Secretary Noem's use of the term "dirtbags" when explaining the Vacatur further demonstrates that the Vacatur and Termination are the result of animus, and that any supposed national interest justifications are pretextual.

81.    Further, the Termination cites to President Trump's Executive Order No. 14159, which reiterates the President's false claims that "bad" migrants from non-European countries are invading the United States, demonstrating that it was implemented to further President Trump's animus-informed immigration priorities.

82.    DHS's reliance on purported national interest concerns that are unsupported by evidence and unconnected to the 2023 Designation reflect that the decision to terminate TPS was not motivated by an objective assessment of country conditions and U.S. national interest.  Instead, it was driven by bias against immigrants from non-European countries.

83.    The Vacatur and Termination decisions have no relationship to Secretary Noem's stated justifications.  These decisions are only explicable on the basis of animus.

**F.  DHS Bypassed the Standard TPS Review Process to Terminate TPS for Venezuela**

84.    In reaching her Vacatur and Termination decisions, Secretary Noem bypassed the standard process for conducting TPS reviews.

85.    TPS review typically begins with career specialists preparing an objective country conditions report, a process spanning months.  This report then informs the USCIS Director's decision memos to the DHS Secretary and, ultimately, the Federal Register notices announcing DHS's decision.  Moreover, the TPS statute requires that DHS consult with "appropriate agencies,"[49] and DHS has typically consulted with State Department officials during its review.

86.    In stark contrast to the standard months-long process described above, Secretary

---

[49] 8 U.S.C. § 1254a(b)(3)(A).

Noem decided to vacate the January 2025 Extension and terminate the 2023 Venezuela Designation within days of taking office. Secretary Noem vacated the January 2025 Extension just three days after her confirmation as DHS Secretary and published the Vacatur in the Federal Register nine days after her confirmation. Just two days after publishing the Vacatur and less than two weeks after her confirmation, Secretary Noem terminated the 2023 Designation.

87. Clearly, Secretary Noem could not have engaged in the typical review process within this timeframe, and any consultation with the State Department or other government agencies was at best cursory.

**G. President Trump's Animus Against Venezuelans and Other Non-European Migrants**

88. Then-candidate, now-President Donald Trump has repeatedly made false statements that put his animus against Venezuelans on full display. In an April 2024 speech in Wisconsin, he falsely claimed "[c]rime is down in Venezuela by 67 percent because they're taking their gangs and the criminals and depositing them very nicely into the United States."[50]

89. At the Republican National Convention on July 19, 2024, President Trump again claimed that the Venezuelan government had purged criminals from its country and sent them to the United States.[51]

90. These statements are unsupported by any evidence that the Venezuelan government was systematically or selectively releasing prisoners and sending them to the United States.[52]

---

[50] Austin Sarat, *Trump's Adin Ross Interview Played Into Democrats' Efforts to Paint Him as Weird*, The Hill (Aug. 9, 2024), https://thehill.com/opinion/4819898-trump-venezuela-crime-claims.

[51] Jorge Valencia, *Trump Says Venezuela Sends Criminals to the U.S. Here's What to Know*, The N.Y. Times (July 31, 2024), https://www.nytimes.com/2024/07/31/world/americas/trump-crime-venezuela-us.html.

[52] *See, e.g.,* Austin Sarat, *Trump's Adin Ross Interview Played Into Democrats' Efforts to Paint Him as Weird*, The Hill (Aug. 9, 2024), https://thehill.com/opinion/4819898-trump-venezuela-crime-claims; Anezka Pichrtova, *Donald Trump Says Extremely Violent Venezuelan Capital is 'Very Safe,'* Newsweek (Aug. 6, 2024), https://www.newsweek.com/trump-venezuela-caracas-comments-adin-ross-interview-1935034; Maria Ramirez Uribe, *Donald Trump Exaggerates Venezuelan Crime Drop and Misleads on Root Causes*, Politifact (April 10, 2024), https://www.politifact.com/factchecks/2024/apr/10/donald-trump/donald-trump-exaggerates-venezuelan-crime-drop-and.

91.     He again repeated this claim during a debate with Vice President Kamala Harris on September 10, 2024, falsely stating that a Venezuelan criminal gang, Tren de Aragua, had taken over Aurora Colorado.  "You look at Aurora in Colorado," Trump said, "They are taking over the towns. They're taking over buildings. They're going in violently."[53]  The Aurora Chief of Police, the Mayor of Aurora, and the Governor of Colorado all refuted President Trump's claim.[54] At the time, Aurora's crime rate was on the decline.

