# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## SOUTHERN DIVISION

|  |  |
|---|---|
| CASA, INC. and MAKE THE ROAD NEW YORK<br><br>     *Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY<br><br>     *Defendants*. | Case No. 8:25-cv-00525-GLR<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................................. 4

I.    UNDER THE INA, TPS IS ESTABLISHED FOR SPECIFIED PERIODS, SUBJECT TO EXTENSION BUT NOT EARLY TERMINATION. ..........................................................4

II.   THE SECRETARY OF DHS HAS REPEATEDLY DESIGNATED AND RE-DESIGNATED VENEZUELA FOR TPS. ..............................................................5

III.  THE MOST RECENT EXTENSION OF TPS RUNS THROUGH OCTOBER 2, 2026. ....................................................................................................5

IV.   SECRETARY NOEM'S PURPORTED VACATUR AND TERMINATION WOULD END TPS PRIOR TO "THE EXPIRATION OF THE MOST RECENT PREVIOUS EXTENSION." ....................................................................................6

V.    PLAINTIFFS' MEMBERS ARE ADVERSELY AFFECTED BY THE SECRETARY'S UNLAWFUL ACTION. ..................................................................7

LEGAL STANDARD............................................................................................... 8

ARGUMENT ........................................................................................................... 9

I.    SECRETARY NOEM'S UNLAWFUL ACTIONS ARE REVIEWABLE UNDER THE ADMINISTRATIVE PROCEDURE ACT............................................................9

II.   PLAINTIFFS HAVE STANDING TO CHALLENGE DHS ACTION ON TPS..............14

      A.   The Plaintiffs' Members Have Standing To Sue In Their Own Right. .......................15

           1. Plaintiffs Have Suffered An Injury-In-Fact. ...........................................15

           2. There Is A Causal Nexus Between The Injury Suffered By Plaintiffs And Defendants' Actions... .............................................17

           3.Plaintiffs Injuries Are Redressable By Declaratory Relief.. .....................................17

      B.   The Interests The Organizations Seek To Protect Are Germane To Plaintiffs' Purpose. ....................................................................................18

      C.   Neither The Claim Nor The Relief Sought Require The Participation Of The Individual Members. ......................................................................18

III.    THE FACTS CONCERNING THE CHALLENGED ACTIONS ARE UNDISPUTED. .................................................................................................................19

IV.    THE SECRETARY'S PURPORTED VACATUR OF THE JANUARY 2025 EXTENSION WAS CONTRARY TO LAW. ......................................................19

    A.    The 2025 Extension Was Duly Issued in Accordance With Applicable Law. ............20

    B.    The TPS Statute Does Not Authorize Secretary Noem To "Vacate" A Prior Determination or Extension, Only To Terminate It....................................................21

    C.    Secretary Noem Has No Inherent Power To Vacate A Prior TPS Determination And Must Instead Proceed Through The Statutory Termination Scheme..........................23

    D.    Secretary Noem's Purported Vacatur Conflicts With The Procedure For Termination Specified By The INA. ..............................................................................................25

V.    THE SECRETARY'S EARLY TERMINATION OF THE 2023 DESIGNATION IS CONTRARY TO LAW .........................................................................................26

CONCLUSION..................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Am. Methyl Corp. v. EPA*,
749 F.2d. 826 (D.C. Cir. 1984) ........................................................23

*Am. Trucking Ass'ns v. Frisco Transp. Co.*,
358 U.S. 133 (1958) ........................................................24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................8

*Baber v. Hosp. Corp. of Am.*,
977 F.2d 872 (4th Cir. 1992) ........................................................8

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................9

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) ........................................................13

*Boyd v. Cinmar of Gloucester, Inc.*,
919 F. Supp. 208 (E.D. Va. 1996) ........................................................9

*CASA de Maryland, Inc. v. Trump*,
355 F. Supp.3d 307 (D. Md. 2018) ........................................................12, 14

*CASA de Maryland, Inc. v. Trump*,
971 F.3d 220 (4th Cir. 2020) ........................................................17

*Casa de Maryland v. Wolf*,
486 F. Supp. 3d 928 (D. Md. 2020) ........................................................16, 18

*CASA, Inc. v. Trump*,
8:25-cv-00201-DLB (4th Cir. February 28, 2025), ECF No. 29 ........................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................8

*Centennial Life Ins. Co. v. Poston*,
88 F.3d 255 (4th Cir. 1996) ........................................................10

*China Unicom (Ams) Operations Ltd. v. FCC,*
    124 F.4th 1128 (9th Cir. 2024) ..........................................................................24

*City of Columbus v. Cochran,*
    523 F. Supp. 3d 731 (D. Md. 2021) ....................................................................10

*Civil Aeronautics Bd. v. Delta Airlines Inc.,*
    367 U.S. 316 (1961)..............................................................................................24

*Cuozzo Speed Tech. v. Commerce for Intell. Prop.,*
    579 U.S. 261 (2016)......................................................................................11, 13

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ................................................................................................13

*FCC v. NextWave Pers. Commc'ns Inc.,*
    537 U.S. 293 (2003) ......................................................................................10, 19

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000).............................................................................................25

*Friends of Cap. Crescent Trail v. U.S. Army Corps of Eng'rs,*
    453 F. Supp. 3d 804 (D. Md. 2020) ......................................................................8

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,*
    629 F.3d 387 (2011).............................................................................................14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
    528 U.S. 167 (2000).............................................................................................14

*Genesis Healthcare, Inc. v. Becerra,*
    39 F.4th 253 (4th Cir. 2022) ...............................................................................10

*Gorbach v. Reno,*
    219 F.3d 1087 (9th Cir. 2000) (en banc) .............................................................23

*INS v. St. Cyr,*
    533 U.S. 289 (2001).............................................................................................13

*Johnson v. Robison,*
    415 U.S. 361 (1974).............................................................................................13

*Lee v. USCIS,*
    592 F.3d 612 (4th Cir. 2010) ...............................................................................14

*Loper Bright Enters. v. Raimondo,*
 603 U.S. 369 (2024)..................................................................................24

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992)..................................................................................16

*Maryland v. Pruitt,*
 320 F. Supp. 3d 722 (D. Md. 2018) ....................................................15, 18

*Matini v. Reliance Standard Life Ins. Co.,*
 2005 WL 2739030 (E.D. Va. Oct. 24, 2005) ...........................................9

*McNary v. Haitian Refugee Ctr.,*
 498 U.S. 479 (1991)..............................................................................11–13

*Nat. Res. Def. Council v. Regan,*
 67 F.4th 397 (D.C. Cir. 2023) ..................................................................23

*Orquera v. Ashcroft,*
 357 F.3d 413 (4th Cir. 2003) ....................................................................13

*Pettengill v. United States,*
 867 F. Supp. 380 (E.D.Va.1994) ..............................................................9

*Reno v. Catholic Soc. Servs., Inc.,*
 509 U.S. 43 (1993)................................................................................12–13

*Rivanna Trawlers Unlimited v. Trawlers, Inc.,*
 840 F.2d 236 (4th Cir. 1988) ......................................................................8

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. Openband at Broadlands, LLC,*
 713 F.3d 175 (4th Cir. 2013) .........................................................14–15, 18

*S.C. State Conf. of NAACP v. S.C. Dep't of Juvenile Just.,*
 2024 WL 5153170 (D.S.C. 2024)..............................................................15

