# EXHIBIT A

Case 8:25-cv-00525-GLR   Document 8-3   Filed 03/03/25   Page 1 of 9


Act Manager, U.S. Coast Guard, 2703 Martin Luther King Jr. Ave. SE, Stop 7710, Washington, DC 20593–7710.

**FOR FURTHER INFORMATION CONTACT:** A.L. Craig, Office of Privacy Management, telephone 202–475–3528, or fax 202–372–8405, for questions on these documents.

**SUPPLEMENTARY INFORMATION:**

### Public Participation and Request for Comments

This notice relies on the authority of the Paperwork Reduction Act of 1995; 44 U.S.C. chapter 35, as amended. An ICR is an application to OIRA seeking the approval, extension, or renewal of a Coast Guard collection of information (Collection). The ICR contains information describing the Collection's purpose, the Collection's likely burden on the affected public, an explanation of the necessity of the Collection, and other important information describing the Collection. There is one ICR for each Collection.

The Coast Guard invites comments on whether this ICR should be granted based on the Collection being necessary for the proper performance of Departmental functions. In particular, the Coast Guard would appreciate comments addressing: (1) The practical utility of the Collection; (2) the accuracy of the estimated burden of the Collection; (3) ways to enhance the quality, utility, and clarity of information subject to the Collection; and (4) ways to minimize the burden of the Collection on respondents, including the use of automated collection techniques or other forms of information technology.

In response to your comments, we may revise this ICR or decide not to seek an extension of approval for the Collection. We will consider all comments and material received during the comment period.

We encourage you to respond to this request by submitting comments and related materials. Comments must contain the OMB Control Number of the ICR and the docket number of this request, [USCG–2021–0175], and must be received by May 10, 2021.

### Submitting Comments

We encourage you to submit comments through the Federal eRulemaking Portal at *https://www.regulations.gov*. If your material cannot be submitted using *https://www.regulations.gov,* contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions. Documents mentioned in this notice, and all public comments, are in our online docket at *https://www.regulations.gov* and can be viewed by following that website's instructions. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted.

We accept anonymous comments. All comments received will be posted without change to *https://www.regulations.gov* and will include any personal information you have provided. For more about privacy and submissions in response to this document, see DHS's eRulemaking System of Records notice (85 FR 14226, March 11, 2020).

### Information Collection Request

*Title:* Outer Continental Shelf Activities—Title 33 CFR Subchapter N.

*OMB Control Number:* 1625–0044.

*Summary:* The Outer Continental Shelf Lands Act, as amended, authorizes the Coast Guard to promulgate and enforce regulations promoting the safety of life and property on Outer Continental Shelf (OCS) facilities. These regulations are located in 33 CFR subchapter N.

*Need:* The information is needed to ensure compliance with the safety regulations related to OCS activities. The regulations contain reporting and recordkeeping requirements for annual inspections of OCS facilities, employee citizenship records, station bills, and emergency evacuation plans.

*Forms:*

• CG–5432, Fixed OCS Facility Inspection Report.

*Respondents:* Operators of facilities and vessels engaged in activities on the OCS.

*Frequency:* On occasion.

*Hour Burden Estimate:* The estimated burden remains 9,582 hours a year.

*Authority:* The Paperwork Reduction Act of 1995; 44 U.S.C. chapter 35, as amended.

Dated: March 3, 2021.

**Kathleen Claffie,**

*Chief, Office of Privacy Management, U.S. Coast Guard.*

[FR Doc. 2021–04845 Filed 3–8–21; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2682–21; DHS Docket No. USCIS–2021–0003]

RIN 1615–ZB86

### Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is designating Venezuela for Temporary Protected Status (TPS) for 18 months, effective March 9, 2021, through September 9, 2022. This notice also provides procedures for individuals who believe they are eligible for TPS under the designation of Venezuela to apply. This notice also provides information about Deferred Enforced Departure (DED) for eligible Venezuelan nationals (and persons without nationality who last habitually resided in Venezuela), and provides information on how eligible individuals may apply for DED-related EADs with USCIS, based on the January 19, 2021 memorandum from former President Donald Trump directing the Secretary to take appropriate measures for the implementation of DED for Venezuelan nationals for 18 months, through July 20, 2022 (see 86 FR 6845, dated January 25, 2021).

