# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

|  |  |
|---|---|
| CASA, INC. and MAKE THE ROAD NEW YORK,<br><br>                    *Plaintiffs*,<br><br>   v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>                    *Defendants*. | Case No.: 8:25-cv-00525-GLR |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TABLE OF CONTENTS

Page

**PROPOSED FINDINGS OF FACT** ............................................................................. **2**

   I.   Introduction ............................................................................................................. 2

   II.   The Parties .............................................................................................................. 3

   III.  Under the Immigration and Nationality Act, TPS Is Established for Specified Periods, Subject to Extension but Not Early Termination. ......................................................... 4

   IV.  The TPS Statute Provides Eligibility Requirements for TPS Applicants. ......................... 6

   V.   The DHS Secretary Has Repeatedly Designated and Re-Designated Venezuela for TPS. 6

   VI.  Secretary Noem's Purported Vacatur and Termination Would End TPS Prior to "The Expiration of the Most Recent Previous Extension." ...................................................... 10

   VII.  Plaintiffs' Members Are Adversely Affected by the Secretary's Unlawful Actions. ...... 11

**PROPOSED CONCLUSIONS OF LAW** ..................................................................... **13**

   I.   Secretary Noem's Unlawful Actions Are Reviewable Under The APA. ......................... 13

   II.   Plaintiffs Have Standing to Challenge DHS's Action on TPS. ...................................... 19

   III.  The Legal Standard for This Court to Enter a Stay Is Governed by *Winter*. ................... 21

   IV.  Plaintiffs Are Likely to Succeed on the Merits. ........................................................... 22

   V.   Plaintiffs Are Likely to Suffer Irreparable Injury Absent a Stay. ................................... 28

   VI.  The Balance of the Equities and Public Interest Favor Plaintiffs. .................................. 31

   VII.  A Ruling in Favor a Stay Applies as to All Venezuelan TPS Holders. ........................... 33

Pursuant to the Court's Scheduling Order (ECF No. 35), Plaintiffs CASA, Inc. ("CASA") and Make the Road New York ("MRNY") provide the following Proposed Findings of Fact and Conclusions of Law. Any below-listed Finding of Fact that should be more properly listed as a Conclusion of Law is hereby incorporated by reference and adopted as a Conclusion of Law. Conversely, any below-listed Conclusion of Law that should be more properly listed as a Finding of Fact is hereby incorporated by reference and adopted as a Finding of Fact.

**PROPOSED FINDINGS OF FACT**

I.    **Introduction**

1.    This matter pertains to the decision by U.S. Department of Homeland Security ("DHS") Secretary Kristi Noem to first, "vacate" the January 17, 2025 extension of Temporary Protected Status ("TPS") for Venezuela (which extended TPS for Venezuela through October 2, 2026),[1] and subsequently terminate Venezuela's 2023 TPS designation.[2]

2.    In their Complaint (ECF No. 1) (the "Complaint"), filed on February 20, 2025, Plaintiffs allege that the Vacatur and Termination are unlawful under the Administrative Procedure Act ("APA").  Plaintiffs also bring Equal Protection and Substantive Due Process claims under the Fifth Amendment.

3.    On March 3, 2025, Plaintiffs filed a Motion for Partial Summary Judgment (ECF No. 8) ("MPSJ") as to Counts I and II of the Complaint, which challenge the Vacatur and subsequent Termination under the APA as being not in accordance with law under 5 U.S.C. § 706. In its Order on March 11, 2025 (ECF No. 33) (the "Order"), this Court granted Defendants' motion to stay briefing on Plaintiffs' MPSJ (ECF No. 27) (the "Stay Motion") to allow Defendants time to respond to the Complaint.  ECF No. 33.  However, in staying the briefing, this Court acknowledged the "potentially severe prejudice to Plaintiffs" should the Termination go into effect on April 7.  *Id.* at 3.

4.    Also on March 11, 2025, Plaintiffs filed a Cross-Motion to Stay Agency Action (ECF No. 32) ("Mot." or "Motion") pursuant to 5 U.S.C. § 705 to stay the effective date of the

---

[1]    Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805 (Feb. 3, 2025) (the "Vacatur").

[2]    Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040 (Feb. 5, 2025) (the "Termination").

2

Vacatur and Termination pending resolution of this action.  The Court's order staying briefing on the MPSJ did not stay the Motion.  *See* ECF No. 33.

## II.    <u>The Parties</u>

### a.    CASA

5.    Plaintiff CASA is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Declaration of George Escobar, ECF No. 8-9 ("Escobar Decl.") ¶ 3.

6.    Founded in 1985, CASA has more than 173,000 lifetime members, including thousands of TPS beneficiaries as members and more than 2,000 members overall who have ties to Venezuela.  *Id.* ¶¶ 4, 10, 12.

7.    Since its founding, CASA has provided direct assistance on approximately 1,000 TPS applications for its members, including legal services to over 100 Venezuelan members seeking TPS, at least 59 of whom received TPS.  *Id.* ¶ 12.

8.    Among its membership, CASA specifically identified three (3) members who are TPS holders under the 2021 designation of TPS,[3] as well as four (4) members who are TPS holders under the 2023 designation of TPS.[4]  *Id.* ¶¶ 15–21.

### b.    MRNY

9.    Plaintiff MRNY is a nonprofit membership organization incorporated in New York with offices in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties. Declaration of Sienna Fontaine, ECF No. 8-10 ("Fontaine Decl.") ¶ 3.

10.    MRNY currently has more than 28,000 members.  *Id.* ¶ 11.

---

[3]    Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure, 86 Fed. Reg. 13574 (Mar. 9, 2021) (the "2021 Designation").

[4]    Extension and Redesignation of Venezuela for Temporary Protected Status, 88 Fed. Reg. 68130 (Oct. 3, 2023) (the "2023 Designation").

11.     Among its membership, more than 20 members are Venezuelan TPS beneficiaries or prima-facie eligible applicants for TPS and more than 200 members' country of origin is Venezuela. *Id.*

12.     MRNY provides representation in immigration cases as a core component of its work and has represented hundreds of individuals seeking relief through TPS, including over 60 Venezuelans. *Id.* ¶¶ 9, 12.

13.     Among its membership, MRNY specifically identified one (1) member who is a TPS holder under the 2021 Designation of TPS, as well as three (3) members who are TPS holders under the 2023 Designation of TPS. *Id.* ¶¶ 18–21.

**c.     Secretary Noem**

14.     Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity.

**d.     DHS**

15.     Defendant U.S. Department of Homeland Security is a cabinet agency of the United States responsible for administering federal immigration laws and programs, including TPS.

**III.    Under the Immigration and Nationality Act, TPS Is Established for Specified Periods, Subject to Extension but Not Early Termination.**

16.     Under the Immigration and Nationality Act of 1990, 8 U.S.C. §§ 1101 to 1537 ("INA"), the Secretary of Homeland Security may designate a country for protected status for up to eighteen months if the Secretary, after consultation with appropriate agencies of the Government,

A.     . . . finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

B.     . . . finds that—

       i.         there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

       ii.       the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and,

       iii.     the foreign state officially has requested designation under this subparagraph; or

C.     . . . finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).

17.     TPS allows nationals of a designated country (and individuals with no nationality who last habitually resided in that country) who are present in the United States at the time of the designation and meet other stringent eligibility criteria to remain lawfully in the United States for the duration of the designation.  *Id.* § 1254a(a), (c).