92.     President Trump doubled down on these statements during later campaign events. In September 2024, he stated, "They emptied their jails in Venezuela, emptied their criminals, emptied their nests. They call them nests of bad people. They're all now in the United States and they're taking over cities. It's like an invasion from within."[55]

93.     During an October 2024 rally in Pennsylvania, President Trump again falsely claimed, "Do you see what they're doing in Colorado? They're taking over . . . They're taking over real estate. They become real estate developers from Venezuela. They have equipment that our military doesn't have."[56]

94.     President Trump's campaign also issued a news release falsely describing Aurora as a "'war zone' due to the influx of violent Venezuelan prison gang members," and stating that Venezuelan immigrants are "bringing chaos and fear with them."[57]

---

[53] Justin Tasolides, *Trump to Rally in Aurora, Colorado, After False Claims of Takeover by Venezuelan Gang*, NY1 (Oct. 11, 2024), https://ny1.com/nyc/all-boroughs/news/2024/10/10/trump-colorado-rally-venezuela-gang-false-claims.

[55] Ariana Baio, *Trump Says His Mass Deportation Will Begin in Ohio Town Where He Falsely Claimed Haitians Were Eating Pets*, Independent (Sept. 13, 2024), https://www.the-independent.com/news/world/americas/us-politics/trump-mass-deportations-springfield-ohio-b2612623.html.
[56] Justin Tasolides, *Trump to Rally in Aurora, Colorado, After False Claims of Takeover by Venezuelan Gang*, NY1 (Oct. 11, 2024), https://ny1.com/nyc/all-boroughs/news/2024/10/10/trump-colorado-rally-venezuela-gang-false-claims.
[57] Angers Hagstrom, *Trump announces rally in 'war zone' Colorado city*, Fox News (Oct. 8, 2024), https://www.foxnews.com/politics/trump-announces-rally-war-zone-colorado-city?msockid=3273a06b44af6d 23351db49b45e06cde; Irie Sentner, *Trump calls Aurora a 'war zone.' Even its Republican mayor disagrees.*,

95.     These statements were all untrue.[58]

96.     According to news reports, President Trump referred to Venezuelan migrants as "criminals" over seventy times on the 2024 campaign trail—singling out Venezuelans for this false accusation far more than migrants from any other country.[59]

97.     On January 20, 2025, at a post-inauguration rally, newly sworn in President Trump renewed his false claims that crime in Venezuela was down because "they took their criminals and gave them to us," and that migrants from mental institutions and prisons were coming into the country.[60]  President Trump made similar statements two days later during a televised Fox News interview;[61] at a political rally on January 25;[62] at a House Republican Issues conference on January 27;[63] at a bill signing on January 29;[64] and at a speech addressing GOP Senators on February 7.[65]

98.     More broadly, President Trump has also repeatedly displayed animus against immigrants of color, in particular those from Latin American and African countries.

Politico (Oct. 11, 2024), https://www.politico.com/news/2024/10/11/trump-aurora-colorado-immigration-gangs-00183533.

[58] Nicole Acevedo, *What led to rumors Trump shared about Venezuelan gangs taking over a Colorado Building*, NBC News. (Sept. 11, 2024), https://www.nbcnews.com/news/latino/trump-debate-venezuelan-gangs-colorado-rcna170255.

[59] Russell Contreras, Delano Massey, & Erin Davis, *Trump keeps calling Venezuelan and Congolese migrants criminals*, Axios (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

[60] *Speech: Donald Trump Holds a Post-Inaugural Rally at Capitol One Arena – January 20, 2025*, Roll Call (Jan. 20, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-inauguration-executive-orders-capitol-one-arena-january-20-2025/#18.

[61] *Interview: Sean Hannity Interviews Donald Trump in the Oval Office on Fox News – January 22, 2025*, Roll Call (Jan. 22, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-interview-sean-hannity-fox-news-january-22-2025/#15.

[62] *Speech: Donald Trump Holds a Political Rally in Las Vegas – January 25, 2025*, Roll Call (Jan. 25, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-las-vegas-january-25-2025/#79.

[63] *Speech: Donald Trump Addresses the House GOP Issues Conference in Miami – January 27, 2025*, Roll Call (Jan. 27, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-house-gop-conference-miami-january-27-2025/#59.

[64] *Remarks: Donald Trump Signs the Laken Riley Bill Into Law – January 29, 2025*, Roll Call (Jan. 29, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-laken-riley-bill-signing-january-29-2025/#22.

[65] *Speech: Donald Trump Addresses GOP Senators at Dinner at Mar-a-Lago – February 7, 2025*, Roll Call (Feb. 7, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-gop-senators-mar-a-lago-february-7-2025.