*Sierra Club v. U.S. Army Corps. Of Eng'rs,*
 909 F.3d 635 (4th Cir. 2018) ........................................................10, 19, 26

*U.S. v. Clarke,*
 628 F. Supp. 2d 1 (D.D.C. 2009) ..............................................................23

*United States v. Seatrain Lines, Inc.,*
 329 U.S. 424 (1947)...................................................................................23

*Virginia Hospital & Healthcare Ass'n v. Roberts*,
    671 F. Supp. 3d 633 (E.D. Va. 2023) ........................................17, 20, 26

**Federal Statutes**

5 U.S.C. § 701(a) ........................................................................11

5 U.S.C. § 706 ...............................................................9, 10, 19–20

6 U.S.C. § 557 ...........................................................................11

8 U.S.C. § 1103(a) ...................................................................11, 24

8 U.S.C. § 1252(a)(2)(B) ...............................................................14

8 U.S.C. § 1254a ...................................................................... *passim*

28 U.S.C. § 2201 .....................................................................10, 28

44 U.S.C. § 1507 ......................................................................8, 19

Pub. L. No. 107-296, 116 Stat. 2135 (2002) ...............................11

**Other Authorities**

8 C.F.R. § 244.2(f)(1) ....................................................................5

8 C.F.R.§ 244.17(a) .......................................................................5

62 Fed. Reg. 16608 .......................................................................21

64 Fed. Reg. 61123 .......................................................................21

66 Fed. Reg. 18111 .......................................................................21

76 Fed. Reg. 29000 .......................................................................21

78 Fed. Reg. 1872 ........................................................................21

79 Fed. Reg. 52027 .......................................................................21

86 Fed. Reg. 13574 ........................................................................5

87 Fed. Reg. 55024 ........................................................................5

88 Fed. Reg. 5022 ........................................................................21

88 Fed. Reg. 68130 ............................................................................................................5, 6

90 Fed. Reg. 5961 ..................................................................................................... *passim*

90 Fed. Reg. 8805 ..................................................................................................... *passim*

90 Fed. Reg. 9040 ..................................................................................................... *passim*

Fed. R. Civ. P. 56 ..............................................................................................................9

H.R. Rep. No. 100-627, 100th Cong., 2d Sess. (1988)........................................................21, 25

## INTRODUCTION

This case challenges two actions by Department of Homeland Security ("DHS") Secretary Kristi Noem, the object and purported effect of which is to prematurely terminate Temporary Protected Status ("TPS") for individuals from Venezuela. Specifically:

- On January 28, 2025, Secretary Noem announced that she would "vacate" the January 17, 2025 decision by DHS regarding TPS for Venezuela. The January 17 decision (the "January 2025 Extension") extended for 18 months – through October 2, 2026 – a 2023 TPS designation for Venezuela and allowed beneficiaries of a 2021 designation for Venezuela to re-register under the extension. Secretary Noem's vacatur (the "Vacatur") was published in the Federal Register on February 3, 2025. Through this Vacatur, Secretary Noem sought to rewind the TPS Venezuelan program to its pre-January 2025 Extension state.

- On February 5, 2025, Secretary Noem issued a purported termination of the 2023 TPS designation for Venezuela (the "Termination"), which was published in the Federal Register the same day.

Secretary Noem's actions violate the Immigration and Nationality Act of 1990 ("INA") and are therefore unlawful. Together, they purport to strip hundreds of thousands of Venezuelans of the right to live and work in the United States. Those individuals reasonably relied on their right to lawfully remain in the United States, a right which was conferred on them pursuant to law for a specified period of time. Secretary Noem's unlawful actions would, among other impacts, directly end TPS for approximately 348,202 Venezuelan beneficiaries[1] on April 7, 2025 – 18 months before the earliest end date permitted by law. Moreover, these actions threaten legal TPS beneficiaries with being summarily returned to a country that the United States has recognized – over successive administrations, including the first Trump Administration – as being unsafe and lacking in critical resources.

This motion presents a straightforward legal issue: does DHS have the power to simply erase a TPS extension? By law, Congress has conferred on the DHS Secretary, after consulting

---

[1] Bamberger Decl., Ex. F, 90 Fed. Reg. 9040, 9041.

with relevant U.S. government agencies and making specific statutory findings about country conditions, the ability to grant TPS to foreign nationals from a given country who are in the United States.  8 U.S.C. § 1254a(a)(1), (b)(1).  The statute directs the DHS Secretary to review each TPS designation on a periodic basis to determine whether the conditions for such designation remain and thus whether to continue the designation.  *Id.* § 1254a(b)(3)(A).  While the DHS Secretary as part of such periodic review has the ability to terminate TPS for a country based on changed country conditions, the timeline for doing so is prescribed by law:  termination cannot take effect until the later of (a) 60 days, or (b) "*the expiration* of the most recent previous extension."  *Id.* § 1254a(b)(3)(A)–(B) (emphasis added).  The law does not permit the Secretary to cut short a prior TPS extension.  *See id.*  The structure and decision-making of TPS designations, and the ability of individuals and families to rely on protected status for specified periods of time, reflects a deliberate policy choice by Congress.

Secretary Noem's purported Vacatur of the January 2025 Extension, and early Termination of the 2023 TPS designation, are facially contrary to law.  Because TPS for Venezuela had already lawfully been extended until October 2, 2026, in accordance with the statute, any purported "vacatur" and subsequent termination cannot *as a matter of law* take effect any sooner than that date.  If the Secretary could terminate TPS by simply "vacating" a prior designation or extension, then the specific termination procedures (and associated timing provisions) prescribed by law would be meaningless.  Secretary Noem's actions may have sought to implement the policy choices of the new administration, but Congress has established when and how those choices may be made.  While Congress has given the DHS Secretary some degree of flexibility with respect to TPS designations, it also delineated with precision the sequence for ending such designations.  In

so doing, Congress specifically chose not to afford the DHS Secretary the ability to vacate a TPS designation or extension prior to its expiration.

The Court therefore need not address Secretary Noem's policy choices to grant this motion. The Administrative Procedure Act provides for judicial review and set aside of agency action contrary to law. Here, Secretary Noem's purported Vacatur and subsequent Termination of TPS run directly counter to the termination procedures prescribed in 8 U.S.C. § 1254a(b)(3). There is no other legal authority that would justify her actions. Accordingly, summary judgment on Counts I and II of the Complaint is appropriate.

Secretary Noem's actions are independently unlawful for a variety of other reasons, including that they are not supported by the required consultation with relevant government agencies and they were plainly motivated by unmistakable and well-documented racial animus in violation of the Fifth Amendment to the Constitution. While Plaintiffs will further develop these arguments at the appropriate stage if necessary, because the DHS Secretary's actions are on their face contrary to law, it is unnecessary to reach these issues to grant Plaintiffs summary judgment now.[2]

The Court should therefore declare inoperative DHS's Vacatur and subsequent Termination before they take effect on April 7, 2025, and declare instead that TPS for Venezuela remains in effect through October 2, 2026, to preserve the rights of the approximately 607,000 TPS holders who would otherwise suffer irreparable harm.[3]

---

[2] Plaintiffs reserve all rights with regards to their challenges to the Vacatur and Termination outlined in Counts III through VI of their complaint.
[3] Bamberger Decl., Ex. D, 90 Fed. Reg. 5961, 5966.