**Note:** Individuals who apply for and receive TPS and who are also covered by DED do not need to apply for employment authorization under both programs. Individuals who apply for an EAD pursuant to their TPS application will receive an EAD with an expiration date of September 9, 2022, that is eligible for renewal if the Secretary extends TPS for Venezuela after September 9, 2022, after determining that Venezuela continues to meet the conditions supporting its designation for TPS. Individuals who apply for an EAD pursuant to DED will receive an EAD with an expiration date of July 20, 2022. If the President does not direct an extension of the DED authorization, DED, and associated employment authorization, will end on July 20, 2022. USCIS encourages individuals who

believe they are eligible for TPS to file for the benefit during the initial registration period announced in this Notice, even if they are also covered by DED, in case they cannot qualify for TPS late initial filing under 8 CFR 244.2(f)(2) after DED has expired.

**DATES:** The designation of Venezuela for TPS is effective on March 9, 2021, and will remain in effect for 18 months, through September 9, 2022. The 180-day registration period for eligible individuals to submit TPS applications begins March 9, 2021, and will remain in effect through September 5, 2021. DED and employment authorization for noncitizens covered under DED for Venezuela is effective through July 20, 2022.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Maureen Dunn, Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *uscis.gov/tps.* You can find specific information about Venezuela's TPS designation by selecting ''Venezuela'' from the menu on the left side of the TPS web page.

• For further information on DED, including additional information on eligibility, please visit the USCIS DED web page at *uscis.gov/humanitarian/temporary-protected-status/deferred-enforced-departure.* You can find specific information about DED for Venezuela by selecting ''DED Granted Country: Venezuela'' from the menu on the left of the DED web page.

• If you have additional questions about DED or TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:** Under section 244(b)(1)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. 1254a(b)(1)(C), the Secretary is authorized to designate a foreign state (or any part thereof) for TPS upon finding that extraordinary and temporary conditions in the foreign state prevent its nationals from returning safely, unless permitting the foreign state's nationals to remain temporarily in the United States is contrary to the national interest of the United States. Regardless of an individual's country of birth, this designation allows eligible Venezuelan nationals (and noncitizens having no nationality who last habitually resided in Venezuela) who have continuously resided in the United States since March 8, 2021, and have been continuously physically present in the United States since March 9, 2021, to apply for TPS. This notice also describes the other eligibility criteria applicants must meet. Individuals who believe they may qualify for TPS under this designation may apply within the 180-day registration period that begins on March 9, 2021, and ends on September 5, 2021. They may also apply for TPS-related Employment Authorization Documents (EADs) and for travel authorization.

This notice also provides information about Deferred Enforced Departure (DED) for eligible Venezuelan nationals (and persons without nationality who last habitually resided in Venezuela), and provides information on how eligible individuals may apply for DED-related EADs with USCIS, based on the January 19, 2021 memorandum from former President Donald Trump directing the Secretary to take appropriate measures for the implementation of DED for Venezuelan nationals for 18 months, through July 20, 2022 (see 86 FR 6845, dated January 25, 2021).

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DED—Deferred Enforced Departure
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Purpose of This Action (TPS)**

Through this notice, DHS sets forth procedures necessary for eligible nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to submit an initial registration application under the designation of Venezuela for TPS and apply for an EAD. Under the designation, individuals must submit an initial Venezuela TPS application (Form I–821) and they may also submit an application for Employment Authorization (Form I–765), during the 180-day initial registration period that runs from March 9, 2021, through September 5, 2021. In addition to demonstrating continuous residence in the United States since March 8, 2021, and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since March 9, 2021, the effective date of this designation of Venezuela, before USCIS may grant them TPS. USCIS estimates that approximately 323,000 individuals are eligible to file applications for TPS under the designation of Venezuela.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. Upon return from such authorized travel, TPS beneficiaries retain the same immigration status they had before the travel.
  ○ The granting of TPS does not result in or lead to lawful permanent resident status.