18.     After a country is designated for TPS, the INA provides a process for periodic review of that designation.  At least 60 days before the end of the initial designation period or any extended designation period, the Secretary shall, "after consultation with appropriate agencies of the Government," "review the conditions in the foreign state (or part of such foreign state) for which designation is in effect" and "determine whether the conditions for such designation under this subsection continue to be met."  *Id.* § 1254a(b)(3)(A).

19.     The INA provides authority for the Secretary to redesignate a country for TPS "after consultation with appropriate agencies of the Government."  *Id.* § 1254a(b)(1).

20.     The INA also provides a specific process for termination of TPS.  The Secretary may terminate TPS only if, following her periodic review, she determines the designated country "no longer continues to meet the conditions of designation."  *Id.* § 1254a(b)(3).  The effective date

of any TPS termination must be at least 60 days after the termination notice is published and no earlier than "the expiration of the most recent previous extension." *Id.*

21.     If, after the review process, the Secretary does not determine that a country's TPS designation should terminate, the country's TPS designation automatically extends for at least six months or, by the Secretary's discretion, a period of twelve or eighteen months. *Id.* § 1254a(b)(3)(C).

## IV.     The TPS Statute Provides Eligibility Requirements for TPS Applicants.

22.     All TPS applications are individually reviewed by the U.S. Citizenship and Immigration Services ("USCIS") , and all applicants are required to submit to a background check. *Temporary Protected Status*, USCIS, https://www.uscis.gov/humanitarian/temporary-protected-status (last visited Mar. 27, 2025).

23.     Additionally, the TPS statute provides that an individual cannot be eligible for TPS if, among other things, they have been convicted of more than a single misdemeanor, have been involved in drug trafficking, could be reasonably regarded as "a danger to the security of the United States," or are involved in a "terrorist organization." 8 U.S.C. § 1254a(c)(2); *id.* § 1158(b)(2)(A); *id.* § 1182(a)(2)(A)–(C), (3)(B).

24.     The Secretary may also withdraw TPS from any individual later determined to lack eligibility. *Id.* § 1254a(c)(3).

## V.     The DHS Secretary Has Repeatedly Designated and Re-Designated Venezuela for TPS.

**a.     March 9, 2021 Publication Notice of "Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure" as Published in the Federal Register.**

25.     For the first time in March 2021, then-Secretary of DHS Alejandro Mayorkas designated Venezuela for TPS based on the extraordinary and temporary conditions in Venezuela,

enabling Venezuelans already residing in the United States as of that date to apply for TPS.   86 Fed. Reg. 13574.

26.     In so doing, DHS cited Venezuela's economic, health, and political crises, lack of access to basic services, human rights abuses, food insecurity,  rising levels of violence and "other factors," to support the 2021 Designation.  *Id.*

27.     In 2020, just prior to the initial designation of Venezuela for TPS, Venezuela's economy, health system, and basic services collapsed, the country plunged deeper into political crisis, human rights deteriorated, and malnutrition spiked.  *Id.* at 13576–77.

**b.     September 8, 2022 Publication Notice of "Extension of the Designation of Venezuela for Temporary Protected Status" as Published in the Federal Register.**

28.     On September 8, 2022, because conditions in Venezuela had not improved, Secretary Mayorkas extended Venezuela's designation until March 10, 2024.   Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55024 (Sept. 8, 2022).

29.     The extension notice cited Congressional Research Service reports from April 2021 that Venezuela was "in the throes of a multiyear economic crisis, one of the worst economic crises in the world since World War II."  *Id.* at 55026.

**c.     October 3, 2023 Publication Notice of "Extension and Redesignation of Venezuela for Temporary Protected Status" as Published in the Federal Register.**

30.     In October 2023, Secretary Mayorkas again extended Venezuela's TPS designation until September 10, 2025.  88 Fed. Reg. 68130.

31.     In extending the designation once again, DHS cited to the continued "severe humanitarian emergency" in Venezuela, as well as recent environmental disasters that contributed to the country's instability.  *Id.* at 68132, 68134.

32.     In the same October 2023 notice, Secretary Mayorkas also redesignated Venezuela for TPS for 18 months, through April 2, 2025. *Id.* at 68132.

33.     The redesignation allowed more Venezuelans to apply for TPS for the first time, provided they had continuously resided in the U.S. since July 31, 2023, and were continuously physically present in the United States since October 3, 2023. *Id.*

34.     The October 2023 decision thus created two different tracks for Venezuelan TPS holders: (1) those who initially registered under the 2021 Designation, who could re-register under the October 2023 extension to receive TPS protections through September 10, 2025; and (2) those who initially registered under the 2023 Designation, who would receive TPS protections through April 2, 2025. *See id.* at 68130.

35.     Pursuant to the October 2023 notice, 2023 Designation beneficiaries were eligible to receive an Employment Authorization Document ("EAD") proving "their legal right to work" through April 2, 2025. *Id.* at 68135.

**d.     January 17, 2025 Publication Notice of "Extension of the 2023 Designation of Venezuela for Temporary Protected Status" as Published in the Federal Register.**

36.     On January 10, 2025, Secretary Mayorkas announced the extension of the 2023 Designation for 18 months, through October 2, 2026.[5]  The announcement cited to the "severe humanitarian emergency the country continues to face due to political and economic crises under the inhumane Maduro regime," which "contributed to high levels of crime and violence, impacting access to food, medicine, healthcare, water, electricity, and fuel."[6]

---

[5]      *DHS to Extend Temporary Protected Status for Venezuela*, U.S. Dep't of Homeland Sec. (Jan. 10, 2025), https://www.dhs.gov/archive/news/2025/01/10/dhs-extend-temporary-protected-status-venezuela.
[6]      *Id*.

37. On January 17, 2025, DHS issued a Federal Register Notice extending the 2023 Designation through October 2, 2026. Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5961 (Jan. 17, 2025) (the "January 2025 Extension").

38. The notice instructed TPS holders that "this Federal Register notice automatically extends [certain identified EADs] through April 2, 2026 without any further action on your part." *Id.* at 5967. It likewise instructed employers to "accept" an expired EAD accompanied by a copy of the January 17, 2025 Federal Register Notice as proof of work authorization through April 2, 2026. *Id.* at 5969–70.

39. The re-registration period began on January 17, 2025 and was scheduled to run until September 10, 2025. *Id.* at 5962.

40. Consistent with the INA, 8 U.S.C. § 1254a(b)(3)(A), Secretary Mayorkas's decision to extend the 2023 Designation occurred approximately 80 days before the designation was set to expire on April 2, 2025.

41. The January 2025 Extension also consolidated the applicant filing processes, allowing all eligible Venezuelan TPS beneficiaries (from both the 2021 and 2023 Designations) to obtain TPS through October 2, 2026. *Id.* at 5962.