99.     News reports indicate that, in addition to Venezuelan migrants, President Trump has over and over singled out migrants from El Salvador, Honduras, Mexico, Guatemala, and "Congo" as "criminals."[66]

100.    In a March 2024 interview with Right Side Broadcasting Network, President Trump displayed his anti-immigrant animus, comparing migrants to Hannibal Lecter, stating "they're rough people, in many cases from jails, prisons, from mental institutions, insane asylums.  You know, insane asylums, that's 'Silence of the Lambs' stuff . . . We don't want 'em in this country."[67]

101.    During a June 2024 rally, Trump repeated a common campaign talking point that "very bad people" from "Congo and Africa," "from Asia," "from the Middle East," and "from South America" have entered the United States "so illegally."[68]

102.    Since taking office, during a speech addressed to Republican Senators, President Trump stated that there were "[m]any, many thousands and thousands of murderers" let into the country "from all over the world.  He went on to falsely allege that "some of these countries allowed [in] every single prisoner . . . . [T]hese are countries also from Africa, from Asia, not just South America, a lot from South America, but not even the most."[69]

103.    In fact, an analysis of President Trump's public comments shows that he has focused his racial animus towards non-European immigrants from across the world, but with particular ire directed towards Venezuelan immigrants.[70]

---

[66] Russell Contreras, Delano Massey, & Erin Davis, *Trump keeps calling Venezuelan and Congolese migrants criminals*, Axios (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.
[67] Megan Lebowitz & Jake Traylor, *Trump compares migrants to Hannibal Lecter in 'The Silence of the Lambs'*, NBC News (Mar. 4, 2024), https://www.nbcnews.com/politics/donald-trump/trump-compares-migrants-hannibal-lecter-silence-lambs-rcna141792.
[68] *Speech: Donald Trump Holds Political Rally in Racine, Wisconsin – June 18, 2024*, Roll Call, June 18, 2024, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-racine-wisconsin-june-18-2024/.
[69] *Speech: Donald Trump Addresses GOP Senators at Dinner at Mar-a-Lago – February 7, 2025*, Roll Call (Feb. 7, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-gop-senators-mar-a-lago-february-7-2025.
[70] *See* Russell Contreras, Delano Massey, & Erin Davis, *Trump keeps calling Venezuelan and Congolese migrants criminals*, Axios (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

104.    Research from across the political spectrum flatly contradicts President Trump's association of migrants, whether documented or undocumented, with criminal activity.  According to a 2024 study commissioned by the U.S. Department of Justice's National Institute of Justice and based on Texas criminal records, "undocumented immigrants are arrested at less than half the rate of native-born U.S. citizens for violent and drug crimes and a quarter of the rate of native citizens for property crimes."[71]  The Cato Institute, a libertarian think tank, came to a similar conclusion, noting in a 2020 policy paper that, "[t]he illegal immigrant criminal conviction rate was 45 percent below that of native-born Americans in Texas.  The legal immigrant criminal conviction rate was 62 percent below that of native-born Americans."[72]

105.    News sources have also repeatedly debunked the claim that any country is "emptying" prisons and mental health institutions to send people to the United States.[73]

106.    President Trump's inflammatory rhetoric has stretched beyond his comments about "criminals."  President Trump has repeatedly stated that migrants are "poisoning the blood of our

---

[71] *Undocumented Immigrant Offending Rate Lower Than U.S.-Born Citizen Rate,* National Institute of Justice (Sept. 12, 2024), https://docs.house.gov/meetings/JU/JU01/20250122/117827/HHRG-119-JU01-20250122-SD004.pdf.
[72] Alex Nowrasteh, Andrew C. Forrester, & Michelangelo Landgrave, *Illegal Immigration and Crime in Texas*, Cato Institute (Oct. 13, 2020), https://www.cato.org/sites/cato.org/files/2020-10/working-paper-60.pdf.  A March 2024 research paper from Stanford University reached an even broader conclusion: "As a group, immigrants have had lower incarceration rates than the US-born for 150 years.  Moreover, relative to the US-born, immigrants' incarceration rates have declined since 1960: immigrants today are 60% less likely to be incarcerated (30% relative to US-born whites.  Ran Abramitzky et al., *Law-Abiding Immigrants: The Incarceration Gap Between Immigrants and the US-born, 1870–2020*, NBER Working Paper No. 31440 (July 2023, Revised March 2024), https://www.nber.org/system/files/working_papers/w31440/w31440.pdf.
[73] Angelo Fichera, *Fact Checking Trump's Recent Immigration Claims,* N.Y. Times (Dec. 24, 2023), https://www.nytimes.com/2023/12/24/us/politics/trump-immigration-fact-check.html; Lori Robertson, et al., *FackChecking Trump's Rally, Fox Interview*, FactCheck.org (Mar. 30, 2023), https://web.archive.org/web/20250126012001/https://www.factcheck.org/2023/03/factchecking-trumps-rally-fox-interview/; Daniel Dale, *Fact check: Trump's Own Campaign Can't Find Proof for His 'Mental Institutions' Immigration Story*, CNN (Apr. 29, 2023), https://www.cnn.com/2023/04/29/politics/fact-check-trump-mental-institutions-migrants-doctor/index.html; *Fact-checking Over 12,000 of Donald Trump's Statements About Immigration,* The Marshall Project (Oct. 21, 2024), https://www.themarshallproject.org/2024/10/21/fact-check-12000-trump-statements-immigrants/emptying_prisons_jails_mental_institutions#emptying_prisons _jails_mental_institutions.