## STATEMENT OF UNDISPUTED FACTS

I.    **UNDER THE INA, TPS IS ESTABLISHED FOR SPECIFIED PERIODS, SUBJECT TO EXTENSION BUT NOT EARLY TERMINATION.**

Congress created TPS to provide temporary immigration relief to foreign nationals in the United States who cannot safely return to their home countries due to armed conflict, environmental disaster, or other extraordinary and temporary conditions. Under the INA, the DHS Secretary may designate a country for protected status for renewable periods of up to eighteen months. 8 U.S.C. § 1254a(b)(2)(B), (3)(C). After a country is designated for TPS, the INA specifies a process for periodic review, requiring DHS to review designations at least 60 days before the end of each designation period and permitting DHS to extend the status so long as the conditions for designation continue to be met. 8 U.S.C. § 1254a(b)(3)(A). Designations remain operative unless terminated in accordance with this review procedure. *Id.* § 1254a(b); *see id*. § 1254a(b)(3)(C) (if the Secretary does *not* determine that country conditions no longer justify TPS, the designation is extended for at least 6 months). The effective date of any TPS termination must be at least 60 days after the termination notice is published and *no earlier* than "the expiration of the most previous extension." *Id.* § 1254a(b)(3)(B). In other words, the DHS Secretary cannot cut a TPS period short. The termination procedure is the only one authorized by the statute. The INA does not authorize the DHS Secretary to "vacate" a prior TPS determination.

Nationals of designated countries are eligible for lawful status and work authorization, provided they prove, among other eligibility criteria, their presence in the United States as of the designation's effective date, establish continuous residence from a date set by the DHS Secretary, and pass a criminal background check, with more than a single misdemeanor disqualifying their ability to secure status. *Id*. §§ 1254a(c)(1)(A), (2)(B). Applicants must register "during the initial

4

registration period," 8 C.F.R. § 244.2(f)(1), and periodically thereafter "in accordance with USCIS instructions."  8 C.F.R.§ 244.17(a); *see also* 8 U.S.C. § 1254a(c)(1)(A)(iv).

## II.    THE SECRETARY OF DHS HAS REPEATEDLY DESIGNATED AND RE-DESIGNATED VENEZUELA FOR TPS.

Then-Secretary of DHS Alejandro Mayorkas first designated Venezuela for TPS in March 2021 (the "2021 Designation"), enabling Venezuelans already residing in the United States as of that date to apply on the basis of the extraordinary and temporary conditions in Venezuela. Declaration of Nowell Bamberger ("Bamberger Decl."), Ex. A, 86 Fed. Reg. 13574.  In September 2022, Venezuela's designation was extended through March 10, 2024.  Bamberger Decl., Ex. B, 87 Fed. Reg. 55024.  In October 2023, Secretary Mayorkas extended Venezuela's TPS designation until September 10, 2025.  Bamberger Decl., Ex. C, 88 Fed. Reg. 68130.

In the same October 2023 notice, Secretary Mayorkas also redesignated Venezuela for TPS for 18 months, through April 2, 2025 (the "2023 Designation").  *Id*.  The redesignation allowed more Venezuelans to apply for TPS for the first time, provided they had continuously resided in the U.S. since July 31, 2023 and were continuously physically present in the United States since October 3, 2023.  Bamberger Decl., Ex. C at 68131.  The October 2023 decision thus created two different tracks for Venezuelan TPS holders: (1) those who initially registered under the 2021 Designation, who could re-register under the October 2023 extension to receive TPS protections through September 2025; and (2) those who initially registered under the 2023 Designation, who would receive TPS protections through April 2025.  *Id.* at 68130.

## III.    THE MOST RECENT EXTENSION OF TPS RUNS THROUGH OCTOBER 2, 2026.

On January 10, 2025–three weeks before the statutory deadline to re-evaluate the 2023 re-designation–Secretary Mayorkas announced that the re-designation would be extended for 18 months, through October 2, 2026.  On January 17, 2025, DHS issued a Federal Register Notice

formally publishing the extension and consolidating the applicant filing processes for Venezuelan

TPS holders so that all eligible Venezuelan TPS beneficiaries (from both the 2021 and 2023

Designations) could obtain TPS by the same designation date of October 2, 2026. Bamberger

Decl., Ex. D, 90 Fed. Reg. 5961, 5962. In practical effect, this extended TPS for the beneficiaries

of the 2021 Designation from September 2025 and of the 2023 Designation from April 2025

through October 2, 2026. Further, this reflected that both categories of beneficiaries met the 2023

Designation's core criteria to be continuous residents in the United States since July 2023. *See*

Bamberger Decl., Ex. C at 68130. This decision was based on USCIS' evaluation that it could

most efficiently process cases for both designations by consolidating the filing processes. *Id.* at

5963.

## IV.  SECRETARY NOEM'S PURPORTED VACATUR AND TERMINATION WOULD END TPS PRIOR TO "THE EXPIRATION OF THE MOST RECENT PREVIOUS EXTENSION."

On January 28, 2025, three days after being sworn in as DHS Secretary, Secretary Noem

announced her intention to "vacate" the January 2025 Extension due to concerns about the

"consolidation of filing processes." *See* U.S. Citizenship & Immigr. Servs., Temporary Protected

Status Designated Country: Venezuela, https://www.uscis.gov/humanitarian/temporary-protected-

status/temporary-protected-status-designated-country-venezuela (last visited Mar. 2, 2025) ("On

Jan. 28, 2025, Secretary of Homeland Security Kristi Noem vacated the Jan. 17, 2025, notice that

extended a Temporary Protected Status (TPS) designation for Venezuela."); Bamberger Decl., Ex.

E, 90 Fed. Reg. 8805, 8807. Notice of this action was published shortly thereafter in the Federal

Register on February 3, 2025. *See* Bamberger Decl., Ex. E. Secretary Noem claimed her action

was a permissible exercise of "inherent authority under the INA to reconsider any TPS-related

determination, and upon reconsideration, to vacate or amend [the January 2025] determination" to

extend the designation. *Id*. There is neither precedent nor statutory authorization for such a

vacatur.  Premised on the January 28, 2025 Vacatur, on February 5, 2025, Secretary Noem issued a new decision *terminating* Venezuela's 2023 Designation effective April 7, 2025.  Bamberger Decl., Ex. F, 90 Fed. Reg. 9040.  The Termination states that even if the relevant conditions in Venezuela remained extraordinary and temporary, termination of the designation is required because it is contrary to the national interest.  *Id.* at 9042.  Yet, less than a month earlier, the January 2025 Extension concluded that extending TPS was not contrary to the national interest.  Bamberger Decl., Ex. D at 5966.

## V.    PLAINTIFFS' MEMBERS ARE ADVERSELY AFFECTED BY THE SECRETARY'S UNLAWFUL ACTION.

CASA, Inc. ("CASA") is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia.  Escobar Decl. ¶ 3.  Founded in 1985, CASA has more than 173,000 lifetime members, including thousands of TPS beneficiaries as members and more than 2,000 members overall who have ties to Venezuela.  *Id.* ¶ 4.  Since its founding, CASA has provided direct assistance on approximately 1,000 TPS applications for its members, including legal services to over 100 Venezuelan members seeking TPS, at least 59 of whom received TPS.  *Id.* ¶ 12.