- To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).
- When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:
  ○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or
  ○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

**Why was Venezuela designated for TPS?**

*Overview*

Venezuela is currently facing a severe humanitarian emergency.[1] Under Nicolás Maduro's influence,[2] the country "has been in the midst of a severe political and economic crisis for several years."[3] Venezuela's crisis has been marked by a wide range of factors, including: Economic contraction; inflation and hyperinflation; deepening poverty; high levels of unemployment; reduced access to and shortages of food and medicine; a severely weakened medical system; the reappearance or increased incidence of certain communicable diseases; a collapse in basic services; water, electricity, and fuel shortages; political polarization; institutional and political tensions; human rights abuses and repression; crime and violence; corruption; increased human mobility and displacement (including internal migration, emigration, and return); and the impact of the COVID–19 pandemic, among other factors.[4]

*Economic Crisis*

Venezuela continues to suffer from a severe economic crisis. The Congressional Research Service (CRS) reported in August 2020 that "Venezuela's economy has collapsed." With the largest proven oil reserves in the world, Venezuela had long been "one of the most prosperous countries in South America." However, in 2014, the country entered into an ongoing "economic recession marked by hyperinflation, shortages of basic goods and a collapse in public services such as electricity and water." Sources attribute Venezuela's economic crisis to a variety of factors, including: The crash of global oil prices; economic mismanagement; heavy government regulation of the economy and the private sector; corruption; and the impact of the COVID–19 pandemic.

*Political Crisis*

Venezuela continues to be impacted by a prolonged political crisis. Following a May 2018 electoral process that lacked legitimacy, but which Nicolás Maduro claimed to have won, the United States and many other democracies recognized Juan Guaidó as the interim President of Venezuela. Maduro continued to exert control over all Venezuelan institutions after January 2019, aside from the legitimately elected, opposition-controlled 2015 National Assembly. In elections held on December 6, 2020—which were rejected by the Organization of American States, many governments, and other international organizations as fraudulent[5]—supporters of Maduro won a vast majority of seats in the National Assembly under manipulated electoral conditions. Maduro installed a new illegitimate purported National Assembly on January 5, 2021.

*Human Rights*

While concerns about "the deterioration of democratic institutions and threats to freedom of speech and press in Venezuela" have been expressed by human rights organizations for over a decade, CRS reported in August 2020 that human rights conditions are even worse under Maduro than under former President Chávez.[6] The Independent International Fact-Finding Mission created by the UN Human Rights Council to investigate allegations of atrocities since 2014 concluded that there were reasonable grounds to believe that pro-government groups and high-level authorities, including Maduro, had committed violations amounting to crimes against humanity. The mission found the judiciary contributed to arbitrary arrests, impunity for egregious abuses, and denial of justice to victims.[7]

*Health Crisis*

Venezuela was facing a significant health crisis even before the start of the COVID–19 pandemic. According to CRS, "overall health indicators, particularly infant and maternal mortality rates," had deteriorated well before the impact of the COVID–19 pandemic. In April 2019, Human Rights Watch and the Johns Hopkins Bloomberg School of Public Health reported that "Venezuela's health system has been in decline since 2012, with conditions worsening drastically since 2017." Human Rights Watch reported in May 2020 that "Venezuela's health system has collapsed. Shortages of medications and health supplies, interruptions of basic utilities at healthcare facilities, and the emigration of healthcare workers have led to a progressive decline in healthcare operational capacity." Venezuelans also face "severe shortages of medicines and medical supplies"[8] and "a complex situation in which access to basic services, especially health services remain critical."[9]

*Food Insecurity*

In an October 2020 report, the Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP) identified Venezuela (and Venezuelan migrants in neighboring countries) as one of 20 "acute food insecurity hotspots"[10] in

---

[1] World Report 2021—Venezuela, Human Rights Watch, Jan. 2021.

[2] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Aug. 26, 2020.

[3] Venezuelan Humanitarian and Refugee Crisis, Center for Disaster Philanthropy, Jan. 18, 2021.

[4] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Aug. 26, 2020; Venezuelan Humanitarian and Refugee Crisis, Center for Disaster Philanthropy, Jan. 18, 2021; Venezuela: Complex Crisis—Overview, ACAPS, Jul. 27, 2020, *https://www.acaps.org/country/venezuela/crisis/complex-crisis* (last visited Feb. 2, 2021); Venezuela: Humanitarian Response Plan with Humanitarian Needs Overview 2020, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.7–9, Jul. 2020; Detailed findings of the independent international factfinding mission on the Bolivarian Republic of Venezuela, United Nations Human Rights Council, p.27, Sep. 15, 2020; Conflictividad Social 2020 [Social Conflict 2020], Observatorio Venezolano de Conflictividad Social (OVCS), Jan. 25, 2021; Asmann, Parker, and Jones, Katie, InSight Crime's 2020 Homicide Round-Up, InSight Crime, Jan. 29, 2021; Venezuela 2020 Crime & Safety Report, Overseas Security Advisory Council (OSAC), U.S. Department of State, Jul. 21, 2020.