42. The notice explained that this decision was based on USCIS's evaluation that it could "most efficiently process [cases for both designations] by consolidating the filing processes for the two Venezuela TPS populations." *Id.* at 5963.

43. The January 2025 Extension concluded that Venezuela continued to experience "a complex, serious and multidimensional humanitarian crisis" with residents "suffer[ing] the second-highest level of hunger in South America." *Id.*

44.    The Extension also cited the lack of basic services, the healthcare system's collapse, the prolonged economic meltdown, and that President Maduro's systemic human rights violations continued.  *Id.*

**VI.    Secretary Noem's Purported Vacatur and Termination Would End TPS Prior to "The Expiration of the Most Recent Previous Extension."**

45.    On January 25, 2025, Secretary Noem was sworn in as DHS Secretary.

46.    On February 3, 2025, Secretary Noem formally published the "Vacatur of 2025 Temporary Protected Status Decision for Venezuela."  90 Fed. Reg. 8805 (Feb. 3, 2025).  The Vacatur announced that DHS "has decided to vacate the January 10, 2025, decision of former Secretary of Homeland Security Alejandro Mayorkas regarding TPS for Venezuela," effective immediately.  *Id.* at 8806.

47.    Rather than terminate the designation, the Vacatur would apparently have returned to the *status quo ante* the January 2025 Extension, in which the 2021 and 2023 Designations would remain in effect, and Secretary Noem would decide whether to extend the designations by February 1, 2025 and July 12, 2025, respectively.  *Id.* at 8807.

48.    The Vacatur also "rescinded" the automatic EAD extensions provided in the January 2025 Extension such that EADs of 2023 Designation beneficiaries would expire on April 2, 2025.  *Id.*

49.    On February 5, 2025, Secretary Noem issued a "Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status."  90 Fed. Reg. 9040.  The Termination announced that Secretary Noem was "terminating the 2023 TPS designation of Venezuela," effective April 7, 2025.  *Id.* at 9041.

50.    The Termination states that it will take effect April 7, 2025, or 60 days after the publication of the Termination Notice.  *Id.* at 9044.

**VII.    Plaintiffs' Members Are Adversely Affected by the Secretary's Unlawful Actions.**

51.    If EADs for 2023 Designation holders expire on April 2, 2025, nearly 350,000 Venezuelan TPS holders (those registered under the 2023 Designation) will lose TPS-related work authorization.[7]

52.    If the Termination takes effect on April 7, 2025, those TPS holders will lose their legal status and face deportation.

53.    In a matter of days, these hundreds of thousands of people may lose their jobs and face the imminent risk of deportation to a country that—as DHS has recently reaffirmed—faces "extraordinary" conditions that prevent them from "returning . . . in safety." 90 Fed. Reg. 5961, 5966. Shortly afterward, another 250,000 Venezuelan TPS holders (those under the 2021 Designation) expect to face a similar fate.[8]

54.    As described in the Plaintiffs' declarations, thousands of TPS holders and their families fear the imminent consequences of Defendants' actions. *See* Escobar Decl. ¶¶ 14–29, 31–33; Fontaine Decl. ¶¶ 17–26, 29–31.

55.    The affidavits of Sienna Fontaine, on behalf of MRNY, and George Escobar, on behalf of CASA, submitted with the MPSJ, collectively describe the circumstances of seven beneficiaries of TPS under the 2023 Designation and four beneficiaries of TPS under the 2021 Designation. *See* Escobar Decl. ¶¶ 14–29; Fontaine Decl. ¶¶ 17–26.

56.    Were the Vacatur and Termination to go into effect, the beneficiaries of the 2023 Designation would lose TPS protection eighteen months before the January 2025 Extension's

---

[7]    90 Fed. Reg. 9040, 9041 (stating that there are approximately 348,202 Venezuelan beneficiaries registered under the 2023 Designation).

[8]    90 Fed. Reg. 9040, 9041 (stating that there are approximately 348,202 Venezuelan beneficiaries registered under the 2023 Designation); 90 Fed. Reg. 5961, 5966 (stating that there are approximately 607,000 current Venezuelan TPS beneficiaries across the 2021 and 2023 Designations).

expiration, and the beneficiaries of the 2021 Designation would lose protection thirteen months earlier than the January 2025 Extension's expiration.

57.     Loss of TPS will expose numerous individuals to an immediate risk of detention and deportation to a country that has been deemed to be experiencing a "humanitarian crisis." *See, e.g.*, Fontaine Decl. ¶¶ 24, 25; Escobar Decl. ¶¶ 24–27, 29; 90 Fed. Reg. 5961, 5963.

58.     Severe economic harm will also ensue once the Termination goes into effect.  As of April 2, 2025, TPS holders, including members of Plaintiffs' organizations, would no longer be able to rely on their TPS-based employment authorization to provide for themselves and their families. *See, e.g.*, Fontaine Decl. ¶¶ 18–20.  Even now, the impending loss of work authorization has already caused many TPS holders to fear an imminent loss of income, which would have devastating consequences on those individuals and their families.

59.     Defendants' impending Termination of TPS for Venezuelans is already inflicting— and will continue to inflict—severe emotional harm on TPS holders and their family members.

60.     Both the Vacatur and Termination have caused TPS holders to reasonably fear an imminent loss of income and face severe mental anguish at the prospect of returning to a country where their safety is at risk, causing them to experience anxiety, depression, and fear.  Fontaine Decl. ¶¶ 29–31; Escobar Decl. ¶¶ 23–29, 33.

61.     The impending Termination looms large in the eyes of TPS holders, including members of Plaintiffs' organizations, and causes them to fear engaging in simple acts, like taking their children to school, for fear of raids.  Fontaine Decl. ¶ 30.

62.     Plaintiffs have provided reports that Defendants have been working to close alternative avenues of immigration status, such as asylum, for Venezuelan individuals. *See e.g.*, Michael Kunzelman and Regina Garcia Cano, *A Timeline of the Legal Wrangling and Deportation*

*Flights After Trump Invoked the Alien Enemies Act*, The Associated Press (Mar. 21, 2025), https://apnews.com/article/trump-deportation-courts-aclu-venezuelan-gang-timeline-43e1deafd66fc1ed4e934ad108ead529; Robin Givhan, *In Tweets and Memes: The Trump Administration's Deportation Policy*, The Washington Post (Mar. 19, 2025), https://www.washingtonpost.com/nation/2025/03/18/tweets-memes-trump-administrations-deportation-policy; Order, *J.G.G. et al., v. Donald J. Trump, et al.*, No. 1:25-cv-00766-JEB, ECF No. 38; Declaration of Robert L. Cerna, *J.G.G., et al., v. Donald J. Trump, et al.*, No. 1:25-cv-00766-JEB, ECF No. 26-1; Charlie Savage and Julian E. Barnes, *Intelligence Assessment Said to Contradict Trump on Venezuelan Gang*, The New York Times (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/us/politics/intelligence-trump-venezuelan-gang-alien-enemies.html; Sergio Martinez-Beltran, *Families of Deported Venezuelans Dispute Gang Claims After Deportations Under Alien Enemies Act*, NPR (Mar. 21, 2025), https://www.npr.org/2025/03/21/nx-s1-5333886/families-of-deported-venezuelans-dispute-gang-claims-after-deportations-under-alien-enemies-act; Christal Hayes, *Trump Revoking Protections for Cubans, Haitians and Other Migrants*, BBC, https://www.bbc.com/news/articles/c33706jy774o (last visited Mar. 27, 2025).