country," echoing the racist, Nazi-era rhetoric of Adolf Hitler.[74]  He first used this term in an

October 2023 interview, falsely stating:

> Nobody has any idea where these people are coming from, and we
> know they come from prisons. We know they come from mental
> institutions and insane asylums. We know they're terrorists. Nobody
> has ever seen anything like we're witnessing right now. It is a very
> sad thing for our country. It's poisoning the blood of our country.
> It's so bad, and people are coming in with disease. People are
> coming in with every possible thing that you could have.[75]

107.    In the months that followed, Trump doubled down on this rhetoric, drawing

condemnation from Republican lawmakers.[76]  In a December 2023 rally in New Hampshire,

President Trump stated "[t]hey're poisoning the blood of our country . . . . [N]ot just in South

America, not just [the] three or four countries that we think about, but all over the world.  They're

coming into our country from Africa, from Asia, all over the world."[77]

108.    In March 2024, on multiple occasions, Trump went even further, stating that

migrants from Latin America were inhuman.  In an interview, he stated: "I don't know if you call

them 'people,' in some cases. They're not people, in my opinion."[78]  Later at a campaign rally,

Trump reiterated his association of immigrants with crime and disease: "You ever see the parks of

our cities? They're migrant camps, and I'll not let them turn the USA into a crime-filled, disease-

[74] Russell Contreras, *Axios Explains: The Racist History of Trump's "Poisoning the Blood,"* Axios (Dec. 30, 2023), https://www.axios.com/2023/12/30/trump-poisoning-the-blood-racism.
[75] Trip Gabriel, *Trump Escalates Anti-Immigrant Rhetoric With 'Poisoning Blood' Comment*, N.Y. Times (Oct. 5, 2023), https://www.nytimes.com/2023/10/05/us/politics/trump-immigration-rhetoric.html ("In 'Mein Kampf,' . . . there are several passages in which Hitler used the words 'poison' and 'blood' in attacking people he deemed a threat to the purity of the Aryan race.").
[76] Megan Lebowitz, *Trump Sparks Republican Backlash After Saying Immigrants Are 'Poisoning the Blood' of the U.S.*, NBC News (Dec. 19, 2023), https://www.nbcnews.com/politics/donald-trump/trump-sparks-republican-backlash-saying-immigrants-are-poisoning-blood-rcna130493.
[77] Ginger Gibson, *Trump Says Immigrants Are 'Poisoning the Blood of Our Country.' Biden Campaign Likens Comments to Hitler.*, NBC News (Dec. 17, 2023), https://www.nbcnews.com/politics/2024-election/trump-says-immigrants-are-poisoning-blood-country-biden-campaign-liken-rcna130141.
[78] Maggie Astor, *Trump Doubles Down on Migrants 'Poisoning' the Country*, N.Y. Times (Mar. 17, 2024), https://www.nytimes.com/2024/03/17/us/politics/trump-fox-interview-migrants.html.

ridden dumping ground, which is what they're doing."[79]  In another interview, President Trump further dehumanized migrants and said their languages "are, like, from, from the planet Mars."[80]

109.    In April 2024, Trump continued to broadcast his dehumanizing views regarding migrants.  He noted, "The Democrats say, 'Please don't call them animals. They're humans.' I said, 'No, they're not humans, they're not humans, they're animals.' Nancy Pelosi told me that. She said, 'Please don't use the word animals when you're talking about these people.' I said, 'I'll use the word animal because that's what they are.'"[81]