Make the Road New York ("MRNY") is a nonprofit membership organization incorporated in New York with offices in Bushwick, Brooklyn; Jackson Heights, Queens; Brentwood, Long Island; Port Richmond, Staten Island; and White Plains, Westchester.  MRNY currently has more than 28,000 members.  Fontaine Decl. ¶ 11.  Among its membership, more than 20 are Venezuelan TPS beneficiaries or prima-facie eligible applicants for TPS and more than 200 members' country of origin is Venezuela.  *Id.*  MRNY provides representation in immigration cases as a core component of its work and has represented hundreds of individuals seeking relief through TPS, including over 60 Venezuelans.  *Id.* ¶¶ 9, 12.

**LEGAL STANDARD**

A court should grant summary judgment where the movant demonstrates no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the movant has made this threshold demonstration, the nonmoving party, to survive the motion for summary judgment, must demonstrate specific, material facts that give rise to a genuine issue and may not simply rely on speculation or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986). Further, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson*, 477 U.S. at 247–48 (emphasis added).

"Summary judgment is especially appropriate in APA actions, as they do not ordinarily involve fact-finding[.]" *Friends of Cap. Crescent Trail v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 3d 804, 813 (D. Md. 2020) (quoting *SourceAmerica v. U.S. Dep't of Educ.*, 368 F. Supp. 3d 974, 986 (E.D. Va. 2019)). This is exemplified here, as all the relevant facts for this motion are included within the Federal Register. *See* Bamberger Decl., Exs. A–F; 44 U.S.C. § 1507 ("[T]he contents of the Federal Register shall be judicially noticed."). Accordingly, this is the somewhat unusual case in which no further fact record is necessary—even review of the administrative record would be superfluous to the relief requested in this motion.

Time is also of the essence.  Secretary Noem's unlawful action is set to take effect on April 7, 2025.  Bamberger Decl., Ex. F at 9041.  A motion for summary judgment may be filed "at any time until 30 days after the close of all discovery."  Fed. R. Civ. P. 56(b); *see also* Comm. Notes on 2009 Amendment ("The rule allows a party to move for summary judgment at any time, even as early as the commencement of the action."); *Matini v. Reliance Standard Life Ins. Co.*, 2005 WL 2739030, at *2 (E.D. Va. Oct. 24, 2005) ("[I]t is not a requirement for a plaintiff to wait to file a motion for summary judgment until a defendant has filed an answer.").  Nor must the entire controversy be ripe before summary judgment can be granted.  "A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a); *see also Boyd v. Cinmar of Gloucester, Inc*., 919 F. Supp. 208, 208–09 (E.D. Va. 1996) ("The Court analyzes motions for partial summary judgment by the same standards that govern motions for full summary judgment under Civil Rule of Procedure 56(c)."); *Pettengill v. United States*, 867 F. Supp. 380, 381 (E.D.Va.1994) (same).

## ARGUMENT

I.    **SECRETARY NOEM'S UNLAWFUL ACTIONS ARE REVIEWABLE UNDER THE ADMINISTRATIVE PROCEDURE ACT.**

Under the Administrative Procedure Act ("APA"), agency action that is "not in accordance with law" is subject to judicial review, and the reviewing court shall "hold unlawful and set aside" such action.  5 U.S.C. § 706(2).  An action for judicial review may be filed by a person "suffering legal wrong" or "adversely affected or aggrieved by agency action."  *Id.* § 702.  Review under the APA is available both for "action made reviewable by statute" as well as for "final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.  "Final agency action" is action which marks "consummation of the agency's decision making process" and "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v.*

*Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, (1970)).

Section 706(2)(A) "*requires* federal courts to set aside federal agency action" that is "not in accordance with law." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis added); *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 772 (D. Md. 2021) ("Where agency action is found contrary to law, it is clear that vacatur is required."). Where agencies exceed their statutory authority with legally deficient orders, federal courts must set aside the agency action. *See Sierra Club v. U.S. Army Corps. Of Eng'rs*, 909 F.3d 635, 655 (citing *NextWave*, 537 U.S. at 300); *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 263 (4th Cir. 2022) (emphasizing court's "broad charter . . . to give declaratory relief with respect to defining terms employed by the agency in this action").

Under the Declaratory Judgment Act, a district court, in a case or controversy within its jurisdiction, "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[A] declaratory judgment action is appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).

The challenged DHS actions in this case satisfy the standards for judicial review under the APA and for granting declaratory judgment. Both are plainly actions of a federal agency, both purport to be final, and both adversely affect the rights of Plaintiffs' members, as discussed at greater length below. The INA does not prescribe any alternative or different mechanism for

judicial review.  Accordingly, judicial review is available unless Congress has withdrawn the right of review either through a "statute[] preclud[ing] judicial review" or because "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a).

While Congress has limited the scope of judicial review for specific determinations made under TPS, it has not withdrawn the right to seek judicial review under the APA for agency action that is contrary to law.  As relevant here, the statute provides that:

> There is no judicial review of any determination of the [Secretary][4] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

8 U.S.C. § 1254a(b)(5)(A).  This review-limiting provision does not apply to this motion or the relief it seeks because Plaintiffs do not challenge any "determination" regarding any "designation," "termination," or "extension" of TPS.

As the Supreme Court has recognized, the term "determination" is a term of art in the context of statutory limits on judicial action.  "[T]he reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions."  *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 492 (1991); *see also Cuozzo Speed Tech. v. Commerce for Intell. Prop.*, 579 U.S. 261, 275 (2016) (holding that statutory bar on review of "determinations" did not "categorically preclude review" or "enable the agency to act outside its statutory limits"; "such 'shenanigans' may be properly reviewable . . . under the Administrative Procedure Act[.]").  Statutory removal of judicial review for agency "determinations" does not foreclose review of whether the agency making such "determinations" did so in accordance with the procedures established by law or in violation of Constitutional protections.  Congress "could

---

[4] The statute originally gave this authority to the Attorney General.  While the text continues to refer to the Attorney General, in 2003, Congress transferred authority for TPS designation, extension, and termination to the Secretary of the Department of Homeland Security.  6 U.S.C. § 557; 8 U.S.C. § 1103(a); *see* Pub. L. No. 107-296, 116 Stat. 2135 (2002).

easily have used broader statutory language" had it wanted to bar "all causes . . . arising under" the statute, or "on all questions of law and fact" in such suits, rather than merely review of a "determination." *McNary*, 498 U.S. at 491–94; *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 63–66 (1993) ("*CSS*") (applying *McNary* to find jurisdiction over challenges to practice governing legalization applications).

This Court has previously held that challenges to DHS action on TPS that are founded on Constitutional or statutory irregularities are not covered by Section 1254a's bar on judicial review. In *Casa de Maryland v. Trump*, Judge George J. Hazel analogized the language in Section 1245a(b)(5)(A) to the statutory provision at issue in *McNary*, finding that the statute does "not constitute an absolute bar on judicial review, but instead to bar review of the merits of an individual determination." 355 F. Supp. 3d 307, 321–22 (D. Md. 2018) (allowing plaintiffs' APA claims to move forward because "the Court need only determine whether a reasonable factfinder could determine that discriminatory intent infected the Secretary's process for terminating El Salvador's TPS," but acknowledging that plaintiffs' INA claims could not move forward if the Secretary's decision was "appropriately based on statutory factors").