[5] See Remarks by Bradley A. Freden, Deputy Permanent Representative of the United States OAS Permanent Council, OAS Resolution Condemns the Fraudulent Elections in Venezuela (Dec 9, 2020).

[6] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), p.7, Aug. 26, 2020.

[7] OHCHR | Venezuela: UN report urges accountability for crimes against humanity (Sep 16, 2020).

[8] Venezuela: Country Focus, European Asylum Support Office (EASO), p.41, Aug. 2020.

[9] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Venezuela: Health Emergency 12-month update, *https://reliefweb.int/report/venezuela-bolivarian-republic/venezuela-health-emergency-12-month-update-mdrve004,* May 20, 2020.

[10] FAO–WFP early warning analysis of acute food insecurity hotspots: October 2020, Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP), p.6, Nov. 2020.

the world.[11] In an April 2019 report, Human Rights Watch and the Johns Hopkins Bloomberg School of Public Health reported that "[h]unger, malnutrition, and severe shortages of food are widespread" in Venezuela.[12] Despite a lack of nationwide nutrition data—last published by the government in 2007—the report asserted that "available evidence suggests malnutrition is high."[13] Moreover, Human Rights Watch reported in January 2021 that, "[b]ased on data collected prior to the pandemic, the 2020 National Survey of Life Conditions reported 8 percent of children under five acutely malnourished and 30 percent chronically malnourished, or stunted."

To help address shortages of food, the Venezuelan government established the Local Committees for Supply and Production (Comités Locales de Abastecimiento y Producción—CLAP) in 2016. According to the European Asylum Support Office (EASO), the CLAP "are responsible for the delivery of food and other government aid to the communities." However, CLAP food boxes "do not meet the basic nutritional needs," and their delivery is reportedly "inconsistent and discretionary." Furthermore, EASO noted that the CLAP are reportedly used to monitor the population—including the political activity of beneficiaries—and "as a tool to discriminate and harass those who oppose the government or are involved in human rights advocacy." There have also been allegations that certain Venezuelans have been "excluded from the list of CLAP beneficiaries because they were not government supporters."

*Access to Basic Services (Electricity, Water, Gas, etc.)*

Venezuela has seen a "collapse of basic services."[14] In a July 2020 report, OHCHR stated that "Access and quality of basic services, such as transportation, electricity, water and sanitation, and gas, continued to deteriorate, undermining the right to an adequate standard of living."[15] Venezuela also faces "severe shortages of water." Further, "an estimated 86% of Venezuelans reported unreliable water service, including 11% who have none at all", according to an April 2020 survey of 4,500 residents by the non-profit Venezuelan Observatory of Public Services.[16]

*Crime and Insecurity*

Sources reported in mid-2020 that Venezuela has "among the highest homicide and crime victimization rates in Latin America and the Caribbean," and "one of the highest number [sic] of violent deaths in the region and in the world." While Venezuela recorded "a substantial decrease in homicides in 2020," InSight Crime noted in January 2021 that "violence is indeed still rampant" in the country. InSight Crime also reported that—per the Venezuelan Violence Observatory (Observatorio Venezolano de Violencia or OVV)—"a violence epidemic continues to plague every single state, as well as the capital district of Caracas." Sources have attributed recent declines in the homicide rate to a variety of factors, including: A decrease in violence among armed structures that engage in territorial control; fewer opportunities to engage in criminal behavior due to rising poverty, emigration, and economic deterioration, among other factors; and the impact of quarantines and restrictions on movement related to the COVID–19 pandemic. In its 2020 report, the U.S. Department of State's Overseas Security Advisory Council (OSAC) stated that "[h]eavily armed criminals have used grenades and assault rifles to commit crimes at banks, shopping malls, public transportation stations, and universities."[17]