## PROPOSED CONCLUSIONS OF LAW

### I.    Secretary Noem's Unlawful Actions Are Reviewable Under The APA.

#### a.    Courts Can Set Aside Agency Actions That Are Contrary to Law.

1. Under the Administrative Procedure Act ("APA"), agency action that is "not in accordance with law" is subject to judicial review, and the reviewing court shall "hold unlawful and set aside" such action.  5 U.S.C. § 706(2).

2. An action for judicial review may be filed by a person "suffering legal wrong" or "adversely affected or aggrieved by agency action."  *Id.* § 702.

13

3.      Review under the APA is available both for "action made reviewable by statute" and for "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

4.      "Final agency action" is action which marks "consummation of the agency's decision making process" and "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, (1970)).

5.      Section 706(2)(A) "requires federal courts to set aside federal agency action" that is "not in accordance with law." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis added); *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 772 (D. Md. 2021) ("Where agency action is found contrary to law, it is clear that vacatur is required.").

6.      Where agencies exceed their statutory authority with legally deficient orders, federal courts must set aside the agency action. *See Sierra Club v. U.S. Army Corps. Of Eng'rs*, 909 F.3d 635, 655 (citing *NextWave*, 537 U.S. at 300); *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 263 (4th Cir. 2022) (emphasizing court's "broad charter . . . to give declaratory relief with respect to defining terms employed by the agency in this action").

**b.      The Vacatur and Early Termination Are Final Agency Actions for Which There Is No Other Remedy in a Court.**

7.      The challenged DHS actions in this case satisfy the standard for judicial review under the APA.

    a.   The Vacatur and Termination are actions of a federal agency.

    b.   The Vacatur and Termination both purport to be final action.  90 Fed. Reg. 8805, 8806 ("This notice vacates Mayorkas' notice immediately."); 90 Fed. Reg. 9040, 9041 ("This termination is effective April 7, 2025.").

14

  c. The Vacatur and Termination both adversely affect the rights of Plaintiffs'

  members.

  d. Defendants do not challenge the finality of these actions.

8. The INA does not prescribe any alternative or different mechanism for judicial review. *See CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 321 (D. Md. 2018) (explaining that removal proceedings do not provide meaningful alternative review because plaintiffs must lose protected status and face removal before bringing claims—a choice "tantamount to a complete denial of judicial review").

9. Accordingly, judicial review is available unless Congress has withdrawn the right of review either through a "statute[] preclud[ing] judicial review" or because "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

  **c.** **The Challenged Actions Do Not Fall Within Section 1254a's Limit on Judicial Review.**

10. "[C]lear and convincing evidence" is required to show that Congress intended to bar Plaintiffs' claims. *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 63–64 (1993).

11. Section 1254a(b)(5)(A) provides "[t]here is no judicial review of a determination of the [Secretary] with respect to the designation, or termination, or extension of a designation, of a foreign state under this subsection."

12. Congress did not withdraw the right to seek judicial review under Section 1254a(b)(5)(A) for agency action that is contrary to law. Section 1254a(b)(5)(A) only forecloses judicial review of "any *determination* of the [Secretary] with respect" to such designations or terminations. *Id.* (emphasis added).

13. Section 1254a(b)(5)(A) does not withdraw the right to seek judicial review for agency action that is precluded by statute. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479

(1991) (holding statutory bar on "a determination" did not preclude judicial review of the "practice or procedure" to make the determination"); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 320 (D. Md. 2018) ("This language closely resembles the language found in *McNary* and *Reno* not to constitute an absolute bar on judicial review, but instead to bar review on the merits of an individual determination.").

14. The Supreme Court has recognized that "determination" is a term of art in the context of statutory limits on judicial review. "[T]he reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 492 (1991); *see also Cuozzo Speed Tech. v. Commerce for Intell. Prop.*, 579 U.S. 261, 275 (2016) (holding that statutory bar on review of "determinations" did not "categorically preclude review" or "enable the agency to act outside its statutory limits"; "such 'shenanigans' may be properly reviewable . . . under the Administrative Procedure Act[.]").

15. Because Section 1254a(b)(5)(A) does not foreclose review of whether the agency making these "determinations" did so in accordance with the procedures established by law, Section 1254a(b)(5)(A)'s bar on judicial review does not apply to Plaintiffs' claims.

**d.    The Issuance of a Stay Is Not Barred by Section 1252(f).**

16. Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" certain provisions of the INA. U.S.C. § 1252(f)(1).

17. The Supreme Court has described 8 U.S.C. § 1252(f)(1) as applying only to §§ 1221–1232. *Biden v. Texas*, 597 U.S. 785, 797 (2022) (describing Section 1252(f) as restraining the operation of "8 U.S.C. §§ 1221-1232"); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525

U.S. 471, 481 (1999) (Section 1252(f) "prohibits federal courts from granting class-wide injunctive relief against the operation of §§ 1221-1231"), which does not encompass TPS, 8 U.S.C § 1254a.

18.     Assuming *arguendo*, however, that Section 1252(f)(1) could apply to an action concerning TPS, relief under 5 U.S.C. § 705 is not injunctive relief prohibited by Section 1252(f)(1). Section 705's mandate to "postpone the effective date of an agency action," thereby allows courts to issue a stay. 5 U.S.C. § 705; *see D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020) (Section 705 "plainly and simply 'authorizes courts to stay agency rules pending judicial rules'"); *Americans for Beneficiary Choice v. U.S. Dep't Health and Human Servs.*, 2024 WL 3297527, at *7 (W. D. Tex. July 3, 2024) ("[B]y 'postpon[ing] the effective date of an agency action,' a section 705 stay stops the portions of the rule which are deemed to be almost certainly unlawful[.]").

19.     The Supreme Court has held that 8 U.S.C. § 1252(f) does not prevent a court from staying agency action. *Nken v. Holder*, 556 U.S. 418, 428–49 (2009).

20.     While a stay and an injunction "[b]oth can have the practical effect of preventing some action before the legality of that action has been conclusively determined . . .a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct." *Id.* at 428–29.

21.     Accordingly, "Congress could limit [courts'] authority to issue stays, just as it has limited district judges' authority to issue injunctions. But treating a rule addressed to 'injunctions' as covering 'stays' would impoverish the language[.]" *Hor v. Gonzalez*, 400 F.3d 482, 484 (7th Cir. 2005); *Casa de Maryland v. Wolf*, 486 F. Supp. 3d 928, 971 (D. Md. 2020) ("Although the standard for a preliminary injunction and a stay pursuant to [Section 705] are the same . . . Section 705 is a congressionally conferred remedy exclusive in the [APA] context and available to the

Court when necessary to 'prevent irreparable injury'"); *Washington v. DHS*, 408 F. Supp. 3d 1191, 1212 (E.D. Wash. 2019) ("Section 705 and preliminary injunctions under Rule 65, although determined by application of similar standards, offer different forms of relief.").