110.    During the September 2024 presidential debate, President Trump repeatedly used language seeking to dehumanize migrants, for example by falsely claiming that Haitian TPS holders were "eating the dogs" and "eating the cats" in Springfield, Ohio.[82]  One month before the presidential election, in October 2024, President Trump suggested that migrants who commit crimes do so because "it's in their genes," and further asserted, "and we got a lot of bad genes in our country right now."[83]

111.    This is in sharp juxtaposition to a statement Trump made that same month lamenting the dearth of migrants from "nice countries" like Denmark, Switzerland, and Norway.[84]

112.    In stark contrast to his general anti-immigrant stance, on February 7, 2025,

---

[79] *Trump Speaks on Border Security, Immigration and Law Enforcement in Greensboro*, WFMY News 2 (Mar. 2, 2024), https://www.youtube.com/watch?v=jk4Qp4LcDR8.

[80] Megan Lebowitz & Jake Traylor; *Trump Compares Migrants to Hannibal Lecter in 'The Silence of the Lambs,'* NBC News (Mar. 4, 2024), https://www.nbcnews.com/politics/donald-trump/trump-compares-migrants-hannibal-lecter-silence-lambs-rcna141792.

[81] *Trump on Migrant Criminals: "They're Not Humans. They're Animals . . . That's What They Are,"* The National Desk (Apr. 3, 2024), https://www.youtube.com/watch?v=1jyDbqa-nHc.

[82] *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383.

[83] Patrick Svitek, *Trump Suggests 'Bad Genes' to Blame for Undocumented Immigrants Who Commit Murders*, Wash. Post (Oct. 7, 2024), https://www.washingtonpost.com/politics/2024/10/07/trump-undocumented-immigrants-bad-genes.

[84] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries*, N.Y. Times, (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.

President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which in part directs the Secretary of State and the Secretary of Homeland Security to "take appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."[85]   Afrikaners are descendants of primarily Dutch, but also French and German colonial settlers who arrived in South Africa over 300 years ago, who President Trump claims are being targeted by a South African land expropriation law.[86]   In defending his position, President Trump stated that Afrikaners were "victims of unjust racial discrimination" due to the alleged land confiscation.[87]

113.   The Executive Order does not even mention South Africa's notorious history of institutionalized racism under an apartheid regime that survived into the 1990s.[88]   In directing Secretary Noem to prioritize admission and resettlement of white South Africans, while simultaneously issuing an Executive Order intending to limit the scope of Temporary Protected Status,[89] President Trump clearly displays his racial animus towards migrants of color.

---

[85] *Addressing Egregious Actions of the Republic of South Africa*, White House (Feb. 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/addressing-egregious-actions-of-the-republic-of-south-africa; *see also* Exec. Order No. 14,159, 90 Fed. Reg. 9,497 (Feb. 7, 2025).

[86] Gerald Imray, *Trump Says Some White South Africans Are Oppressed and Could Be Resettled in the U.S. They Say No Thanks*, AP News (Feb. 8, 2025), https://apnews.com/article/trump-south-africa-afrikaners-0120efec17122b47e3371e0e39fe1db8.

[87] Nellie Payton, *Trump's Accusations Against South Africa Spark 'White Privilege' Self-Mockery*, Reuters (Feb. 11, 2025), https://www.reuters.com/world/trumps-accusations-against-south-africa-spark-white-privilege-self-mockery-2025-02-11.

[88] *Addressing Egregious Actions of the Republic of South Africa*, White House (Feb. 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/addressing-egregious-actions-of-the-republic-of-south-africa/; *see also* Exec. Order No. 14,159, 90 Fed. Reg. 9,497 (Feb. 7, 2025).

[89] *Protecting the American People Against Invasion*, White House (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion; *see also* Exec. Order No. 14, 159, 90 Fed. Reg. 8443 (Jan. 29, 2025).

## H. Secretary Noem's Animus Against Venezuelans and Other Non-European Migrants

114.    Secretary Noem has similarly displayed her anti-immigrant animus on numerous occasions, repeatedly referring to them as "dirtbags."[90]

115.    Secretary Noem's history of derogatory remarks towards Venezuelan migrants predated her term as Secretary.  Before her nomination to DHS, she stated, "Venezuela didn't send us their best. They emptied their prisons and sent criminals to America.  Deportations need to start on DAY ONE of [President Trump's] term" in office.[91]  In a CBS News Interview on March 5, 2024, Secretary Noem made similar remarks, claiming, "We've seen these countries that hate us empty out their prisons, their mental institutions."[92]