This motion does not ask this Court to review or set aside any "determination" by Secretary Noem or DHS, but rather to find that her actions were not authorized by law.  No provision of law authorized Secretary Noem to vacate a prior TPS extension.  On the question of whether or not to vacate the January 2025 Extension, therefore, the law did not authorize Secretray Noem to make any "determination" at all.  Likewise, Plaintiffs do not ask the Court to review the grounds on which Secretary Noem issued the Termination, only the procedures she followed and the timing of the Termination's effective date, which unlawfully purports to take effect prior to the earliest date permitted by statute.

While this is not a close question, any doubt should be resolved in favor of permitting judicial review. "The APA establishes a basic presumption of judicial review [for] one suffering legal wrong because of agency action." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (internal quotation marks omitted); *see Orquera v. Ashcroft,* 357 F.3d 413, 422 (4th Cir. 2003) (acknowledging the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action"); *INS v. St. Cyr,* 533 U.S. 289, 298 (2001) ("For the INS to prevail it must overcome . . . the strong presumption in favor of judicial review of administrative action . . . ."); *Reno v. CSS*, 509 U.S. 43, 63−64 (1993) (declining to "impute to Congress an intent to preclude judicial review of the legality of INS action [in an amnesty proceeding] entirely" because the court will "find an intent to preclude such [judicial review of administrative action] only if presented with clear and convincing evidence") (quoting *McNary*, 498 U.S. at 496) (internal quotation marks and citations omitted).

The Supreme Court has applied that "strong presumption" to find review available even under statutes with language far more preclusive than that here. *See, e.g.*, *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 678–79, 681 (1986) (construing statute stating "[n]o action . . . shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter" as inapplicable to general statutory and constitutional challenges) (quoting 42 U.S.C. § 405(h)). Moreover, because Section 1254a(b)(5)(A) bars review only of determinations made "under this subsection," it would not bar Plaintiffs' claims because they do not challenge actions taken by the DHS Secretary "under" that subsection. *Johnson v. Robison*, 415 U.S. 361, 367 (1974) ("A decision of law or fact 'under' a statute" means only a decision regarding "the interpretation or application of a particular provision of the statute *to a particular set of facts*.") (emphasis added); *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 274–75 (2016) (explaining

APA claim alleging agency acted outside statutory limits would not arise "under" analogous provision) (quoting 35 U.S.C. § 314(d)); *Trump*, 355 F. Supp. 3d at 322 (allowing review of Plaintiffs' Equal Protection, Substantive Due Process, and APA claims). Had Congress intended to strip jurisdiction for these types of claims, it would have used language like it did in 8 U.S.C. § 1252(a)(2)(B), where it clearly stated "no court shall have jurisdiction to review . . . any judgment . . . or any other decision notwithstanding any other provision of law (statutory or nonstatutory)." *See Lee v. USCIS*, 592 F.3d 612, 619–20 (4th Cir. 2010) (enforcing jurisdiction stripping provision where statute explicitly applied to both judgments as well as any other decision). Instead, Congress made a deliberate choice to insulate from judicial review only the DHS Secretary's exercise of judgment within the scope of her discretion, not the scope of that discretion itself.

## II.    PLAINTIFFS HAVE STANDING TO CHALLENGE DHS ACTION ON TPS.

To establish standing, a plaintiff must have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," "fairly traceable to the challenged action of the defendant," and "likely . . . [to] be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Organizational plaintiffs can establish standing by showing a cognizable injury was suffered by the organization's members rather than the organization itself. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396–97 (2011). This form of "representational standing" is established with a showing that (1) the organization's members "have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. Openband at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (quoting *Md. Highways Contractors Ass'n,*

*Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir.1991)).  As part of this showing, the organization must set forth facts to make plausible that "at least one identified member had suffered or would suffer harm." *S. Walk*, 713 F.3d at 184 (emphasis omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).  Descriptions of constituents can suffice to constitute identification. *S.C. State Conf. of NAACP v. S.C. Dep't of Juvenile Just.*, 2024 WL 5153170 at *8 (D.S.C. 2024). And where, as here, multiple organizations are plaintiffs, as long as one organization can establish standing, "[t]he Court need not consider whether any of the other plaintiff organizations have standing." *Maryland v. Pruitt*, 320 F. Supp. 3d 722, 726 (D. Md. 2018).

There can be no genuine dispute that both CASA and MRNY satisfy the necessary requirements for representational standing.

**A.  The Plaintiffs' Members Have Standing to Sue in Their Own Right.**

Each plaintiff has identified representative members with standing to sue in their own right because they have suffered (1) an injury-in-fact; (2) that is traceable to defendants; and (3) therefore redressable by a favorable decision.

*1.  Plaintiffs Have Suffered an Injury-In-Fact.*

*First*, Plaintiffs' members have and will suffer harm from Secretary Noem's actions.  The accompanying affidavit of George Escobar, on behalf of CASA, describes seven CASA members who are Venezuelan beneficiaries of TPS, and who would be adversely affected by Secretary Noem's unlawful Vacatur and Termination.  The accompanying affidavit of Sienna Fontaine, on behalf of MRNY, describes four MRNY members who are Venezuelan beneficiaries of TPS, and who would be adversely affected by Secretary Noem's unlawful Vacatur and Termination.  Of these eleven, the seven beneficiaries of TPS under the 2023 Designation would lose TPS protection 18 months before the earliest date on which it would otherwise terminate, and the four beneficiaries

of TPS under the 2021 Designation will lose a 13-month extension of their TPS.  That, alone, is a legal injury that would establish their standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992) ("If [a plaintiff is the object of the allegedly unlawful government action], there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

        In addition to the direct injury occasioned by the loss of TPS, Plaintiffs' members would also suffer injuries to their safety, mental health, and economic security.  T.G., for instance, has five family members reliant on him for support, including a minor daughter with medical issues.  Escobar Decl. ¶ 26.  Losing TPS would place an extreme economic burden on T.G. and his family.  *Id.*  Similarly, for J.Z. and her husband, TPS has granted them employment authorization, the loss of which would jeopardize J.Z.'s husband's ability to receive healthcare now and in the future.  Fontaine Decl. ¶ 24.  Defendants' actions have also caused Plaintiffs' members to reasonably fear an imminent loss of income and face severe mental anguish at the prospect of returning to a country where their safety is at risk.  Fontaine Decl. ¶¶ 29–31; Escobar Decl. ¶¶ 23–29.  For example, C.M. was brutally attacked on multiple occasions for protesting the Maduro and Chavez regimes in Venezuela and fears jail or even death if she is forced to return to Venezuela.  Fontaine Decl. ¶ 26.  K.F. similarly has faced mental anguish at the prospect of being forced to return to Venezuela, where she fears persecution due to her participation in anti-government protests.  Fontaine Decl. ¶ 23.  Loss of TPS will cause these individuals to lose their livelihoods and face potential expulsion to a country where their safety is at risk.  These injuries, flowing from the loss of TPS, are not necessary to establish Plaintiffs' standing but are additional injuries of the type courts have held establish standing.  *See Casa de Maryland v. Wolf,* 486 F. Supp. 3d 928, 948 (D. Md. 2020) (finding members suffered "concrete and particularized injury" where agency action would

16

exacerbate "physical or mental harm" and "already existent economic insecurity"); *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 240 (4th Cir. 2020) (agency action that caused plaintiffs to "forgo[] specific financial resources" constitutes injury).