**What authority does the Secretary have to designate Venezuela for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government (Government), to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, or termination of or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A). The Secretary, in his/her discretion, may then grant TPS to eligible nationals of that foreign state (or noncitizens having no nationality who last habitually resided in the designated country). See INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in the foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. See INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. See INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. See INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Notice of the Designation of Venezuela for TPS**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions are met. See INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am designating Venezuela for TPS for 18 months, from March 9, 2021 through September 9, 2022. See INA section 244(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

**Required Application Forms and Application Fees To Register for TPS**

To register for TPS based on the designation of Venezuela, you must submit an Application for Temporary Protected Status (Form I–821) and pay

---

[11] FAO–WFP early warning analysis of acute food insecurity hotspots: October 2020, Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP), p.5–6,12, Nov. 2020.

[12] Venezuela's Humanitarian Emergency: Large-Scale UN Response Needed to Address Health and Food Crises, Human Rights Watch & Johns Hopkins Bloomberg School of Public Health, p.4, Apr. 4, 2019.

[13] Venezuela's Humanitarian Emergency: Large-Scale UN Response Needed to Address Health and Food Crises, Human Rights Watch & Johns Hopkins Bloomberg School of Public Health, p.4, Apr. 4, 2019.

[14] Venezuela: Country Focus, European Asylum Support Office (EASO), p.41, Aug. 2020.

[15] Outcomes of the investigation into allegations of possible human right violations of the human rights to life, liberty and physical and moral integrity in the Bolivarian Republic of Venezuela, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.4, Jul. 2, 2020.

[16] Latest on Water Shortage in Venezuela, Hispanic Oulook Magazine, June 2020.

[17] Venezuela 2020 Crime & Safety Report, Department of State Overseas Security Advisory Council, July 21, 2020.

the filing fee (or submit a Request for a Fee Waiver (Form I–912)). You may be required to pay the biometric services fee. Please see additional information under the ''Biometric Services Fee'' section of this notice.

Although not required to do so, if you want to obtain an EAD valid through September 7, 2021, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or submit a Request for a Fee Waiver (Form I–912)). If you do not want to request an EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may complete a Request for Fee Waiver (Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *dhs.gov/privacy.*

**Refiling a TPS Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 180-day registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to refile by the registration deadline, you may still refile your Form I–821 with the biometrics fee. USCIS will review this situation to determine whether you established good cause for late TPS registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. See INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late initial registration, visit the USCIS TPS web page at *uscis.gov/tps.* Following denial of your fee waiver request, you may also refile your Form I–765, with fee, either with your Form I–821 or at a later time, if you choose.

*Note:* Although a registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of registration, and could wait to seek an EAD until after USCIS has approved your TPS registration application. If you choose to do this, to register for TPS you would only need to file the Form I–821 with the biometric services fee, if applicable (or request a fee waiver).

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

Table 1-Mailing Addresses:

Mail your completed Application for Employment Authorization (Form I–765) and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You are applying through the U.S. Postal Service and you live in Florida. | USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036. |
| You are using FedEx, UPS, or DHL and you live in Florida | USCIS, Attn: TPS Venezuela, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034 |
| You are applying through U.S. Postal Service and you live in any other state. | USCIS Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60690. |
| You are using FedEx, UPS, or DHL and you live in any other state | USCIS, Attn: TPS Venezuela (805282), 131 South Dearborn—3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS website at *uscis.gov/tps* under ''Venezuela.''

**Purpose of this Action (DED)**

Pursuant to the President's constitutional authority to conduct the foreign relations of the United States, foreign policy considerations warrant implementing DED for Venezuela through July 20, 2022.[18] Through this notice, DHS is establishing procedures for individuals covered by DED for Venezuela to apply for employment authorization through July 20, 2022.

---

[18] *See* Deferred Enforced Departure for Certain Venezuelans, 86 FR 6845, January 25, 2021, available at **Federal Register**: Deferred Enforced Departure for Certain Venezuelans.

**What is Deferred Enforced Departure (DED)?**

• DED is an administrative stay of removal ordered by the President. The authority to grant DED arises from the President's constitutional authority to conduct the foreign relations of the United States. The President can authorize DED for any reason related to this authority. DED has been authorized in situations where foreign nationals may face danger if required to return to countries experiencing political instability, conflict, or other unsafe conditions, or when there are other foreign policy reasons for allowing a designated group of foreign nationals to remain in the United States.