22.     Had Congress intended to strip courts of the ability to stay orders pursuant to Section 1252(f), it would have said so clearly.  *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 11 (1942) ("Congress would not, without clearly expressing such a purpose, deprive the [court] of its customary power to stay orders under review.").

23.     Accordingly, even if Section 1252(f)(1) applied here, it does not restrict the Court's ability to issue a stay under Section 705 in this instance.

**e.     A Stay Under Section 705 Is Timely.**

24.     TPS for all Venezuelans would continue unabated were it not for the *Termination*, which will not take effect until April 7.  *See* Mot. 5.

25.     Furthermore, "[c]ourts – including the Supreme Court – routinely stay already-effective agency action under Section 705."  *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (collecting cases); *Wolf*, 486 F. Supp. 3d at 970–71 (finding requirements of a stay met after effective date of rule had passed).

26.     The Vacatur purportedly took effect when it was published and "rescinded" the automatic EAD extensions, 90 Fed. Reg. 8805, 8807, such that EADs of 2023 Designation beneficiaries would expire on April 2, 2025.  88 Fed. Reg. 68130, 68135.

27.     Relief "under Section 705 (even after the effective date) restores the . . . status quo *ex ante*," *i.e.*, the conditions that existed under the January 2025 Extension.  *Texas*, 646 F. Supp. 3d at 771.

28.     Thus, this Court can likewise stay the Vacatur such that the January 2025 Extension's expiration date of October 2, 2026, and automatic EAD extension date of April 2, 2026, remain in effect.  90 Fed. Reg. 5961, 5962.

29.     For these reasons, this Court has the ability to stay the Vacatur and Termination for the duration of the proceedings.

## II.     Plaintiffs Have Standing to Challenge DHS's Action on TPS.

30.     To establish standing, a plaintiff must have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," "fairly traceable to the challenged action of the defendant," and (c) "likely . . . [to] be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

31.     Organizational plaintiffs can establish standing by showing a cognizable injury was suffered by the organization's members rather than the organization itself.  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396–97 (2011).

32.     Associational standing is established with a showing that (1) the organization's members "have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. Openband at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (quoting *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)).

33.     As part of this showing, the organization must set forth facts to make plausible that "at least one identified member had suffered or would suffer harm." *S. Walk*, 713 F.3d at 184 (emphasis omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

34.   Defendants do not challenge Plaintiffs' standing.

35.   Plaintiffs have established associational standing based on detailed, sworn declarations proving that their members are directly affected by Defendants' actions.  Escobar Decl. ¶¶ 15–21 (identifying CASA members with Venezuelan TPS); Fontaine Decl. ¶¶ 11, 18–21 (identifying MRNY members with Venezuelan TPS and noting that "at least 20 [MRNY members] are Venezuelan TPS beneficiaries or prima-facie eligible applicants for TPS.").

36.   Courts, including courts in this district, have consistently held that this is enough. *See Virginia Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 652 (E.D. Va. 2023) (finding plaintiffs had associational standing and granting summary judgment in their favor where plaintiffs "established by affidavit that all VHHA members have been economically harmed by" the challenged agency action); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 952 (10th Cir. 2024) (acknowledging the "[l]ongstanding and well-established doctrine in the federal courts" that anonymous persons may have standing to bring claims because identifying an injured member as "Member 1" certainly satisfies the need that a particular person must show injury).

37.   Plaintiffs' members' injuries stem from Defendants' action purporting to vacate the extension of TPS and subsequently terminate TPS for these members, and the relief requested—suspension of both the Vacatur and Termination—would redress those injuries.

38.   Protecting TPS for their members is germane to the purposes of Plaintiffs CASA and MRNY, each of which seeks to assist immigrant and working class communities, including by helping eligible individuals to secure TPS benefits.  Escobar Decl. ¶¶ 8–9, 12; Fontaine Decl. ¶¶ 9–12.

39.     The participation of Plaintiffs' individual members is not required to adjudicate the claim here, which addresses categorically whether the Termination should be stayed for all Venezuela 2023 TPS holders, not with respect to the characteristics of any particular TPS holder.

40.     Plaintiffs' specific allegations of injury with respect to their members, which Defendants do not challenge, are sufficient to establish standing at this stage.

## III.    The Legal Standard for This Court to Enter a Stay Is Governed by *Winter*.

41.     The legal standard for analyzing whether a stay of agency action is proper corresponds to the legal standard for analyzing whether a preliminary injunction is proper.  *See District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

42.     Specifically, in determining whether a stay of agency action is proper under Section 705, a court will conduct a balancing test using the *Winter* factors.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

      a.   *First*, a court considers whether the requesting party is likely to succeed on the merits of their claim.  *Id.*

      b.   *Second*, a court considers whether the requesting party will suffer irreparable harm if a stay is not entered.  *Id.*

      c.   *Third*, a court considers whether the balance of equities are in the requesting party's favor.  *Id.*

      d.   *Fourth and finally*, a court considers whether a stay would be in the public interest.  *Id.*

43.     In cases where the government is a party, the third and fourth *Winter* factors merge. *Wolf*, 486 F. Supp. 3d at 969–70.

IV.    <u>**Plaintiffs Are Likely to Succeed on the Merits.**</u>

    **a.    Plaintiffs Are Likely to Show That Secretary Noem's Purported Vacatur of the January 2025 Extension Was Contrary to Law.**

44.    Plaintiffs have established a strong likelihood of success on the merits of their claims because, by the INA's plain terms, Secretary Noem has no authority to "vacate" a TPS extension already granted.

45.    Defendants concede that the INA contains no express grant of authority to "vacate" a prior TPS determination.  Instead, Defendants purport to rely on an "inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination."  90 Fed. Reg. 8805, 8806; Defendant's Response in Opposition to Motion, ECF No. 36 ("Opp.") at 19–22.  Plaintiffs are likely to succeed in showing that no such "inherent authority" exists.

46.    The Supreme Court has repeatedly emphasized that agencies "are creatures of statute" and "possess only the authority that Congress has provided."  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,* 595 U.S. 109, 117 (2022).

47.    DHS therefore "has no inherent authority," but "only the authority given it by" the INA.  *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023).

48.    "There is no general principle that what [an agency] can do, [it] can undo."  *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc) (Attorney General lacked inherent authority to denaturalize people allegedly granted citizenship in error); *see U.S. v. Clarke*, 628 F. Supp. 2d 1, 7 (D.D.C. 2009) (citing *Gorbach* to reiterate that citizenship is safeguarded from abrogation save for some "clearly defined procedure").

49.     It is "sometimes" true that Congress grants agencies such authority; it is "sometimes not." *Gorbach*, 219 F.3d at 1095; *United States v. Seatrain Lines*, *Inc.,* 329 U.S. 424 (1947) (agency lacked authority to modify shipping certificate already issued).