116.    In her farewell address as Governor in January 2025, Secretary Noem falsely conflated immigration with criminal activity, stating, "The situation at our Southern Border is nothing short of an invasion . . . [T]he cartels and their affiliates have invaded our poorest communities . . . Increased crime. Increased drugs. Increased overdose deaths, violence, rape, human trafficking and murder. . . . This invasion is an existential threat to America."[93]

---

[90] @Sec_Noem, X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, CBS Mornings, Jan. 29, 2025, https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem on New York City raids reported that nearly half of those arrested had no criminal history. *Id.*

[91] @KristiNoem, *X* (Feb. 26, 2024, 2:19 PM), https://x.com/KristiNoem/status/1762195636491825295 ("Nations like Venezuela are emptying their prisons of dangerous criminals to send them to America."); @KristiNoem, *X* (Feb. 27, 2024, 8:26 PM), https://x.com/KristiNoem/status/1762650522920652828 (Venezuela . . . emptied their prisons and sent criminals to America."); @KristiNoem, *Instagram*, Mar. 6, 2024, https://www.instagram.com/kristinoem/reel/C4ML17eRBYr/ ("Countries like Venezuela are emptying their prisons, their mental institutions, and sending them to America."); @KristiNoem, *X* (Mar. 14, 2024, 12:24 PM), https://x.com/KristiNoem/status/1768312288560247199 ("Remember, Venezuela emptied their prisons and told them to come to America."); @KristiNoem, *Instagram* (Dec. 9, 2024), https://www.instagram.com/kristinoem/reel/DDVjJnURRqw ("[N]ations like Venezuela are using our open border to solve their own crime and mental health crises.").

[92] *South Dakota Gov. Kristi Noem calls on Nikki Haley to exit 2024 race*, CBS News (Mar. 4, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race.

[93] *Transcript: State of the State doubles as farewell address for Gov. Kristi Noem*, The Dakota Scout (Jan. 14, 2025), https://www.thedakotascout.com/p/transcript-state-of-the-state-doubles.

117.    At her confirmation hearing, Secretary Noem falsely conflated Venezuelan TPS holders with criminals, stating, "[T]his extension [of TPS] of over 600,000 Venezuelans . . . is alarming when you look at what we've seen in different states including Colorado with gangs doing damage and harming the individuals and the people that live there."[94]

118.    In a February 2025 interview, Secretary Noem described the TPS program as being "abused," stating that "folks from Venezuela that have come into this country are members of TDA," referring to the criminal gang, Tren de Aragua.[95]   She alleged that the administration was evaluating all of its programs, including TPS, to ensure "they're not to the benefit of criminals."[96] She echoed President Trump's racist rhetoric towards Venezuelan migrants by falsely claiming that Venezuela "emptied out their mental health facilities and sent them to the United States of America."[97]

### I.    Impact of the Vacatur and Termination on Plaintiffs and Communities

119.    CASA members who received TPS through the 2023 Venezuela redesignation face irreparable harm if it is terminated and they (and other TPS holders) are deported.  If TPS is terminated, CASA members may lose their jobs, businesses, and homes.  They may be separated from their families and deported to a country facing collapse and dictatorship.  They may also lose access to critical medical care and basic services, and face political repression and abuse.

120.    The harm inflicted by the termination of the 2023 Designation is also vividly illustrated through the experiences of MRNY members.  Consider J.Z., a 33-year old Venezuelan TPS recipient, whose family faces not only the loss of protection from removal but also disruption

---

[94] *Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-gov-kristi-noem-testifies-at-confirmation-hearing/654484.
[95] *Transcript: Meet the Press – February 2, 2025*, NBC News (Feb. 2, 2025), https://www.nbcnews.com/meet-the-press/meet-press-february-2-2025-n1311457.
[96] *Id.*
[97] *Id.*

of critical medical care for her husband.  Her daughters, already trauma survivors, now experience renewed anxiety and fear at school.  Similarly, K.P. who fled political persecution in Venezuela, relied on TPS to provide the security needed to perform critical parental duties like taking her 6-year old daughter to school—a simple act that many of her undocumented neighbors avoid out of fear of ICE raids.  C.M., who survived brutal beatings and death threats in Venezuela for opposing the Maduro regime, now faces the prospect of returning to a country where she fears imprisonment or death.  The termination of the 2023 Designation threatens to unravel these individuals' hard-won stability, potentially forcing them to choose between remaining in the U.S. without status or returning to face the very dangers that prompted their flight and, until Secretary Noem's termination announcement, served as the basis for Venezuela's TPS designation.