### 2. There Is a Causal Nexus Between the Injury Suffered by Plaintiffs and Defendants' Actions.

*Second*, Plaintiffs' members' injuries are caused by and "fairly traceable" to Defendants' actions. *Virginia Hospital & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 652 (E.D. Va. 2023) (finding hospital associations' members' injuries were "fairly traceable" to agency because the agency was "charged with promulgating" the rule in question). Likewise, here, it is Secretary Noem who issued the Vacatur and Termination, and DHS will implement those decisions, which are causing injuries to Plaintiffs' members. *See* Bamberger Decl., Ex. E at 8806; Ex. F at 9041. Absent Secretary Noem's Vacatur and Termination, Plaintiffs' members would be eligible to maintain TPS until at least October 2, 2026, enhancing their protection from removal and enabling them to apply for work authorization. *See* Escobar Decl. ¶¶ 10–11, 14–29; Fontaine Decl. ¶¶ 15–21; Bamberger Decl., Ex. D.

### 3. Plaintiffs' Injuries Are Redressable by Declaratory Relief.

*Finally*, Plaintiffs' members' injuries—as described in the affidavits—will be redressed if this Court declares the Vacatur and Termination as "not in accordance to the law" and declares the operative expiration of TPS to be October 2, 2026, in accordance with the January 2025 Extension. *See* Bamberger Decl., Ex. D at 5961–63. Doing so would directly redress Plaintiffs' members' injuries because it would reinstate their TPS, and allow them to remain safely in the United States, through October 2, 2026. *See id.* Indeed, reinstating the January 2025 Extension allows Plaintiffs' members to continue working under their TPS-based employment authorizations, which would enable them to continue to support themselves and their families. *See* Fontaine Decl. ¶ 30; 8 U.S.C.

1254a(a)(1)(B) (TPS "shall authorize the [beneficiary] to engage in employment in the United States and provide the [beneficiary] with an 'employment authorized' endorsement or other appropriate work permit.").

**B.    The Interests the Organizations Seek to Protect Are Germane to Plaintiffs' Purpose.**

Moreover, Plaintiffs CASA and MRNY seek to protect the interests of their members that are germane to Plaintiffs' purposes. Specifically, as to CASA, assisting individual members in applying for TPS and advocating for the protection of TPS across the country is critical to CASA's mission. Escobar Decl. ¶¶ 9, 11–13. Similarly, for MRNY, protecting the period of TPS protection and associated work authorization is central to their mission, as they devote significant resources to providing legal support and counseling for individuals registering for TPS and seeking TPS-related work authorization. Fontaine Decl. ¶ 12; *Wolf*, 486 F. Supp. 3d at 948 (finding that the interests of individual members impacted by changes in asylum-based employment authorization rules were germane to the plaintiff organizations' missions as plaintiffs devoted significant time and resources to representing asylees through the employment authorization process).

**C.    Neither the Claim nor the Relief Sought Require the Participation of the Individual Members.**

Plaintiffs' legal challenges do not require the participation of individual members in the lawsuit. As a remedy, Plaintiffs seek a declaration that the Vacatur and the subsequent Termination are unlawful and inoperative. Plaintiffs do not seek money damages. Accordingly, "neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *S. Walk*, 713 F.3d at 184; *Wolf*, 486 F. Supp. 3d at 948 (holding redressability prong satisfied where "[p]laintiffs seek the ultimate remedy of setting aside the rules, not money damages or other remedy that requires the individual member to join the litigation as a party"); *Maryland v. Pruitt*, 320 F. Supp. 3d 722, 727 n.1 (D. Md. 2018) ("[P]articipation of individual members is

not necessary in a case such as this that presents a pure question of law."); *cf.* Order Denying Stay, *CASA, Inc. v. Trump*, 8:25-cv-00201-DLB (4th Cir. February 28, 2025), ECF No. 29 at 3–4 (approving universal relief when the issue is a categorical policy that does not differ based on membership of an organization).

## III.    THE    FACTS    CONCERNING    THE    CHALLENGED    ACTIONS    ARE UNDISPUTED.

Because this motion challenges only whether Secretary Noem's issuance of the Vacatur and Termination were facially contrary to law, the facts relevant to that determination are a matter of public record and not subject to any genuine dispute.  It cannot be disputed that Venezuela was designated for TPS on March 9, 2021 and October 3, 2023, and that Secretary Mayorkas extended that designation to October 2, 2026 in his determination of January 17, 2025.  Bamberger Decl., Exs. A, C, & D.  Nor can it be disputed that Secretary Noem purported to "vacate" that determination on January 28, 2025 and to terminate the 2023 Designation on February 5, 2025. DHS itself acknowledges that it purports to terminate Venezuela's 2023 TPS designation effective April 7, 2025.  Bamberger Decl., Ex. F.  And April 7, 2025 is undisputedly approximately 18 months before October 2, 2026.  In addition to being undisputed, these facts are judicially noticeable.  44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed."). The remainder of the issues to be decided in this motion are questions of law regarding the scope of the DHS Secretary's authority, which are subject to review by the Court.  *See* 5 U.S.C. § 706.

## IV.    THE SECRETARY'S PURPORTED VACATUR OF THE JANUARY 2025 EXTENSION WAS CONTRARY TO LAW.

Section 706(2)(A) "requires federal courts to set aside federal agency action" that is "not in accordance with law." *NextWave*, 537 U.S. at 300; *see Sierra Club v. U.S. Army Corps. of Eng'rs*, 909 F.3d 635, 651–54 (4th Cir. 2018) (vacating agency decision under Section 706(2)(A) for issuing a decision inconsistent with the conditions expressly outlined in the statutory scheme);

*Virginia Hospital & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 657–63 (E.D. Va. 2023) (vacating agency action because it "conflict[ed] with other requirements within the [statutory scheme]"). Here, neither the INA nor any other statute grants Secretary Noem the authority, whether explicit or implicit, to vacate the January 2025 Extension. Her action was accordingly "not in accordance with law" and should be set aside. 5 U.S.C. § 706(2)(A).

### A.     The 2025 Extension Was Duly Issued in Accordance with Applicable Law.

The January 2025 Extension was lawfully issued in accordance with the timeframe and procedures required by the TPS statute. Secretary Mayorkas's decision to extend the 2023 Designation occurred approximately 80 days before that designation was set to expire on April 2, 2025; that is, "[a]t least 60 days" before the expiration as directed by the TPS statute. 8 U.S.C. § 1254a(b)(3)(A). Prior to issuing the January 2025 Extension, Secretary Mayorkas consulted with the Department of State and other U.S. agencies in determining that the extension was "warranted because extraordinary and temporary conditions supporting Venezuela's TPS designation remain, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily." *See* Bamberger Decl., Ex. D at 5963; 8 U.S.C. § 1254a(b)(3)(A) (requiring that the Secretary "consult[] with appropriate agencies of the Government" and review country conditions prior to terminating or extending a TPS designation).