• Although DED is not a specific immigration status, individuals covered

by DED are not subject to removal from the United States, usually for a designated period of time. Furthermore, the President may direct that certain benefits, such as employment authorization or travel authorization, be available to foreign nationals covered by the DED directive.

• If the President provides for employment or travel authorization, USCIS administers those benefits. USCIS publishes a **Federal Register** notice to instruct the covered population on how to apply for any benefits provided.

• The President issues directives regarding DED and who is covered via presidential memorandum. The qualification requirements for individuals who are covered under DED are based on the terms of the President's directive regarding DED and any relevant implementing requirements established by DHS. Since DED is a directive not to remove particular individuals, rather than a specific immigration status like TPS, there is no DED application form required to obtain DED coverage.

The Presidential Memorandum ordering DED for Venezuelans can be found at: *https://www.federalregister.gov/documents/2021/01/25/2021-01718/deferred-enforced-departure-for-certain-venezuelans*

**Eligibility and Employment Authorization for DED**

**How will I know if I am eligible for employment authorization under the DED Presidential Memorandum for eligible Venezuelans?**

The procedures for employment authorization in this notice apply only to noncitizens who are Venezuelan nationals, and persons without nationality who last habitually resided in Venezuela, who are present in the United States as of January 20, 2021, and except for noncitizens:

• Who have voluntarily returned to Venezuela or their country of last habitual residence outside the United States;

• Who have not continuously resided in the United States since January 20, 2021;

• Who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or removable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

• Who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

• Who were deported, excluded, or removed, before January 20, 2021;

• Who are subject to extradition;

• Whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

• Whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

**What will I need to file if I am covered by DED and would like to obtain employment authorization?**

If you are covered under DED for Venezuela and would like to work, you must apply for an EAD by filing an Application for Employment Authorization (Form I–765). Please carefully follow the Application for Employment Authorization (Form I–765) instructions when completing the application for an EAD. When filing the Application for Employment Authorization (Form I–765), you must:

• Indicate that you are eligible for DED by entering ''(a)(11)'' in response to Question 27 on the Application for Employment Authorization (Form I–765); and

• Submit the fee for the Application for Employment Authorization (Form I–765).

The regulations require individuals covered under DED who request an EAD to pay the fee prescribed in 8 CFR 103.7 for the Application for Employment Authorization (Form I–765). *See also* 8 CFR 274a.12(a)(11) (employment authorization for DED-covered individuals); and 8 CFR 274a.13(a) (requirement to file EAD application if EAD desired). If you are unable to pay the fee, you may apply for an application fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation.

**How will I know if USCIS will need to obtain biometrics?**

If biometrics are required to produce your EAD, you will be notified by USCIS and scheduled for an appointment at a USCIS Application Support Center.

**Where do I submit my completed DED-based Application for Employment Authorization (Form I–765)?**

For DED, mail your completed Application for Employment Authorization (Form I–765) and supporting documentation to the proper address in Table 2.

TABLE 2—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You are applying through the U.S. Postal Service | USCIS, Attn: DED Venezuela, PO Box 805283, Chicago, IL 60680–6943] |
| You are using FedEx, UPS, or DHL | USCIS, Attn: DED Venezuela, 131 South Dearborn—3rd Floor, ≤Chicago, IL 60603–5517 |

**Can I file my DED-based Application for Employment Authorization (Form I–765) electronically?**

No. Electronic filing is not available when filing an Application for Employment Authorization (Form I–765) based on DED.

**What happens after July 20, 2022, for purposes of DED-based employment authorization?**

This DED authorization is set to end on July 20, 2022. After that date, employers will no longer accept EADs with a category code of A11 and a July 20, 2022, expiration date, and employees will need to present other evidence of continued work authorization.

**General Employment-Related Information for TPS Applicants and Individuals With DED-Based Employment Authorization and Their Employers**

**How can I obtain information on the status of my EAD request?**

To get case status information about your TPS application, as well as the status of your TPS or DED-based EAD request, you can check Case Status Online at *uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on the third page of Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *uscis.gov/I–9Central.* An EAD is an acceptable document under List A.

**If I have an EAD based on another immigration status, can I obtain a new EAD?**

Yes, if you are eligible for DED or TPS, you can obtain a new EAD, regardless of whether you have an EAD based on another immigration status. If you want to obtain a new TPS-based EAD valid through September 9, 2022, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee. If you want to obtain a new DED-based EAD valid through July 20, 2022, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee.