50.     Pursuant to this framework, courts have consistently rejected agencies' reliance on "implied powers" to disregard enumerated statutory procedures. *Nat. Res. Def. Council v. Regan,* 67 F.4th 397 at 403–04 (holding EPA lacked implicit authority to rescind its position that a contaminant should be regulated where, by statute, that conclusion triggered specific periodic review process); *Am. Methyl Corp. v. EPA*, 749 F.2d. 826, 835–38 (D.C. Cir. 1984) (holding EPA lacked implicit authority to revoke waiver permitting sale of fuel additive where statute established mechanism for prohibiting sale of dangerous additives, including those "mistakenly waived into commerce").

51.     Rather, where statutes provide "specific instructions," those instructions "are to be followed scrupulously" and "should not be modified by resort to such generalities as 'administrative flexibility' and 'implied powers.'" *Civil Aeronautics Bd. v. Delta Airlines Inc.*, 367 U.S. 316, 325 (1961); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 428 (2024) (Gorsuch, J., concurring) ("[I]t is Congress's view of 'good government' . . . that controls."). Congress "undoubtedly can limit an agency's discretion to reverse itself," *New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008), and it has done so here.

52.     The INA makes clear that once a foreign state has been designated for TPS, as the January 2025 Designation did as to Venezuela, such designation "*shall* remain in effect until the effective date of [any subsequent] termination of the designation under paragraph (3)(B)," and "[s]uch termination . . . *shall not be effective earlier* than 60 days after the date the notice is published or, if later, *the expiration of the most recent previous extension*." 8 U.S.C. §

1254a(b)(2)(B), (3)(B) (emphasis added); *see Bufkin v. Collins*, 145 S.Ct. 728, 737 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command.").

53.    At the time of Secretary Noem's Vacatur, an extension was in force, specifically, Secretary Mayorkas's decision to extend Venezuela's TPS designation to October 2, 2026.  90 Fed. Reg. 5961.

54.    Defendants cannot circumvent the statutory procedures for termination of TPS by rebranding a termination as a "vacatur" of a prior extension.  To hold otherwise would allow federal agencies, including DHS, to employ a "back-door mechanism . . . to circumvent Congress's intended [processes]" for termination and extensions under the statute.  *Sierra Club v. U.S. Army Corps. of Engineers*, 909 F.3d 635, 652 (4th Cir. 2018); *Virginia Hospital & Healthcare Ass'n*, 671 F. Supp. 3d 633*,* 661 (E.D. Va. 2023) (finding that agency action was "contrary" to the statutory scheme based not only on "isolated provisions" but also by "giv[ing] meaning and effect to the overall statutory scheme") (citing *King v. Burwell*, 576 U.S. 473, 486 (2015)).

55.    The cases Defendants cite to support their claims of inherent authority, Opp. 28–29, are inapposite.

56.    *The Last Best Beef v. Dudas* focused on instances where federal agencies can correct themselves if they "take erroneous or unlawful action."  506 F.3d 333, 340 (4th Cir. 2007) (finding that the U.S. Patent Office had authority to cure a legal deficiency after it unknowingly issued a trademark hours after legislation prohibiting the trademark was enacted).

57.    Here, Secretary Noem did not claim any "error" in Secretary Mayorkas's extension for Venezuela.  *See* Vacatur at 8807.  She cited only his "novel approach" to consolidating the two Venezuela designations, and what she considered his "inadequately developed" explanation for it. *Id.*

58.     In fact, the TPS statute does afford the DHS Secretary broad discretion to establish the "manner" by which "the alien registers for the temporary protected status under this section." 8 U.S.C. § 1254a(c)(1)(A).  Indeed, DHS regularly establishes a single re-registration process for TPS beneficiaries who initially registered under different designations of their country.  *See, e.g.*, 79 Fed. Reg. 52027 (establishing one re-registration process for all TPS beneficiaries from Sudan, regardless which designation they initially registered under); 88 Fed. Reg. 5022 (permitting individuals who initially registered for TPS under Haiti's 2010 or 2011 designation to "re-register" under a later re-designation).

59.     In contrast, there is no discretion to vacate or early-terminate a designation once made, and a policy disagreement does not provide "inherent authority" to violate the statute.  *See Ohio Valley Env't Coal., Inc.*, 555 F.Supp.2d at 647 (distinguishing *Last Best Beef* and finding permit modification ineffective where "[a]ny mistake made by the agency was to issue a permit inconsistent not with the law, but with a policy choice").

60.     Defendants' out-of-circuit authority, Opp. 20 and n.11, recognizes that any implied reconsideration authority must yield to statutory limitations.  *See Alberston v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1951) (finding agency had authority to hear a motion for reconsideration where "nothing in the statute or rules opposed such a motion"); *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) (noting that courts have recognized implied reconsideration authority "in the absence of a specific statutory limitation"); *Gun South v. Brady*, 877 F.2d 858, 862–64 (11th Cir. 1989) (finding implied authorization for agency's temporary suspension of firearms importation where "no provision precludes the suspension").

61.    For Defendants to argue that Secretary Noem was entitled to vacate the prior TPS designation because, years earlier, Secretary Mayorkas had vacated the TPS *termination* for El Salvador and other countries, Opp. 1 n.1 and 21–22, is a false equivalency.

62.    The INA authorizes the Secretary to determine to *designate* a country for TPS benefits at any time, but permits *termination* of existing benefits only following the expiration of the most recent extension.  *See* 8 U.S.C. § 1254a(a)(1), (b)(1), (b)(3).

63.    Secretary Mayorkas's actions to continue TPS protection were consistent with the discretion afforded to the Secretary under the statute.  In contrast, vacating an *extension* would circumvent the TPS statute's termination process.

64.    In any event, Secretary Mayorkas's actions were uniquely situated: the relevant terminations had been enjoined for years and had never taken effect,[9] Secretary Mayorkas rescinded them to bring agency rules in line with judicial determinations, and the rescission was not challenged in court.

65.    Finally, Defendants cannot circumvent the plain text of the statute by relying on purported foreign policy or national security considerations.

66.    "Regardless of how serious the [purported] problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)).

---

[9]    *See Ramos v. Nielsen,* 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom. Ramos v. Wolf,* 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted,* 59 F.4th 1010 (2023), *appeal dismissed sub nom. Ramos v. Mayorkas,* 2023 WL 4363667.

67.     While Defendants emphasize the Secretary's "border and national security responsibilities," the breadth of the "national interest" standard, and "foreign policy" implications, they do not (and could not) argue that these factors authorize vacatur if the TPS statute does not allow it.  Opp. 19–22.

68.     Vacatur authority is "foreclosed" if Congress has "require[d] other procedures."  *Id.* at 20 n.11.  Congress has done so here.  *See* 8 U.S.C. § 1254a(b)(2)(B), 3(B).

69.     Because the Vacatur is "incompatible with the expressed or implied will of Congress," *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring), Defendants' reliance on *Youngstown* is misplaced.  Opp. 20 (citing *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring)).