121.    Finally, DHS's actions in initially vacating its January 2025 Extension of TPS have also harmed 2021 TPS renewal applicants.  For individuals like K.F., an MRNY member and 2021 TPS recipient, the vacatur's consequences are twofold: (1) it nullifies the consolidated application process that DHS established on January 17, 2025, all after having invested time and resources to apply; and (2) most troubling, it leaves K.F.'s application hanging in bureaucratic purgatory.  Not only has her investment in the application process been rendered futile, but her pending application now exists in a procedural void.

## VI. CAUSES OF ACTION

### Count I
### Agency Action Contrary to Law (Vacatur)

122.    Plaintiffs re-allege and incorporate by reference all of the allegations above.

123.    The Court is authorized to hold unlawful and set aside agency action found to be "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law."  5 U.S.C. § 706(2).

124.    Defendants' Vacatur of the January 2025 Extension constitutes "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

125.    The January 2025 Extension was duly issued in accordance with applicable law.

126.    Neither the INA nor any other statute authorizes the Secretary to vacate a previously-issued TPS determination.

127.    Plaintiffs are accordingly entitled, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201 to a declaration that the Secretary's purported vacatur of the January 2025 Extension is unlawful and to have that purported vacatur set aside and declared inoperative.

### Count II
### Agency Action Contrary to Law (Termination)

129.    Plaintiffs re-allege and incorporate by reference all of the allegations above.

130.    The Court is authorized to hold unlawful and set aside agency action found to be "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law."  5 U.S.C. § 706(2).

131.    Defendants' Termination of the 2023 Designation constitutes "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

132.    The 2023 Designation was duly issued in accordance with applicable law.

133.    Pursuant to the INA, termination of a TPS determination must be based on findings that "a foreign state no longer continues to meet the conditions for designation."  8 U.S.C. § 1254a(b)(3)(B).  The Secretary's Termination of the 2023 Designation contains no such finding, but instead is based on a determination that continuing TPS "is contrary to the national interest."

134.    Pursuant to the INA, termination of a TPS determination cannot become effective until the earlier of 60 days following the date the notice of termination is published, or "if later" "the expiration of the most recent previous extension."  8 U.S.C. § 1254a(b)(3)(B).  The most

recent previous extension expires on October 2, 2026.  The Secretary's Termination of the 2023 Designation is therefore unlawful to the extent it purports to terminate TPS status for Venezuela prior to that date.

135.    Plaintiffs are accordingly entitled, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201 to a declaration that the Secretary's Termination of the 2023 Designation is unlawful and to have that purported termination set aside and declared inoperative.

## Count III
## Further Violation of the Administrative Procedure Act (Vacatur)

136.    Plaintiffs re-allege and incorporate by reference all of the allegations above.

137.    Defendants' Vacatur of the January 2025 Extension constitutes "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

138.    In addition to the grounds outlined in Count I, Defendants' Vacatur of the January 2025 Extension should be declared unlawful and void under the Administrative Procedures Act because, among other reasons,

a.    The Secretary's purported vacatur did not follow a periodic review of the conditions for designation and contained no determination that the conditions for designation were no longer met, as required for a designation to be terminated under the INA;

b.    The Vacatur improperly assumed that prior TPS designations or extensions could be revoked solely due to policy disagreements with prior administrations;

c.    DHS failed to engage in any meaningful process prior to issuing the Vacatur, undermining the TPS statute's purpose and deviating from past DHS practice;

d.    The circumstances and timeframe of the Vacatur reflect that the decision was pretextual; and

e.    Defendants vacated the January 2025 Extension based on discriminatory motives rather than the factors specified by the INA.

139.    Plaintiffs will suffer irreparable injury from the unlawful Vacatur, as alleged above.

## Count IV
## Further Violation of the Administrative Procedure Act (Termination)

140.    Plaintiffs re-allege and incorporate by reference all of the allegations above.

141.    Defendants' Termination of the 2023 Designation constitutes "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

142.    In addition to the grounds outlined in Count II, Defendants' Termination of the 2023 Designation should be declared unlawful and void under the Administrative Procedures Act because, among other reasons:

    f.    The Termination was not issued in compliance with the consultation and other requirements provided for in the INA;

    g.    DHS's review and consultation process leading up to the Termination decision deviated significantly from past DHS practice, and DHS provided no explanation for this deviation;

    h.    DHS failed to engage in any meaningful process prior to issuing the Termination, in breach of the TPS statute and deviating from past DHS practice;

    i.    The circumstances and timeframe of the Termination reflect that it was pretextual; and

    j.    Defendants' Termination of the 2023 Designation is based on discriminatory motives rather than the factors specified by the INA.