Secretary Noem's Vacatur cited no statutory infirmity with the January 2025 Extension. Bamberger Decl., Ex. E at 8807. Instead, she cited a policy disagreement, arguing that the extension notice "adopted a novel approach of implicitly negating the [2021 Designation] by effectively subsuming it within the [2023 Designation]." *Id.* But there is nothing novel about a country being

designated for TPS multiple times.[5]  Similarly, her objection to Secretary Mayorkas's decision to allow 2021 Designation beneficiaries to re-register under the 2023 Designation, *id.*, ignores that the TPS statute gives the Secretary broad flexibility to regulate individual registration.  8 U.S.C. 1254a(c)(1)(A)(iv) (requiring TPS applicants to register "to the extent and in a manner which the [Secretary] establishes").  Indeed, DHS regularly establishes a single re-registration process for TPS beneficiaries who initially registered under different designations of their country.[6]

**B.    The TPS Statute Does Not Authorize Secretary Noem to "Vacate" a Prior Determination or Extension, Only to Terminate It.**

There is no express grant of DHS authority under the INA to reconsider a TPS extension. The TPS program was enacted by Congress to provide a "more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil," H.R. Rep. No. 100-627, 100th Cong., 2d Sess. at 4 (1988), as an alternative to ad hoc Presidential action.  Congress endowed the DHS Secretary with the authority to designate a country for protected status, after consulting with the necessary government agencies, if the DHS Secretary:

> (A) . . . finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) . . . finds that—
>
> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

---

[5] The TPS statute "explicitly contemplates more than one designation" for a country.  62 Fed. Reg. 16608, 16609. *See, e.g.*, 64 Fed. Reg. 61123 (1999 redesignation of Burundi); 66 Fed. Reg. 18111 (2001 redesignation of Angola); 76 Fed. Reg. 29000 (2011 redesignation of Haiti); 78 Fed. Reg. 1872 (2013 redesignation of Sudan).

[6] *See, e.g.*, 79 Fed. Reg. 52027 (establishing one re-registration process for all TPS beneficiaries from Sudan, regardless which designation they initially registered under); 88 Fed. Reg. 5022 (permitting individuals who initially registered for TPS under Haiti's 2010 or 2011 designation to "re-register" under a later re-designation).

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) . . . finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).

Under this framework, TPS provides temporary immigration relief to foreign nationals in the United States who cannot safely return to their home country because of ongoing armed conflict, an environmental disaster, or other "extraordinary and temporary conditions in the foreign state." *Id.* § 1254a(a)(1), (b). Following the initial TPS designation, the INA also provides a process for periodic review of that designation. Specifically, at least 60 days before the end of the initial designation period or any extended designation period, the Secretary shall, "after consultation with appropriate agencies of the Government," "review the conditions in the foreign state (or part of such foreign state) for which designation is in effect" and "determine whether the conditions for such designation under this subsection continue to be met." *Id.* § 1254a(b)(3)(A). The INA further allows the DHS Secretary to continue to designate a country for TPS "after consultation with appropriate agencies of the Government." *See id.* § 1254a(b)(1). If the DHS Secretary does not terminate a TPS designation in this review process, it will be extended automatically as a matter of law for at least 6 months. *Id.* § 1254a(b)(3)(C).

Absent from these provisions is a single grant of authority allowing for the DHS Secretary to vacate TPS extensions. Indeed, the words "vacate," "vacatur," or "vacating" do not appear at all. The statute instead provides strict rules with fixed time periods and procedures for

22

*terminations*, which can occur only after "*the expiration* of the most recent previous extension," not at the whim of the DHS Secretary. *Id.* § 1254a(b)(3)(B) (emphasis added). The Vacatur does not purport to be a "termination," nor can it because Secretary Noem did not follow the necessary procedures required to properly issue a termination. The plain language of the TPS statute therefore precludes Secretary Noem from "vacating" the January 2025 Extension.

### C. Secretary Noem Has No Inherent Power to Vacate a Prior TPS Determination and Must Instead Proceed Through the Statutory Termination Scheme.

Without an express grant of "vacatur" power, Secretary Noem purports to rely on an "inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination" to extend the designation. Bamberger Decl., Ex. E at 8806. Secretary Noem has no such authority. "There is no general principle that what [an agency] can do, [it] can undo." *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc) (Attorney General lacked inherent authority to denaturalize people allegedly granted citizenship in error); *see U.S. v. Clarke*, 628 F. Supp. 2d 1, 7 (D.D.C. 2009) (citing *Gorbach* to reiterate that citizenship is safeguarded from abrogation save for some "clearly defined procedure"). It is "sometimes" true that Congress grants agencies such authority; it is "sometimes not." *Gorbach*, 219 F.3d at 1095; *United States v. Seatrain Lines, Inc.,* 329 U.S. 424 (1947) (agency lacked authority to modify shipping certificate already issued). Ultimately, implying a "vacating" authority in the TPS statute turns solely upon the statutory scheme.

Pursuant to this framework, courts have consistently rejected agencies' reliance on "implied powers" to undo decisions in flagrant disregard of enumerated statutory procedures. *Nat. Res. Def. Council v. Regan,* 67 F.4th 397, 403–04 (D.C. Cir. 2023) (holding EPA lacked implicit authority to rescind its position that a contaminant should be regulated where, by statute, that conclusion triggered specific periodic review process); *Am. Methyl Corp. v. EPA*, 749 F.2d. 826,

835–38 (D.C. Cir. 1984) (holding EPA lacked implicit authority to revoke waiver permitting sale of fuel additive where statute established mechanism for prohibiting sale of dangerous additives, including those "mistakenly waived into commerce").  Rather, where statutes provide "specific instructions," those instructions "are to be followed scrupulously" and "should not be modified by resort to such generalities as 'administrative flexibility' and 'implied powers.'"  *Civil Aeronautics Bd. v. Delta Airlines Inc.*, 367 U.S. 316, 325 (1961); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 428 (2024) (Gorsuch, J., concurring) ("[I]t is Congress's view of 'good government' . . . that controls.").  This is particularly so when a statute implicates reliance interests by providing for agency action, once taken, to remain in place for a specified period of time.  *See China Unicom (Ams) Operations Ltd. v. FCC*, 124 F.4th 1128, 1148 (9th Cir. 2024) (holding that the "use of a fixed term is . . . inconsistent with . . . an implied power to revoke a license at any time").

There is no provision of the INA or any other law that authorized Secretary Noem to "vacate" a TPS determination prior to its expiration.  The Federal Register notice giving effect to the Vacatur relies on three sections of the INA, Bamberger Decl., Ex. E at 8806 n.2, but none of them so much as mention vacatur, much less endorse it in substance:

- Section 1103(a) is a general grant "for carrying out [Secretary Noem's] authority under the provisions of" the immigration laws, but those laws provide no vacatur authority.  8 U.S.C. § 1103(a)(3).  Such "broad enabling statute[s]" at most provide authority to correct "inadvertent ministerial errors." *Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 145–46 (1958).  A complete reversal of an extension of TPS is far beyond an "inadvertent ministerial error."

- Section 1254a(b)(5)(A), as discussed above, is a limitation on judicial review (not applicable here, for reasons discussed above), and not a grant of authority to the Secretary.

- Section 1254a(b)(3) requires the Secretary to periodically "review the conditions in the foreign state . . . for which a designation is in effect" to determine whether to extend or terminate TPS, but affords no right to cut short a TPS determination already made or to act outside of the procedures for termination prescribed by law, as explained at length above.

These provisions neither facially nor by implication grant any authority to vacate a prior extension. Moreover, it would be improper to imply vacatur power from these provisions, because doing so would subvert Congress's express purpose to ensure a "more formal and orderly mechanism" and transform it to a scheme that constantly places its beneficiaries in the throes of uncertainty and disorder. *See* H.R. Rep. No. 100-627, at 4.