**Can my employer require that I provide any other documentation to prove my status, such as proof of my Venezuelan citizenship?**

No. When completing Form I–9, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the ''Lists of Acceptable Documents.'' Therefore, employers may not request proof of Venezuelan citizenship when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov.* USCIS accepts calls in English, Spanish and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *justice.gov/ierandtheUSCISandE-Verifywebsitesatuscis.gov/i-9-central* and *e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, individuals approved for TPS may show their Form I–797, Notice of Action, indicating approval of their Form I–821 application, or their A12 or C19 EAD to prove that they have TPS. Individuals may present their A11 EAD to show they are covered by DED. However, while Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are covered under TPS and/or DED and/or show you are authorized to work based on TPS and/or DED. Examples of such documents are:

- Your new EAD with a category code of A12 or C19 for TPS, or A11 for DED;
- A copy of your Form I–797, the notice of approval, for a current Form I–821, if you received one from USCIS; or
- Any other relevant DHS-issued document that indicates your immigration status or authorization to be in the United States, or that may be used by DHS to determine whether you have such status or authorization to remain in the United States.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the SAVE program to confirm the current immigration status of applicants for public benefits. SAVE can verify when an individual has TPS or DED based on the documents above. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *uscis.gov/save/save-casecheck,* then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and SAVE verification case number or an immigration identifier number that you provided to the benefit-granting agency. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the response is correct, find detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records on the SAVE website at *www.uscis.gov/save.*

[FR Doc. 2021–04951 Filed 3–8–21; 4:15 pm]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7040–N–05]**

**60-Day Notice of Proposed Information Collection: Public Housing Assessment System (PHAS) Appeals; PHAS Unaudited Financial Statement Submission Extensions; Assisted and Insured Housing Property Inspection Technical Reviews and Database Adjustments; OMB Control No. 2577–0257**

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing, PIH, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* May 10, 2021.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; telephone 202–402–5564 (this is not a toll-free number) or email at *Colette.Pollard@hud.gov* for a copy of the proposed forms or other available information. Persons with hearing or speech impairments may access this number through TTY by calling the Federal Relay Service at (800) 877–8339 (this is a toll-free number).

**FOR FURTHER INFORMATION CONTACT:** Dacia Rogers, Office of Policy, Programs and Legislative Initiatives, PIH, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; telephone 202–402–3374, (this is not a toll-free number). Persons with hearing or speech impairments may access this number via TTY by calling the Federal Relay Service at (800) 877–8339 (this is a toll-free number). Copies of available documents submitted to OMB may be obtained from Ms. Rogers.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

**A. Overview of Information Collection**

*Title of Information Collection:* Public Housing Assessment System (PHAS) Appeals; Public Housing and Multifamily Housing Technical Reviews and Database Adjustments; Assisted and Insured Housing property inspection Technical Reviews and Database Adjustments.

*OMB Approval Number:* 2577–0257.

*Type of Request:* Revision of a currently approved collection.

*Form Number:* HUD–52306.

*Description of the need for the information and proposed use:* The collection of this information supports HUD's ongoing mission to provide safe, decent, and habitable housing to low income households. To ensure HUD's subsidized housing meets this criteria accurate data and information collection is required to provide an assessment reflective of the property's condition. Poorly performing PHAs may be subject to additional reporting requirements, may receive HUD assistance, and are subject to possible penalties. For the Office of Housing, accurate scores are vital to their monitoring and compliance efforts. Unacceptable property scores result in automatic penalties and referral for enforcement actions.

Pursuant to § 6(j)(2)(A)(iii) the United States Housing Act of 1937, as amended, HUD established procedures in the Public Housing Assessment System (PHAS) rule for a public housing agencies (PHAs) to appeal an overall PHAS score or a troubled designation (§ 902.69). The PHAS rule in §§ 902.24 and 902.68 also provides that under certain circumstances PHAs may submit a request for a database adjustment and technical review, respectively, of physical condition inspection results.

Pursuant to the Office of Housing Physical Condition of Multifamily Properties regulation at § 200.857(d) and (e), multifamily property owners also have the right, under certain circumstances, to submit a request for a database adjustment and technical