70.     Plaintiffs are therefore likely to show that Defendants' attempt to erase Venezuela's "most recent previous extension" and then terminate TPS eighteen months before the "expiration of" that extension violates the statute.

**b.**     **Plaintiffs Are Likely to Show That Secretary Noem's Early Termination of the 2023 Designation is Contrary to Law.**

71.     Likewise, Plaintiffs are likely to show that, in issuing the Termination, DHS failed to comply with the INA's procedures and required timeframe.

72.     The unlawfulness of the Termination follows from the unlawfulness of the purported Vacatur.

73.     Pursuant to the January 2025 Extension, the 2023 Designation will expire on October 2, 2026.  90 Fed. Reg. 5961.  Thus, under the INA, any subsequent termination of the 2023 Designation must take effect *after* October 2, 2026.  *See* 8 U.S.C. § 1254a(b)(3)(B).

74.     In the Termination, Secretary Noem announced that she was "terminating the 2023 TPS designation of Venezuela" "effective April 7, 2025."  90 Fed. Reg. 9040, 9041.  In doing so,

Secretary Noem seeks to unlawfully cut short the TPS designation of Venezuela by nearly 18 months.  The Termination thus violates the directives for terminating a country's TPS designation set forth in the INA.

75.    Secretary Noem's Vacatur and Termination "contravene an express statutory command":  that any termination "shall" take effect no sooner than the most recent previous extension.  *Nat. Res. Def. Council*, 67 F.4th at 404.

76.    To read the statute otherwise would "nullif[y] textually applicable provisions meant to limit [the Secretary's] discretion."  *Id.* at 402 (quoting *New Jersey*, 517 F.3d at 583).

77.    Congress established fixed time periods for TPS precisely to eliminate confusion under prior humanitarian programs about "how long [beneficiaries] will be able to stay." 101 Cong. Rec. 25811, 25837 (Oct. 25, 1989) (Statement of Rep. Richardson) (debate on precursor to TPS statute).

78.    Although the INA authorizes Secretary Noem to terminate Secretary Mayorkas' validly issued extension, such termination "must follow a process consistent with applicable law and regulations."  *Ohio Valley Env't Coal., Inc. v. Apogee Coal Co., LLC*, 555 F.Supp.2d 640, 647 (S.D.W.Va. 2008).

79.    Plaintiffs are therefore likely to show that Secretary Noem, in issuing the Vacatur and Termination, did not follow the procedures enumerated by the statute.

**V.    <u>Plaintiffs Are Likely to Suffer Irreparable Injury Absent a Stay.</u>**

80.    Plaintiffs have established that they are likely to suffer irreparable injury absent a stay.

81.     Through their motions, and particularly through the affidavits of MRNY's Sienna Fontaine and CASA's George Escobar, Plaintiffs have established that harm to their members is both likely and severe.

82.     Plaintiffs have established that TPS holders—including members of Plaintiffs' organizations—face severe anxiety and mental anguish due to the Vacatur and impending Termination.  *See* Escobar Decl. ¶¶ 14–29, 31–33; Fontaine Decl. ¶¶ 17–26, 29–31.

83.     Plaintiffs have also established that TPS holders' families will be harmed and courts regularly find that even "temporar[y]" agency decisions can cause "irreparable harms" when they threaten to "separate[] families."  *See e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017); *Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020) (collecting cases).

84.     By April 2, in the absence of a stay, 2023 TPS holders nationwide will lose their TPS-related employment authorization.  90 Fed. Reg. 8805, 8807; 88 Fed. Reg. 68130, 68135.  By April 7, these 2023 TPS holders will lose their right to legally remain in this country based on TPS.  90 Fed. Reg. 9040, 9041.

85.      While TPS provides only "temporary" immigration status, the INA provides for TPS to remain in effect for a defined period of time—through the end of the most recent extension. 8 U.S.C. § 1254a(b)(2)(B), 3(B).  However temporary TPS may be in the abstract, in this case the January 2025 Extension concretely provides for TPS through October 2, 2026.  90 Fed. Reg. 5961.

86.     Without the extension, 2023 TPS holders will be immediately exposed to a risk of detention, and potentially, immediate deportation to a country where they face persecution and threats to their physical safety.  *See, e.g.*, Fontaine Decl. ¶¶ 23–26.

87.    The fact remains that losing 18 months of lawful immigration status (including the right to work in this country) is a cognizable and irreparable injury.

88.    In addition, the possibility that Plaintiffs' members could seek alternative immigration status does not prevent a finding that TPS holders are likely to suffer irreparable injury should the Termination go into effect on April 7, as such alternative avenues are both speculative, remote, and ever-changing under the Government's current immigration policies.

89.    As is widely publicized and touted by Defendants themselves, these potential injuries have already manifested in the detention and deportation of individuals nationwide. *See e.g.*, *Michael Kunzelman and Regina Garcia Cano*, *A timeline of the legal wrangling and deportation flights after Trump invoked the Alien Enemies Act*, The Associated Press (Mar. 21, 2025), https://apnews.com/article/trump-deportation-courts-aclu-venezuelan-gang-timeline-43e1deafd66fc1ed4e934ad108ead529; Robin Givhan, *In tweets and memes: The Trump administration's deportation policy*, The Washington Post (Mar. 19, 2025), https://www.washingtonpost.com/nation/2025/03/18/tweets-memes-trump-administrations-deportation-policy/; Order, *J.G.G. et al., v. Donald J. Trump, et al.*, No. 1:25-cv-00766-JEB, ECF No. 38; Declaration of Robert L. Cerna, *J.G.G., et al., v. Donald J. Trump, et al.*, No. 1:25-cv-00766-JEB, ECF No. 26-1; Charlie Savage and Julian E. Barnes, *Intelligence Assessment Said to Contradict Trump on Venezuelan Gang*, The New York Times (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/us/politics/intelligence-trump-venezuelan-gang-alien-enemies.html; Sergio Martinez-Beltran, *Families of deported Venezuelans dispute gang claims after deportations under Alien Enemies Act*, NPR (Mar. 21, 2025), https://www.npr.org/2025/03/21/nx-s1-5333886/families-of-deported-venezuelans-dispute-gang-claims-after-deportations-under-alien-enemies-act; Christal Hayes, *Trump revoking protections*

*for Cubans, Haitians and other migrants*, BBC (last accessed on Mar. 27, 2025), https://www.bbc.com/news/articles/c33706jy774o.

90.    Because alternative avenues for recourse are uncertain at best, and in any event would not provide redress for the imminent loss of TPS and work authorization, it would not be redundant for this Court to provide relief through the TPS program. *See Wolf*, 486 F. Supp. 3d at 969 (D. Md. 2020) (finding the Government's claimed "alternative 'avenues'" to be "dead ends" where the loss of work authorization strips asylum applicants from "the necessities to apply for asylum in the first instance").

## VI.    The Balance of the Equities and Public Interest Favor Plaintiffs.

91.    In cases where the government is a party, the third and fourth *Winter* factors merge. *Wolf*, 486 F. Supp. 3d at 969–70.