143.    Plaintiffs will suffer irreparable injury from the unlawful Termination.

### Count V
### Violation of Fifth Amendment Equal Protection

144.    Plaintiffs re-allege and incorporate by reference all of the allegations above.

145.    The Equal Protection Clause as incorporated by the Fifth Amendment prohibits the federal government from taking action for which discriminatory intent or purpose is a motivating factor.  *E.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977); *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

146.    Defendants' Vacatur of the January 2025 Extension and Termination of the 2023 Designation was motivated by the Administration's discriminatory intent to remove Venezuelans

with protected status because of their race, ethnicity, and national origin. The discriminatory intent is evidenced by, *inter alia*, Secretary Noem's contemporaneous reference to Venezuelans in the United States as "dirtbags"; in addition to the President's remarks that Venezuela "emptied their jails" and that Venezuelans are "all now in the United States and they're taking over cities" in "an invasion from within"; his false claims that Venezuelan gangs are "taking over" Aurora, Colorado; his repeated references to Venezuelan migrants as "criminals"; and his consistent rhetoric labeling immigrants of color as "criminals," "animals," and dirty or diseased.

147.    The Vacatur of the January 2025 Extension and the Termination of the 2023 Designation therefore violate the Fifth Amendment's guarantee of equal protection.

## Count VI
## Violation of Fifth Amendment Substantive Due Process

148.    Plaintiffs re-allege and incorporate by reference all of the allegations above.

149.    At the "core" of the Fifth Amendment's Due Process guarantee is "protection against arbitrary action." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). Substantive due process protects against egregious federal action that "shocks the conscience" and "offend[s] the community's sense of fair play and decency," *Rochin v. California*, 342 U.S. 165, 172-73 (1952), and "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," *Cnty. of Sacramento*, 523 U.S. at 849 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

150.    Defendants' abuse of authority under the INA to advance the Administration's discriminatory objective of removing Venezuelans with protected status because of their race, ethnicity, and national origin both shocks the conscience and offends fundamental notions of fair play and decency.

151.    The vacatur of the January 2025 Extension and the termination of the 2023 Designation therefore violate Fifth Amendment substantive due process principles.

### VII.    PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court:

a.  Declare unlawful and set aside the February 3, 2025 Vacatur of the January 17, 2025 Extension;

b.  Declare unlawful and set aside the February 5, 2025 Termination of the 2023 TPS Designation for Venezuela;

c.  Declare that the 2023 TPS Designation for Venezuela remains in effect until October 2, 2026;

d.  Enter such orders as are necessary to give effect to the foregoing declarations of law;

e.  Grant an award of attorneys' fees and costs; and

f.  Grant any other and further relief that this Court may deem fit and proper.

Dated: February 20, 2025                    Respectfully submitted,

                                           CLEARY GOTTLIEB STEEN & HAMILTON LLP

                                           By:  /s/ Nowell D. Bamberger
                                                Nowell D. Bamberger (21111)
                                                Matthew D. Slater (05582)
                                                Rathna Ramamurthi(*phv forthcoming*)
                                                Madeline Hundley (*phv forthcoming*)
                                                Gillian Isabelle (*phv forthcoming*)
                                                Ava Kazerouni (*phv forthcoming*)
                                                2112 Pennsylvania Ave NW
                                                Washington, D.C. 20037
                                                Tel. (202) 974-1500
                                                Fax (202) 974-1999
                                                nbamberger@cgsh.com
                                                mslater@cgsh.com

                                           WASHINGTON LAWYERS' COMMITTEE FOR CIVIL
                                           RIGHTS AND URBAN AFFAIRS
                                                Ryan Downer (*phv forthcoming*)
                                                Sarah L. Bessell
                                                Madeleine Gates (*seeking admission to
                                                D.Md.*)
                                                Ellie M. Driscoll (*phv forthcoming*)
                                                700 14th St. #400
                                                Washington, D.C. 20005
                                                Tel. (202) 319-1000
                                                Fax (202) 319-1010
                                                ryan_downer@washlaw.org
                                                sarah_bessell@washlaw.org
                                                madeleine_gates@washlaw.org
                                                ellie_driscoll@washlaw.org

                                           CASA, INC.
                                                Nicholas Katz, Esq. (21920)
                                                8151 15th Avenue
                                                Hyattsville, MD 20783
                                                Tel. 240-491-5743
                                                nkatz@wearecasa.org

                                           MAKE THE ROAD NEW YORK
                                                Harold A. Solis (*phv forthcoming*)
                                                Paige Austin (*phv forthcoming*)
                                                301 Grove Street
                                                Brooklyn, NY 11237
                                                Tel. (718) 418-7690

41

*Attorneys for Plaintiffs*