  **D. Secretary Noem's Purported Vacatur Conflicts with the Procedure for Termination Specified by the INA.**

  In addition to the lack of positive authority conferring on the DHS Secretary the ability to vacate a prior TPS determination, the purported ability to do so would be wholly incongruent with the regime for termination that Congress has prescribed. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988))). Rather, the statutory scheme provides that once an extension is published in the Federal Register, that extension remains in force until, at the earliest, the date on which it is terminated pursuant to the statutory provisions. *See* 8 U.S.C. § 1254a(b)(2)(B) (a designation "shall remain in effect until the effective date of the termination"); *id*. § 1254a(b)(3)(B) (any termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension"). And at the time of Secretary Noem's Vacatur, an extension *was* in force, specifically Secretary Mayorkas's decision to extend Venezuela's TPS designation to October 2, 2026. Bamberger Decl., Ex. D at 5962.

  In short, Secretary Noem cannot circumvent the statutory procedures for termination of TPS by merely rebranding a termination as a "vacatur" of a prior extension. To hold otherwise would allow federal agencies, including DHS, to employ a "back-door mechanism . . . to

circumvent Congress's intended [processes]" for termination and extensions under the statute. *Sierra Club v. U.S. Army Corps. of Engineers*, 909 F.3d 635, 652 (4th Cir. 2018); *Virginia Hospital & Healthcare Ass'n*, 671 F. Supp. 3d 633, 661 (E.D. Va. 2023) (finding that agency action was "contrary" to the statutory scheme based not only on "isolated provisions" but also by "giv[ing] meaning and effect to the overall statutory scheme") (citing *King v. Burwell*, 576 U.S. 473, 486 (2015)). This Court should accordingly grant summary judgment for Plaintiffs on Count I and set aside the Vacatur as "not in accordance with law" under Section 706(a)(2).

## V.    THE SECRETARY'S EARLY TERMINATION OF THE 2023 DESIGNATION IS CONTRARY TO LAW.

Likewise, in issuing the Termination, DHS failed to comply with the INA's procedures and timeframe. Specifically, the Termination (1) unlawfully seeks to circumvent the effective date provided by statute for a termination; and (2) does not rely on any findings regarding country conditions in Venezuela, as required by statute.

*First*, while it would also fail for other reasons, the unlawfulness of the Termination follows inexorably from the unlawfulness of the purported Vacatur. The INA provides that any termination of a TPS designation can take effect no sooner than "*the expiration* of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B) (emphasis added). This statutory scheme reflects Congress's intent to establish fixed time periods and procedures for terminations and thereby ensure stability and predictability for TPS beneficiaries. Pursuant to the January 2025 Extension, the 2023 Designation will expire on October 2, 2026. Bamberger Decl., Ex. D. Thus, under the INA, any subsequent termination of the 2023 Designation must take effect *after* October 2, 2026. *See* 8 U.S.C. § 1254a(b)(3)(B). But in the Termination, Secretary Noem announced that she was "terminating the 2023 TPS designation of Venezuela" effective April 7, 2025. Bamberger Decl., Ex. F at 9044. In doing so, Secretary Noem seeks to unlawfully cut short the TPS designation of

Venezuela by nearly a year and a half. The Termination thus violates the directions for terminating a country's TPS designation set forth in the INA.

*Second*, and separately, Secretary Noem arrived at the Termination without following the statutory requirements. The INA provides that, prior to terminating a TPS designation, the DHS Secretary must "review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect" and "determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A)–(B). Here, it is clear from the face of the Termination that DHS failed to follow those requirements. The summary of the action comments that, "[i]n particular, the Secretary has determined that it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States," without any discussion of the exigent conditions in Venezuela that prompted TPS. Bamberger Decl., Ex. F at 9041. Indeed, despite noting that "certain conditions for the 2023 TPS designation of Venezuela may continue," Secretary Noem nevertheless concluded termination was warranted "*even assuming* the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary.'" *Id.* at 9042 (emphasis added); *see id.* (commenting that there were "notable improvements in several areas" without identifying those improvements or citing to any sources). The INA on its face does not permit the Secretary to "assume" that the conditions in Venezuela are unimproved and then to terminate TPS anyway. Rather, the statute provides for the Secretary to terminate TPS status for a given country only if she finds that the "foreign state . . . no longer continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(B). Secretary Noem's purported termination makes no such finding.[7]

---

[7] This is in stark contrast to the January 2025 Extension, which detailed the humanitarian crisis in Venezuela by citing dozens of sources and pointing to, among other dire conditions, food insecurity, lack of basic services, the healthcare system's collapse, the prolonged economic meltdown, and human rights violations. Bamberger Decl., Ex. D at 5963–66.

For these reasons, the Court should grant summary judgment for Plaintiffs on Count II and declare that the Termination is ineffective or, alternatively, is effective no sooner than October 3, 2026.[8]

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment on Counts I and II of the Complaint, declare the Vacatur and Termination unlawful and of no effect, declare that the January 2025 Extension remains in effect and that any termination of it can take effect no sooner than October 3, 2026, and retain jurisdiction to order "further relief" pursuant to 28 U.S.C. § 2201 as may be appropriate.


Date: March 3, 2025

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:    /s/ Nowell D. Bamberger
       Nowell D. Bamberger (21111)
       Matthew D. Slater (05582)
       Rathna J. Ramamurthi (*phv forthcoming*)
       Madeline Hundley (*phv forthcoming*)
       Gillian Isabelle (*phv forthcoming*)
       Ava Kazerouni (*phv forthcoming*)
       2112 Pennsylvania Ave NW
       Washington, D.C. 20037
       Tel. (202) 974-1500
       Fax (202) 974-1999
       nbamberger@cgsh.com
       mslater@cgsh.com
       rramamurthi@cgsh.com
       mhundley@cgsh.com
       gisabelle@cgsh.com
       akazerouni@cgsh.com

---

[8] The remaining counts of the Complaint challenge the Vacatur and Termination on other grounds, which if successful would deprive the Termination of any effect. Consideration of those claims are for another day, in light of the pressing need to clarify that the January 2025 Extension must remain in effect beyond April 7, 2025, and until October 2, 2026.

WASHINGTON LAWYERS' COMMITTEE FOR CIVIL
RIGHTS AND URBAN AFFAIRS

     Ryan Downer (*phv forthcoming*)
     Sarah L. Bessell
     Madeleine Gates (*seeking admission to
     D.Md.*)
     Ellie M. Driscoll (*phv forthcoming*)
     700 14th St. #400
     Washington, D.C. 20005
     Tel. (202) 319-1000
     Fax (202) 319-1010
     ryan_downer@washlaw.org
     sarah_bessell@washlaw.org
     madeleine_gates@washlaw.org
     ellie_driscoll@washlaw.org

CASA, INC.

     Nicholas Katz, Esq. (21920)
     8151 15th Avenue
     Hyattsville, MD 20783
     Tel. 240-491-5743
     nkatz@wearecasa.org

MAKE THE ROAD NEW YORK

     Harold A. Solis (*phv forthcoming*)
     Paige Austin (*phv forthcoming*)
     301 Grove Street
     Brooklyn, NY 11237
     Tel. (718) 418-7690
     Fax (866) 420-9169
     harold.solis@maketheroadny.org
     paige.austin@maketheroadny.org

*Attorneys for Plaintiffs*