92.    The public interest is not harmed but rather served when agencies are required to "comport with [their] own rules and regulations." *Wanrong Lin v. Nielsen*, 377 F. Supp. 3d 556, 565 (D. Md. 2019).

93.    The Termination is a categorical policy that will implicate hundreds of thousands of people nationwide in direct contravention of the INA's requirements. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 327 (4th Cir. 2021) (upholding a nationwide injunction because the policy in question categorically impacts refugees "throughout the country" and "enjoining [the policy] only as to plaintiffs . . . would cause inequitable treatment of refugees and undermine the very national consistency that the Refugee Act is designed to protect").

94.    The Termination will undermine public welfare by forcing thousands of tax-paying individuals out of productive jobs. *Temporary Protected Status protects families while also boosting the U.S. Economy*, FWD.us 2 (Feb. 2024), https://www.fwd.us/wp-

content/uploads/2024/02/FWD_TPSIIIReport.pdf (finding that Venezuelans who are eligible for

TPS contribute an estimated $11.5 billion to the U.S. economy each year); *The Contributions of*

*Temporary Protected Status Holders to the U.S. Economy*, Am. Immigr. Council 3 (Sept. 2023)*,*

https://www.americanimmigrationcouncil.org/sites/default/files/research/contributionstemporary

protectedstatus_0923.pdf. (finding that in 2021, TPS holders from all countries paid an estimated

$1.3 billion in federal taxes and $966.5 million in state and local taxes).

95.     The mass exodus of these workers will inflict harm not only on them, but thousands

of dependents, including minor children, and ultimately the U.S. economy as a whole.

96.     In contrast, Defendants have not supported their arguments that a stay implicates

"public safety and national security," Stay Motion at 4–5, and that it would inhibit their ability to

enforce the immigration laws.  Opp. 25–26.

97.     In the Termination notice itself, the only support for DHS's allegation that

extending TPS for Venezuela would implicate national security concerns is a reference to a

singular news article, in which TPS holders are never mentioned.  90 Fed. Reg. 9040, 9042.

98.     Defendants' scaremongering concerning the Tren de Aragua threat is undercut by

the TPS statute's embedded eligibility requirements, which would preclude Tren de Aragua

members from becoming TPS members.    USCIS, "Temporary Protected Status,"

https://www.uscis.gov/humanitarian/temporary-protected-status (last accessed March 27, 2025);

8 U.S.C. § 1254a(c)(2); *id.* § 1158(b)(2)(A); *id.* §§ 1182(a)(2)(A)–(C), (3)(B).

99.     A stay of agency action would not bar Defendants from pursuing national security

concerns related to these particular individuals.

100.    Plaintiffs' challenges go to the legality of the Vacatur and Termination themselves, which is a question for the Court to decide. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024).

101.    As this Court has previously found, if the Vacatur and Termination are likely unlawful, they cannot be justified on the basis that Defendants believe them to be good policy because Defendants have no legitimate interest in enforcing unlawful or unconstitutional decisions. *Sanchez v. McAleenan*, 2024 WL 1256264, at *14 (D. Md. March 25, 2024) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice.") (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

102.    Likewise, if this Court stays the Termination to revert to the *status quo ante*, then Defendants' ability to enforce the relevant TPS decisions will merely be delayed pending resolution of this case on the merits.

103.    The balance of equities and public interest therefore weigh in favor of granting a stay.

## VII.    <u>A Ruling in Favor a Stay Applies as to All Venezuelan TPS Holders.</u>

104.    The "APA's default rule … empowers this Court to 'hold unlawful and set aside agency action.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 295 (4th Cir. 2018) (citing 5 U.S.C. § 706(2)(A)).

105.    The APA explicitly authorizes any person who has been aggrieved by a "final agency action to obtain judicial review in federal district court" and have that court set aside agency action that is, as here, not in accordance with law. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 828 (2024) (Kavanaugh, J., concurring).

106.    Such a vacatur order under the APA permits all affected individuals, not just the individual plaintiffs, to obtain relief.  *Id.* at 827.

107.    "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Maryland v. U.S. Dep't. of Agric.*, — F.Supp.3d —, 2025 WL 800216 (D. Md., Mar 13, 2025); *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("[W]e conclude that the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."), *cert. granted in part*, — U.S. —, 2025 WL 65914 (Mem.) (Jan. 10, 2025).

108.    The Termination is a categorical policy that will implicate hundreds of thousands of people nationwide, and not a determination that individual members of Plaintiffs' organizations should not receive TPS.

109.    As the proper remedy under Section 705 is a stay of Secretary Noem and DHS's attempt at Vacatur and Termination, a ruling in Plaintiffs' favor allows for *all* Venezuelan TPS holders to obtain relief.  *See  Maryland v. U.S. Dep't. of Agric.*, — F.Supp.3d —, 2025 WL 800216, *25 (D. Md., Mar. 13, 2025) ("the proper provisional remedy under . . . Section 705 is a stay of the Government's efforts.").

110.    Universal relief is therefore not overbroad.  *See HIAS, Inc. v. Trump*, 985 F.3d 309, 327 (4th Cir. 2021) (upholding a nationwide injunction because the policy in question categorically impacts refugees "throughout the country" and "enjoining [the policy] only as to plaintiffs . . . would cause inequitable treatment of refugees and undermine the very national consistency that the Refugee Act is designed to protect").

Date: March 27, 2025

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:   */s/ Nowell D. Bamberger*
      Nowell D. Bamberger (21111)
      Matthew D. Slater (05582)
      Rathna J. Ramamurthi (*pro hac vice*)
      Madeline Hundley (*pro hac vice*)
      Gillian Isabelle (*pro hac vice*)
      Ava Kazerouni (*pro hac vice*)
      2112 Pennsylvania Ave NW
      Washington, D.C. 20037
      Tel. (202) 974-1500
      Fax (202) 974-1999
      nbamberger@cgsh.com
      mslater@cgsh.com
      rramamurthi@cgsh.com
      mhundley@cgsh.com
      gisabelle@cgsh.com
      akazerouni@cgsh.com

WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS

      Ryan Downer (*pro hac vice*)
      Sarah L. Bessell (30969)
      Madeleine Gates (seeking admission to D.Md.)
      Ellie M. Driscoll (*pro hac vice*)
      700 14th St. #400
      Washington, D.C. 20005
      Tel. (202) 319-1000
      Fax (202) 319-1010
      ryan_downer@washlaw.org
      sarah_bessell@washlaw.org
      madeleine_gates@washlaw.org
      ellie_driscoll@washlaw.org

CASA, INC.

      Nicholas Katz, Esq. (21920)
      Hyattsville, MD 20783
      Tel. 240-491-5743
      nkatz@wearecasa.org

MAKE THE ROAD NEW YORK

Harold A. Solis (*pro hac vice*)
Paige Austin (*pro hac vice*)
301 Grove Street
Brooklyn, NY 11237
Tel. (718) 418-7690
Fax (866) 420-9169
harold.solis@maketheroadny.org
paige.austin@maketheroadny.org

*Attorneys for Plaintiffs*